# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **CORIZON, LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. _____** |
| ) | |
| **PRISCILLA WAINWRIGHT,** ) | **Judge _____** |
| **in her official capacity as Director of** ) | **Magistrate Judge _____** |
| **Contracts Management for the State** ) | |
| **of Tennessee Department of** ) | |
| **Correction; TONY C. PARKER, in** ) | |
| **his official capacity as Commissioner** ) | |
| **for the State of Tennessee** ) | |
| **Department of Correction;** ) | |
| **MICHAEL F. PERRY, in his official** ) | |
| **capacity as Chief Procurement** ) | |
| **Officer for the State of Tennessee** ) | |
| **Central Procurement Office;** ) | |
| **MAGGIE WILSON, in her official** ) | |
| **capacity as Sourcing Account** ) | |
| **Specialist for the State of Tennessee** ) | |
| **Department of Correction; JOHN** ) | |
| **DOES 1-10, additional employees of** ) | |
| **the State of Tennessee operating in** ) | |
| **their official capacities; and** ) | |
| **Centurion of Tennessee, LLC (as a** ) | |
| **party with an interest in the subject** ) | |
| **of the action),** ) | |
| ) | |
| **Defendants.** ) | |

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF</u>

Plaintiff Corizon, LLC ("Corizon") brings this Complaint against Defendants

Priscilla Wainwright, in her official capacity as Director of Contracts Management

4815-5620-5515

for the State of Tennessee Department of Correction ("TDOC"); Tony C. Parker, in his official capacity as TDOC Commissioner; Michael F. Perry, in his official capacity as Chief Procurement Officer for the State of Tennessee Central Procurement Office ("CPO"); and Maggie Wilson, in her official capacity as Sourcing Account Specialist for TDOC. Because Corizon has no way of knowing the exact roles played and precise decisions made by any particular State of Tennessee (the "State") employee, it has named as Defendants those State employees most clearly involved in the solicitation and contract award at issue. To the extent there may be yet unidentified individual State employees also engaged in the conduct identified herein or who must be enjoined to prevent the legal violation complained of herein, Corizon also names additional John Doe Defendants, who are individual State employees acting in their official capacities to violate Corizon's rights under federal law. Corizon also names Centurion of Tennessee, LLC ("Centurion") as a Defendant as a party with an interest in the subject of the action under Rule 19 of the Federal Rules of Civil Procedure.

This Complaint seeks prospective injunctive relief against the State employee Defendants, to prevent their ongoing and threatened violations of the Sherman Antitrust Act (the "Sherman Act"). The Sherman Act claim in this action is brought pursuant to the doctrine of *Ex Parte Young*.

In support of its claim, Corizon states as follows:

# INTRODUCTION

Corizon's Sherman Act claim arises out of the now completed solicitation of a contract (the "Contract") in the Tennessee inmate health care services market (the "Market"). The Contract sets the terms by which a private contractor will provide behavioral health services to inmates housed in State prisons overseen by TDOC. The solicitation process, the Contract terms, and the decision to award the Contract to Corizon's competitor, Centurion, were all overseen and approved by State employee Defendants from both TDOC and CPO. Transition activities related to the Contract are presently underway and ongoing and the Contract is set to go into effect no later than November 1, 2020. The performance and implementation of the Contract should and must be enjoined.

An injunction is needed because, through the solicitation and Contract approval process, the State employee Defendants "went rogue." They abandoned reasonable TDOC and CPO policy and procedure that fostered competition in the Market. They unilaterally and inexplicably replaced such policy and procedure with Contract requirements and terms that eliminate competition.

This Market competition killing move was made in the middle of the Contract solicitation process when the State employee Defendants increased the "performance bond" required for the Contract from $1,000,000.00 to approximately $120,000,000.00 (the "Performance Bond Change" or simply the "Change").

Nothing like the Performance Bond Change had ever happened before in the Market, there is no reasonable explanation for it, and most respondents were flummoxed by it. Corizon assumed at first it was a mistake. Historically, TDOC and CPO have only required a modest, reasonable performance bond for services contracts in the Market. The State employees Defendants' decision to astronomically increase the performance bond required for the Contract makes no sense.

As one casts about for an explanation, it is disquieting to learn that, during the solicitation process and contemporaneous with the Performance Bond Change, Wes Landers, the former Chief Financial Officer for TDOC, was discussing employment opportunities with Centurion, the ultimate winning respondent for the Contract and the only respondent with the financial backing required to meet the new performance bond requirement for this Contract. Landers, after the Performance Bond Change but prior to the completion of the solicitation process, left TDOC to take a job with Centurion.

Whether the Performance Bond Change was tied to Landers' future employment with Centurion or otherwise rooted in misconduct will need to await further discovery. Whatever the explanation, the Performance Bond Change is: (i) the result of rogue actions by individual State employee Defendants, (ii) inconsistent with Tennessee law and prior TDOC and CPO practice, and (iii) destructive to competition in the Market. The Change all but ensures that only one participant in

the Market, Centurion, will be able to win services contracts in the future. The solicitation and procurement process is designed to foster competition, not eliminate it.

The most pressing issue is the Contract, which is set to go into effect no later than November 1, 2020. The transition process is massive, involving many employees at facilities across the State. Once complete, it will be impossible as a practical matter, even if the Court finds Corizon's claim meritorious, to return the parties to their proper positions.

Relying on the Sherman Act, Corizon seeks an immediate temporary restraining order followed by a preliminary injunction enjoining the implementation and performance of the Contract. The Court should preserve the status quo pending resolution of this litigation, and a final determination of Corizon's claims on the merits. Preserving the status quo will ensure that inmate behavioral health services needs will continue to be met, while allowing the litigation process to determine the scope of the Sherman Act violation in this case.

The issues raised in this case also have a broader implication to future contracts, like the inmate general health services contract that will be the subject of competition in the near future. Accordingly, Corizon also seeks a preliminary and permanent injunction not only prohibiting the implementation of the Contract, which is the product of prior unlawful conduct, but also prohibiting State employees from

imposing a maximum liability performance bond requirement in the competition for future inmate behavioral and/or health services contracts absent clear and express direction from the State legislature.

**PARTIES, JURISDICTION AND VENUE**

1.     Plaintiff Corizon is a provider of healthcare services in correctional facilities throughout the United States. Corizon is a Missouri Limited Liability Company with its principal place of business at 103 Powell Court, Brentwood, Tennessee 37207.

2.     Defendant Priscilla Wainwright ("Wainwright") is sued in her official capacity as Director of Contracts Management for TDOC. Upon information and belief, Wainwright can be served with process at 320 Sixth Avenue North, Nashville, Tennessee 37243.  Further upon information and belief, Wainwright was directly involved in the solicitation process and decisions at issue.

3.     Defendant Tony C. Parker ("Parker") is sued in his official capacity as Commissioner of TDOC. Upon information and belief, Parker can be served with process at 320 Sixth Avenue North, Nashville, Tennessee 37243.  Further upon information and belief, Parker was directly involved in the solicitation process and decisions at issue.

4.     Defendant Michael F. Perry ("Perry") is sued in his official capacity as Chief Procurement Officer for the State. Upon information and belief, Perry can be

served with process at WRS Tennessee Tower, 3rd Floor, 312 Rosa L. Parks Avenue, Nashville, Tennessee 37243. Further upon information and belief, Perry was directly involved in the solicitation process and decisions at issue.

5.      Defendant Maggie Wilson ("Wilson") is sued in her official capacity as Sourcing Account Specialist for TDOC. On information and belief, Wilson can be served with process at 320 Sixth Avenue North, Nashville, Tennessee 37243. Wilson was directly involved in the solicitation process and decisions at issue.

6.      Defendants John Doe 1-10 are additional individual employees of the State of Tennessee who, acting in their official capacities, violated Corizon's rights under the Sherman Act in their processing, evaluating, and awarding of the Contract to Centurion and who would violate Corizon's rights and injure competition in Market by implementing and performing the Contract with Centurion. Corizon anticipates that additional discovery will reveal the identities of these specific individuals.

7.      Corizon does not have full insight into the allocation of responsibilities among State employees. Upon information and belief, each of the State employees identified as a Defendant played some role in the decisions and actions at issue here and/or will play a role in the implementation and performance of the contract at issue in the lawsuit.

8. Centurion is a Tennessee limited liability company with its principal place of business in St. Louis, Missouri. Centurion may be served through its registered agent, CT Corporation System, at 300 Montvue Road, Knoxville, Tennessee 37919-5546. Centurion is named as a Defendant because it arguably has an interest in the Contract.

9. This case raises a federal question under the Sherman Act (15 U.S.C. § 1 *et seq*.), and thus, the Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

10. The Court has personal jurisdiction over the State employee Defendants as they perform their official duties in Tennessee and over Centurion because it does business in Tennessee.

11. This Court is the appropriate venue for this dispute, as the agreement in restraint of trade has been executed and is planned to occur in this judicial district. *See* 28 U.S.C. § 1391 and 15 U.S.C. § 22.

## FACTUAL ALLEGATIONS

### General Background on the Provision of
### Health Care Services to Inmates in Tennessee

12. Individuals convicted of State law crimes and sentenced to prison in Tennessee receive health care services provided by the State.

13.     These health care services include general medical care, as well as behavioral health services, like treatment for psychiatric issues, alcohol and drug abuse, and other mental issues such as depression and anxiety.

14.     The State is not in the position to furnish the personnel and expertise required to efficiently and effectively provide these health care services to all inmates, and thus the State, primarily in conjunction with TDOC and CPO, contracts with private companies, which have specialized experience in providing inmate health care services.

## The Market

15.     There are several companies that often compete for Market contracts in Tennessee, including Corizon, Centurion, Wellpath, Wexford and, more recently, VitalCore.

16.     Of these entities, Centurion is not only the largest, but it is also financially backed by an enormous corporate parent -- Centene, a Fortune 100 company with more than $60 billion in annual revenue.

17.     Corizon and Wellpath are headquartered in Tennessee, but other Market participants, including Centurion, are headquartered in other states.

18.     The Market is not fluid, with Market participants shuttling in and out, new companies forming and others leaving the Market.  Instead, this Market tends

to involve the same participants responding to solicitations for State contracts time and time again.

19. Contracts in the Market are multi-year contracts that at present exceed $100,000,000.00 in value.

20. The State solicits proposals for these contracts in broad categories within the Market. For instance, the State will solicit proposals for the general inmate medical services contract and then separately solicit proposals for the inmate behavioral health services contract.

21. The Market has, prior to the events giving rise to this case, been competitive and has functioned effectively. The State publishes a Request for Proposals (an "RFP") and a series of established, recognized private companies respond, offering the prices and services consistent with the reasonable solicitation requirements and competing for the business.

22. Contracts between a state and a private contractor in the inmate healthcare context sometimes, but not always, require a "performance bond," that is, an amount of money the private contractor "posts," through a third-party surety to reduce a state's risk by guaranteeing performance under a contract.

23. Prior to the events giving rise to this case, the amount of the performance bond TDOC/CPO required for a Market contract had never been an outcome determinative consideration in the solicitation process.

24.     This is because the terms of the Market services contracts proposed by TDOC/CPO have consistently required only a modest performance bond, generally less than 5% of the contract value, and often much less.

25.     This policy and practice is consistent with Tennessee law, which vests the State with the right, but not the obligation, to require an "appropriate" performance bond for a State contract. See Tenn. Code. Ann. § 12-3-502(i).

## Corizon's Business and Work in Tennessee

26.     Corizon provides inmate health care services throughout the country but is headquartered here in the Middle District, in Williamson County, Tennessee.

27.     Corizon has been in the inmate health care services business for more than 40 years, focusing on a science-based approach that protects inmate mental and physical health in cost-effective and efficient manner.

28.     Corizon was awarded the Tennessee inmate behavioral health care services contract in 2012 (the "2012 Contract") and has provided such services since that time, with a new contract having been most recently awarded in 2016 (the "2016 Contract").

29.     Since 2012, Corizon has performed its responsibilities and obligations under the Tennessee inmate behavioral health services contract with integrity and fairness and without complaint from the State.

30.    Over the past eight years, Corizon has built a strong partnership with the State, substantially improving the provision of behavioral health services to inmates in Tennessee.

### Corizon's and the State's Historic Experience with Performance Bonds

31.    The 2016 Contract, which is currently in effect, has a value of approximately $76,000,000.00.

32.    The 2016 Contract has a modest performance bond requirement of $1,000,000.00, approximately 1.3% of the value of the 2016 Contract value.

33.    For more than decade, Corizon has sought to win contracts in the Market. Throughout that time period, TDOC/CPO have always required only a modest and "appropriate" performance bond to secure the performance of a Market services contract, typically much less than 5% of the maximum value under any given contract.

34.    For example, in 2009, Corizon was awarded the general medical services contract in the Market (the "2009 Contract"). The 2009 Contract worth more than $181,000,000.00. The performance bond on that contract was $5,000,000.00, or about 2.8% of the contract value.

35.    This low ratio of performance bond to maximum contract liability is consistent with Corizon's experience in other states where it provides inmate behavioral health services.

36.     Corizon also does business with several states (including Michigan, Maryland, and Wyoming) that require no performance bond whatsoever for their inmate health care services contracts.

37.     Throughout the course of Corizon's relationship with the State, TDOC has never suggested that any performance bond was inadequate.

38.     TDOC has likewise never made a claim on the performance bond of any Corizon contract with the State of Tennessee.

## Requiring a Large Performance Bond
## Makes No Sense for Market Services Contracts

39.     The previously existing policy and practice of TDOC and CPO to require a modest performance bond in a Market services contract makes sense and fosters competition.

40.     Significant performance bonds are typically only required when there is a substantial risk that the contractor's failure to perform will expose the State to significant losses.

41.     There is no such risk in a Market services contract.

42.     In a Market services contract, TDOC tracks the quality of services provided and controls the taxpayer investment by only paying for services after they are rendered.

43.     Moreover, TDOC can terminate a Market services contract for any reason upon 30 days written notice.

44.     This is distinct from a setting where large performance bonds are reasonable, such as in the construction context.  In that context, the CPO/State agencies have required a "maximum liability performance bond," meaning that a construction contractor must provide a bond of 100% of the maximum value of the contract as a condition of being awarded the contract.

45.     Requiring a maximum liability performance bond for a more than $120,000,000.00 Market services contract serves no reasonable interest, increases taxpayer cost, and stifles competition for several reasons.

46.     A performance bond is obtained from a third-party surety.

47.     A surety, by virtue of the bond, is agreeing to step into the shoes of the contracting party and perform the obligations of the contract if it cannot.

48.     A surety will require a party seeking a large performance bond to have great financial strength and strong collateral as a condition of providing the bond.

49.     Corizon, despite being a financially strong competitor, could not secure a $120,000,000.00 plus performance bond.

50.     Upon information and belief, very few companies would be in a position to provide such a performance bond.

51.     Moreover, even if a respondent was able to obtain a $120,000,000.00 plus performance bond, it must pay for it.

52.     The larger the bond, the more the respondent must pay the surety.

53.     The cost of an outsized performance bond must be factored into the overall proposal submitted to the State, which increases, in turn, the cost of a contract to the State (and thus the taxpayer).

54.     Requiring a maximum liability performance bond in a Market services contract bears no rational connection to the magnitude of the risk incurred by the State, a point TDOC has implicitly recognized by consistently only requiring a modest performance bond in connection with such contracts.

### The Solicitation Process for the Contract

55.     Corizon's 2016 Contract with TDOC is set to end on October 31, 2020.

56.     Solicitations for State inmate health services contracts begin with the State issuing an RFP.  With the end of the 2016 Contract approaching, CPO and TDOC, through Wilson, put out an RFP for a new behavioral health services contract on or about August 8, 2019 ("RFP Release 1").  A true and correct copy of an excerpt from RFP Release 1 is attached as **Exhibit A**.

57.     RFP Release 1 solicited proposals for a multi-year contract to provide behavioral health services for certain State-managed prison and inmate health care facilities throughout the State.

58.     Consistent with the policy and previous practice of requiring relatively modest, but reasonable, performance bonds in Market services contracts, RFP

Release 1 stated that the winner of the Contract would be required to post a $1,000,000.00 performance bond.

59.     Section 1.10 of RFP Release 1 expressly states:

The State shall require a Performance Bond upon approval of a contract pursuant to this RFP.  The amount of the Performance Bond shall be a sum equal to one million dollars ($1,000,000) and said amount shall not be reduced at any time during the period of the contract.

See RFP Release 1, **Exhibit A**, at § 1.10 (emphasis original).

60.     Over the next several months, respondents submitted questions to Wilson and worked on gathering and providing additional information in support of their proposals.

61.     Corizon initially operated under the impression that the performance bond requirement would be $1,000,000.00, the same as the performance bond requirement of the 2016 Contract and, upon information and belief, other respondents did as well.

**Wes Landers Goes to Work for the Largest Respondent and
the Performance Bond Requirement Skyrockets**

62.     Wes Landers was the Chief Financial Officer (CFO) of TDOC from approximately September 2012 until mid-March 2020.

63.     Upon information and belief, Landers was involved in and oversaw in some way the solicitation process for significant TDOC contracts, including the Contract. True and correct copies of a series of e-mails from and to Landers that

were produced by the State as part of the post-award open file disclosure process are attached as **Collective Exhibit B** (the "Internal Landers Communications").

64.     Throughout early 2020, Landers repeatedly communicated, including through written correspondence, with Defendant Wainwright, TDOC's Director of Contracts Management, about the status of the procurement process for the Contract. See Internal Landers Communications, **Collective Exhibit B**.

65.     At the same time Landers was exchanging in his TDOC internal dialogue, he was also considering private sector employment in the Market, specifically with Centurion.  True and correct copies of a series of e-mails between Landers and Centurion that were produced by the State as part of the post-award open file disclosure process are attached as **Collective Exhibit C** (the "Landers/Centurion Communications").

66.     Landers secured an offer of employment with Centurion, and, upon information and belief, that offer was in place by late January 2020. Upon further information and belief, Landers was planning to leave to public sector employment and become a Centurion employee at that time.

67.     Despite the fact that Landers secured a lucrative job with one of the respondents under consideration, in February 2020, he continued to communicate with Wainwright about the status and terms of the Contract solicitation.  See Internal

Landers Communications and Landers/Centurion Communications, **Collective Exhibits B and C** respectively.

68. At the same time, one or more State employees, perhaps even someone that reported directly to Landers, revised RFP Release 1 to require that the winning respondent post a performance bond equal to "one hundred percent (100%) of the awarded contract maximum liability." Upon information and belief, TDOC consulted with Defendant Perry and the CPO in connection with the Performance Bond Change.

69. The estimated total, maximum liability for the Contract has, at all relevant times, been in excess of $100,000,000.00 and, as ultimately signed, exceeds $123,000,000.00. A performance bond in excess of $120,000,000.00 would carry an annual premium well in excess of $1,000,000.00, thus adding more than $5,000,000.00 to the overall cost of the Contract.

70. At the same time Landers was pursuing a job with Centurion, other State employees were overseeing a change in the bonding requirement from $1,000,000.00 to more than $123,000,000.00, a change of more than 12,000%.

71. Centurion is backed by a massive corporate parent, Centene, and is in a much better position to satisfy the new bonding requirement than the other Market participants.

72.     On February 18, 2020, Landers formally accepted the employment with Centurion that, upon information and belief, had been offered to him weeks earlier, i.e. before the Change had been made internally.

73.     On February 25, 2020, Wilson formalized the Change, issuing a revised, amended RFP ("RFP Release 2") to the respondents with the requirement that the winning respondent provide a performance bond in the amount of the "maximum liability" of the Contract.  A true and correct copy of an excerpt from RFP Release 2 is attached as **Exhibit D**.

74.     RFP Release 2, issued February 25, 2020 states:

> The State shall require a Performance Bond upon approval of a contract pursuant to this RFP.  The amount of the Performance Bond shall be a sum equal to one hundred percent of the contract's maximum liability and said amount shall not be reduced at any time during the period of the contract.

See RFP Release 2, **Exhibit D**, at § 1.10 (emphasis original).

75.     The very next day, on February 26, 2020, Centurion delivered its "New Hire Welcome Packet" to Landers.   See Landers/Centurion Communications, **Collective Exhibit C**.

76.     The State's official records indicate that Landers "retired," something that is not true.  A true and correct copy of Landers' March 16, 2020 TDOC Resignation Form produced by the State as part of the post-award open file disclosure process is attached as **Exhibit E**.

## **Corizon Challenges the Changed Solicitation Terms**

77.     Corizon repeatedly raised concerns with various State employee Defendants about the Performance Bond Change.

78.     On May 20, 2020, Thomas Alsup, a Corizon representative involved in the solicitation process, emailed Wilson, stating that the bonding requirement change was "highly unusual" and that "bond companies will not write a bond for the size value the State is requesting." True and correct copies of communication between Alsup and Wilson are attached as **Collective Exhibit F**.

79.     Alsup suggested the Change had been a misunderstanding, reminding Wilson that the prior contract had a $1,000,000.00 performance bond, which was industry standard and consistent with the TDOC's prior practice. Id.

80.     Wilson responded on May 26, 2020, stating the bond requirement would not be changed. Id.

81.     Alsup responded the same day, pointing out there was no State policy that supported such a massive performance bond in a Market services contract, and such large maximum liability performance bonds, per State policy, were traditionally reserved for the construction context. Id.

82.     Alsup explicitly asked Wilson to provide the State policy that would support such an enormous bond in a Market services contract. Id.

83.     Wilson did not provide any such policy.

84.     Alsup followed up with Wilson on June 1, 2020, providing the bonding requirement language for the inmate health services contract for the Commonwealth of Pennsylvania, a contract with a maximum value of approximately $250,000,000.00 and a $5,000,000.00 performance bond.

85.     Wilson did not respond to this email.

86.     Despite the Change, Corizon attempted to submit a reasonable proposal that did not require a 100% maximum liability performance bond, notifying Wilson that requiring such a bond would result in a significant increase in the contract price.

87.     In a June 4, 2020 letter back to Corizon in response to this submission, Wilson stated "it appears that exceptions were taken to the mandatory requirement for the Performance Bond . . . A response must not include alternate contract terms and conditions. If a response contains such terms and conditions, the State, at its sole discretion, may determine the response to be a nonresponsive counteroffer and reject it." True and correct copies of Wilson's June 4, 2020 letter to Corizon and Corizon's response to the same are attached as **Collective Exhibit G**.

88.     Wilson informed Corizon that the alternative performance bond arrangement needed to be withdrawn, or TDOC would reject Corizon's proposal on that basis. Id.

89.     The next day, Corizon responded, acknowledging Wilson's letter and stating that "Because of the unprecedented bond amount, Corizon Health needs

additional time to make a determination on this exception. In addition, the result of this will likely result in a substantial price increase of approximately 10%." Id.

90.     Corizon requested an additional week to consider the matter.  Id.

91.     Wilson rejected Corizon's request and Corizon's submission was deemed non-responsive.  Corizon was not considered for the potential Contract award.  Id.

92.     Corizon's legal counsel also reached out to CPO raising concerns about the changed bonding requirement and the involvement of Landers in the solicitation process to no avail.

93.     The State employee Defendants never denied that Landers was involved in the consideration of the respondent submissions, or that he went to work for Centurion following the Change and while the solicitation process was ongoing. Nor have they identified any logical rationale for the Change.

94.     There has been no indication that the State employee Defendants plan to restore the performance bond requirement to more reasonable levels in future solicitations for service contracts in the Market.

**TDOC Awards the Contract to Centurion**

95.     After the Change was formalized, Centurion was in the unique position of being able to produce a letter to Wilson stating that Centurion had bonding

capacity in excess of $500,000,000.00 in the aggregate and bonding capacity in excess of $100,000,000.00 for any individual contract.

96.     No other respondents submitted a letter making similar representations and, upon information and belief, no other respondent was in a position to do so. Corizon did not have the ability to provide a maximum liability performance bond.

97.     Upon information and belief, the Contract could not be awarded and approved without the agreement of Defendants Wilson, Parker, Perry and Wainwright, who all, along with certain John Doe Defendants, approved the awarding of the Contract to Centurion, despite the deviation from longstanding practice.

98.     On July 16, 2020, Wilson notified the various respondents that the State intended to award the Contract to Centurion.

99.     The State employee Defendants have continued to take deliberate actions to move the Contract toward implementation despite the fact that its terms are inconsistent with State policy and procedure and despite the damaging impact to competition in the Market.

100.    The State employee Defendants have also permitted Centurion various deviations from the protocol called for by the terms of RFP Release 2, as amended.

101. Apparently, even for a company as well-heeled as Centurion, coming up with a $120,000,000.00 performance bond for a services contract proves to be quite a challenge.

102. For example, under the terms of RFP Release 2, as amended, Centurion was required to post its 100% performance bond by August 4, 2020, but did not do so.

103. When Corizon pointed out this anomaly with respect to the timing to TDOC, TDOC Inspector General Kelly Young told Wilson "I really don't have patience for them being whiny . . . ." A true and correct copy of communications between Young and Wilson are attached as **Exhibit H**.

104. The State also increased the amount of the award for the Contract from approximately $118,000,000.00 at the time it was originally announced to more than $123,000,000.00 at the time of signing, with no explanation of the reason for the increase.

105. The Contract between TDOC and Centurion is set to go into effect on November 1, 2020. Id. A true and correct copy of the Contract signed by the State and by Centurion is attached as **Exhibit I**. Transition activities related to the Contract are presently underway and ongoing and the Contract is set to go into effect no later than November 1, 2020. The state-wide transition process is a massive undertaking involving many facilities and employees.

## The Damage to the Relevant Market From this Agreement

106. The Market is a specialized, critically important market in Tennessee, involving a handful of private contractors who, through the benefit of their experience and expertise, can provide cost-effective and supportive care and treatment to inmates housed in Tennessee prisons.

107. This Market is of critical importance to Tennessee residents, who are ultimately funding the work done by these private companies and who have an indirect interest in seeing that inmates in Tennessee prisons have their health care needs met in a cost-effective, but also compassionate, manner.

108. The Market is also of critical importance to the inmates themselves, who have a direct interest in quality health services while they pay their debt to society and await reentry.

109. This Market has previously functioned efficiently. The State of Tennessee, pursuant to Tennessee law and the procurement policies and procedures that implemented that law, solicited proposals from time to time from established, recognized private inmate health care service providers to provide health care services to inmates.

110. Because of the specialized nature of the Market, the same several respondents are often involved. However, competitive responses were submitted by companies across the economic spectrum, from enormous companies backed by

massive corporate parents like Centurion to smaller companies based in and outside of Tennessee.

111.   The State's policy of tying procurement considerations to the cost-effective provision of quality services kept the Market running effectively, where all respondents had a reasonable opportunity to compete for a Market services contract.

112.   The State employee Defendants' decision to change the performance bond requirements—approximately 6 months after the original RFP was issued—for the Contract and apparently for all Market services contracts thereafter, upon information and belief, has and will functionally eliminate competition in the Market.

113.   The contracts typically solicited in this Market tend to be services contracts worth hundreds of millions of dollars. Imposing a 100% maximum liability performance bond condition on such a contract requires the respondent to provide a performance bond in the hundreds of millions of dollars.

114.   Upon information and belief, such a massive bond is not something that any of the typical respondents in the Market can reliably obtain, except Centurion.

115.   Upon information and belief, only Centurion, backed by its massive corporate parent, Centene, is in the position to obtain such a bond, without otherwise considerably injuring other areas of its business.

116.   The unreasonable restrictions that the State employee Defendants have imposed on the Market will, upon information and belief, eliminate competition, as only Centurion, now the employer of former TDOC CFO Wes Landers, will be able to effectively compete on Market service contracts.

117.   The State employee Defendants' actions are not supported by law or regulation.

118.   Indeed, in its laws and regulations, the State has committed to (i) competitive, fair procurement for government contracts, (ii) not imposing unreasonable or outlandish terms that only benefit certain entities, (iii) imposing only "appropriate" performance bonds, and (iv) avoiding actual and potential conflicts of interest in the solicitation process. *See e.g.* T.C.A. 12-3-501 (public contracts shall be awarded by "<u>competitive</u> sealed solicitations by the central procurement office"); T.C.A. 12-3-502(i) (procurement bonds are not required for State contracts/performance bonds "appropriate" in amount may be required).

119.   For instance, the CPO, in recognition of the vital role fair and transparent public solicitation and purchasing plays in the State, has issued a comprehensive Business Conduct and Ethics Policy (the "Policy"), Policy Number 2013-009 (as amended August 17, 2017).  A true and correct copy of the Policy is attached as **<u>Exhibit J</u>**.

120.   That Policy commits the State to full and open competition, transparency, and the avoidance of even the appearance of impropriety.  The Policy is binding on all State employees involved in the procurement of government contracts.

121.   Paragraph 4 of the Policy states "[a]ll Central Procurement Office or Covered State Agency Personnel involved in public Procurement or Contract Administration must act in good faith and deal with the public in a fair and impartial manner.  All Central Procurement Office or Covered State Agency Personnel must act with honesty and integrity and shall remove themselves from Procurement or Contract Administration in the event they cannot act in good faith or conduct their work in a fair and unbiased manner."

122.   Here, the State employee Defendants abandoned settled policy and practice consistent with State law, instead embracing an irrational and nonsensical performance bond requirement that eliminated the competitive process that the relevant statutes and regulations are designed to foster.

123.   Goods used in connection with providing inmate behavioral health services to the State have in the past and will in the future be purchased outside the State.  In performing the 2012 and 2016 Contracts, physicians employed by Corizon have used medications manufactured outside the State and any respondent under the Contract will necessarily do the same.

# CLAIM FOR RELIEF

## VIOLATION OF 15 U.S.C. § 1

124. Corizon re-alleges and incorporates the foregoing paragraphs as if fully restated herein.

125. Corizon is not asserting a claim against Centurion but rather names it solely as an interested party.

126. The State employee Defendants, by and through their anticompetitive actions as outlined herein, have entered a contract, combination, or conspiracy in restraint of trade and commerce that prevents all but one entity, Centurion, from providing inmate health care services in the relevant Market and thereby have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

127. The Contract and restraint of trade affects interstate commerce as many of the goods and services to be provided will come into Tennessee from other states or be rendered remotely from other states. Additionally, other respondents on the Contract, including Centurion, were formed in and/or are headquartered in states other than Tennessee, and the restraint of trade limits those companies from doing business in Tennessee thereby likewise affecting interstate commerce.

128. In furtherance of their contract, combination or conspiracy in restraint of trade, the State employee Defendants have agreed and acted upon a policy of excluding all but Centurion from the inmate health care services Market by imposing

a performance bond requirement that only Centurion can reasonably meet, thereby harming competition in the Market.

129. By overhauling the performance bonding requirement during the Landers transition, rejecting arguments that the new performance bond requirement will destroy competition in this Market, and awarding the Contract to the most financially powerful Market participant, the State employee Defendants have demonstrated a unity of purpose, as well as common design and understanding, to reduce or eliminate competition in the Market.

130. As is demonstrated by the continued insistence of the State employee Defendants on proceeding with the Centurion contract and imposing the same bonding requirement in the future in this Market, the State employee Defendants possessed, and still possess, a conscious commitment to a common scheme designed to achieve an unlawful objective.

131. The State employee Defendants' actions constitute a continuing agreement, understanding, and concert of action involving Market participants.

132. The State employee Defendants' actions have the purpose and effect of unreasonably restraining trade in the Market, the net effects of which are anticompetitive, and any purported procompetitive justifications are illegitimate and pre-textual.

133. The State employee Defendants' actions create a series of anticompetitive effects in the Market, including:

(a)     preventing and deterring inmate health care services providers in Tennessee and other states from competing for Market contracts because they cannot meet the unreasonable bonding requirement, at least without causing significant financial strain to their business;

(b)     depriving the taxpayer from enjoying the benefits of competition in this Market, forcing the taxpayer to incur substantial additional costs in funding inmate health care services contracts, with no commiserate improvement in inmate health and wellness;

(c)     depriving inmates in the State of Tennessee from enjoying the same benefits of competition; and

(d)     reducing innovation and creativity in services in the Market.

134.   The State employee Defendants' actions constitute a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

135.   Alternatively, the State employee Defendants' actions constitute a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the Rule of Reason. On their face, the State employee Defendants' actions restrict, and are intended to restrict, the method of competing in the Market, thereby restricting the number of competitors and causing prices in that market to rise, maintain, or stabilize above

competitive levels. The State employee Defendants have market power in this Market and can enforce their competition-restricting agreement by using the legal authority of the State to preclude entrance into the Market or to restrict the method of competition in the Market. There is no legitimate business justification for the State employee Defendants' agreement.

136.   The State employee Defendants' actions evidence an intent to deprive inmate health care services providers, other than Centurion, of a fair opportunity to compete in the Market. Through their actions, the State employee Defendants intend to reduce the number of providers of inmate health care services in Tennessee and the output of such services.

137.   The State employee Defendants' actions do not enhance, and in fact weaken, the public health and safety in Tennessee and do not serve any legitimate public purpose.

138.   As a direct, proximate, and foreseeable result of the State employee Defendants' actions, Corizon has or will suffer irreparable injury if the Contract is further implemented and performed and/or if all future Market services contracts impose the same maximum liability performance bond requirement, because Corizon will forever lose the opportunity to fairly compete in the Market for the Contract and subsequent contracts with the same or similar performance bond terms.

## **PRAYER FOR RELIEF**

WHEREFORE, Corizon respectfully requests relief as follows:

(a)     Declare that the State employee Defendants' actions violated the Sherman Act;

(b)     Enter an order temporarily restraining, and then preliminarily enjoining the State employee Defendants from implementing and performing the Contract, thereby maintaining the status quo pending a full hearing on the merits;

(c)     Permanently enjoin Defendants from proceeding under the Contract, as it is the product of conduct violating the Sherman Act;

(d)     Permanently enjoin the State employee Defendants from requiring maximum liability performance bonds in future health services solicitations absent clear and express direction to that effect from the State legislature; and

(e)     Award such further relief as the Court deems just and proper.

Respectfully submitted,

s/ W. Travis Parham
W. Travis Parham, TN BPR #016846
Andrew A. Warth, TN BPR #027606
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone: (615) 244-6380
Travis.Parham@wallerlaw.com
Drew.Warth@wallerlaw.com

*Attorneys for Plaintiff,*
*Corizon LLC*

4815-5620-5515

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Dana Bell, Director of Business Development for Corizon, LLC, state that I have read the factual allegations and representations contained in the foregoing Verified Complaint for Injunctive Relief, that I have personal knowledge as to Paragraphs 12-38, 55-68, and 70 to 105 of the Verified Complaint for Injunctive Relief and that I verify under penalty of perjury under the laws of the United States of America that said facts are true and correct. With respect to the factual allegations that are asserted on the basis of information and belief, I believe those facts to be true and correct based on my current understanding of the relevant events.

Executed this 16th day of October, 2020.

_____
DANA BELL

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, F. Jeffrey Sholey, Senior Vice President and Chief Financial Officer for Corizon, LLC, state that I have read the factual allegations and representations contained in the foregoing Verified Complaint for Injunctive Relief, that I have personal knowledge as to Paragraphs 39-54, 69 and 106 to 123 of the Verified Complaint for Injunctive Relief and that I verify under penalty of perjury under the laws of the United States of America that said facts are true and correct. With respect to the factual allegations that are asserted on the basis of information and belief, I believe those facts to be true and correct based on my current understanding of the relevant events.

Executed this 16th day of October, 2020.

F. JEFFREY SHOLEY