IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CORIZON, LLC,                          )
                                       )
    Plaintiff,                     )
                                       )
v.                                     )    NO. 3:20-cv-00892
                                       )    JUDGE RICHARDSON
PRISCILLA WAINWRIGHT, et al.,          )
                                       )
    Defendants.                    )

## MEMORANDUM OPINION

Pending before the Court is a Motion for a Temporary Restraining Order and for Preliminary Injunction (Doc. No. 2, "Motion"). Also pending is a Motion and Memorandum of Law Seeking Expedited Discovery (Doc. No. 4). The Defendants sued in their official capacities ("State Defendants") filed a Response opposing the Motion (Doc. No. 16). Defendant Centurion[1] filed a separate Response opposing the Motion (Doc. No. 18). Plaintiff replied to the responses. (Doc. No. 24).

For the reasons discussed below, the Motion will be denied as to Plaintiff's request for a Temporary Restraining Order ("TRO").

## BACKGROUND

A.  <u>Factual Background</u>[2]

The State, through the Tennessee Department of Corrections ("TDOC") and Tennessee Central Procurement Office ("CPO"), contracts with private companies to provide inmate health

---

[1] Plaintiff made clear that Centurion was included as a Defendant pursuant to Fed. R. Civ. P. 19 because it is a party in interest in the subject of the action.

[2] The following facts, unless identified as in dispute or otherwise qualified herein, are taken as true for purposes of the Motion, because they are either: (1) asserted and evidentially supported at least

1

care services, including behavioral health services. Such contracts typically are multi-year contracts. In the past, the State has required, from the private company selected to perform such a contract, a performance bond of 5 percent or less of the contract's value. A performance bond is usually obtained by the private company from a third-party surety who agrees to step into the shoes of the contracting party to perform the obligations under the contract if the contracting party cannot perform. A third-party surety usually looks for financial strength and strong collateral when deciding whether or not to provide a private company with a performance bond. A performance bond typically carries with it an annual premium.

The contract at issue, which is set to go into effect on November 1, 2020, and continue through October 31, 2025, is a contract to provide inmate behavioral health services on behalf of the State of Tennessee (the "Contract"). Plaintiff is an inmate health care services business that was previously awarded contracts from the State of Tennessee in 2012 and 2016 to provide these same behavioral health services. Plaintiff's contract for 2016 through 2020 (which was extended six months by the State to allow for completion for the Request for Proposals ("RFP") process) ("2016 Contract") had a value of approximately $76,000,000.00 and required a performance bond of $1,000,000.00. This performance bond represented approximately 1.3% of the total value of the 2016 Contract.

With the approach of the expiration of the 2016 Contract's term, CPO and TDOC put out an RFP Release ("RFP 1") in August 2019 soliciting bids on the Contract, which was to be awarded via competitive bidding. RFP 1 stated that the winner of the Contract would be required to post a

_____

to some degree by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice.

$1,000,000.00 performance bond (the same bond amount that was required in Plaintiff's 2016 Contract). RFP 1 was later revised and reissued on February 25, 2020 ("RFP 2")[3] to require the winner of the contract to post a performance bond equal to "one hundred percent (100%) of the awarded contract maximum liability." (Doc. No. 1-5 at 7).[4] Though Plaintiff characterizes this as a "change," (Doc. No. 1 at 3), Defendants claim that the maximum liability performance bond requirement was contained in the original pro forma contract provided with RFP 1, but that RFP 1 contained a clerical error referencing a different bond requirement. (Doc. No. 17-1 at 1; Doc. No. 18 at 4). Accordingly, Defendants claim that RFP 2 clarified, rather than changed, the bond requirement. The estimated maximum liability of the Contract is approximately $123,000.000.00.[5] The annual premiums on a bond for such a contract would total more than $1,000,000.00 per year, increasing the total cost of the Contract, over its lifetime, by more than $5,000,000.00.

During the RFP process, Wes Landers, the Chief Financial Officer of TDOC, left his employment with the State and began employment with Defendant Centurion, another company that provides inmate health care services. Emails in the record indicate that Landers and Defendant Centurion were communicating about possible employment for Landers with Defendant Centurion as early as mid-February (while the RFP process was ongoing). (Doc. No. 1-4). On February 26, the day after RFP 2 was issued, Landers received his onboarding paperwork to accept a position

---

[3] There were many other amendments to the RFP. For ease of reference, the Court has enumerated only the amendments material for purposes of deciding this Motion.

[4] Herein, cited page numbers are the numbers stamped on the applicable pages by the Clerk's Office, which may differ from the page numbers placed on the document by the author/filer of the document.

[5] Plaintiff alleges that this amount represented an increase from an initial amount of $118,000,000.00 when the Contract was announced and that no explanation for the increase has been provided.

3

with Defendant Centurion via email. (Doc. No. 1-4). Landers presently serves as the Vice President of Operations of Centurion in Georgia.

It is unclear to the Court at this time how much influence Landers may have had over the RFP process—and/or the decision to set the performance bond requirement so high—while he worked for the State. Plaintiff claims that Landers was involved directly in TDOC's RFP process. (Doc. No. 1-2). In a letter from the State's Central Procurement Office (CPO), a representative explained that "the issue of whether the performance bond was necessary for this RFP is a decision that is within the purview of the agency [presumably TDOC] and not within that of the CPO." (Doc. No. 17-1 at 1). Emails sent from Landers indicate that he was involved to some extent in the process, with Landers stating in his declaration that he remained involved in the process in order to update leadership at biweekly meetings. (Doc. No. 1-3; Doc. No. 18-3 at 2). However, Landers also stated in his declaration that "[CPO] is responsible for creating the templates and model language for [an RPF], including the RFP at issue in this case. The standard terms and conditions (including the performance bond requirements) in the RFP were governed and determined by the [CPO], its Risk Management section, and their attorneys at the Department of General Services. Neither I nor anyone under my supervision had any influence or control over the performance bond requirements contained in the RFP and pro forma contract." (Doc. No. 18-3 at 2).[6]

The letter from CPO also indicated that Landers had not violated ethical policies and that Landers:

> does not appear to have had any communications with the solicitation coordinator or TDOC personnel regarding a change in the RFP or the Contract and gave notice

---

[6] The Court has difficulty reconciling what appear to be two diametrically opposed accounts of who would have been responsible for setting the performance bond requirement—TDOC or the CPO. But it need not reconcile them, or alternatively declare them irreconcilable (and thus potentially problematic for Defendants), because the Motion is subject to denial in any event for the reasons set forth herein. For the same reason, the Court need not draw any conclusions as to

4

of his future employment to the Commissioner of TDOC. Mr. Landers was appropriately advised by the Commissioner of TDOC that Mr. Landers could not perform work in Tennessee in connection with the RFP. Last, according to the information available to the CPO, Mr. Landers is currently the Vice President of Operations for Centurion in Georgia, where he currently resides, and will not be working with the State of Tennessee on the contract resulting from the RFP.

(Doc. No. 17-1 at 2).

Defendant Centurion, Plaintiff, and three other companies (Wellpath, Wexford, and VitalCore) each sought to win the Contract and submitted a bid in response to the RFP. Plaintiff claims that Centurion, the ultimate winner of the Contract, was the only respondent to the RFP (bidder) with the ability to pay the maximum liability performance bond. (Doc. No. 1 at 4, 26, 27, 30). However, Defendants have provided evidence that the other three companies also submitted bids that met the performance bond standard, that these companies were apparently able to pay the bond requirement, and that only Plaintiff was unable to pay the bond requirement. (Doc. No. 17-3; Doc. No. 18 at 4). Plaintiff was ultimately unable to secure a $120,000,000.000 (or more) performance bond, and Plaintiff instead submitted a bid with the same bond amount as its 2016 Contract ($1,000,000.00). A representative for State Defendants informed Plaintiff that the alternative bond arrangement would need to be withdrawn, or the proposal would be rejected. Plaintiff's submission was ultimately deemed non-responsive, and as a result Plaintiff was not considered as a potential recipient of the Contract. Plaintiff considered filing a protest of the RFP (and had entirely drafted a protest) pursuant to Tenn. Code Ann. § 12-3-514, but Plaintiff

---

how involved Landers was in the setting of the amount of the performance bond—even though the Court does not begrudge Plaintiff its apparent suspicions on this issue.

ultimately opted not to, citing the importance of maintaining a good business relationship with the State. (Doc. No. 17-4).

As for the four bidders whose bids were deemed responsive, their bids were relatively close to one another in the scoring metric governing which of them would be declared the winner. (Doc. No. 18-1 at 11). But ultimately Defendant Centurion was awarded the Contract on July 16, 2020, with a start date of November 1, 2020. Defendant Centurion is currently providing medical services to the State through June 2021, and Defendant Centurion has been preparing to commence the Contract on November 1. Defendant Centurion provided the Court with a list of actions taken over the past two months as part of the process of transitioning into performance of the Contract, (Doc. No. 18-2 at 2), including extending offers of employment to 185 Corizon employees. (Doc. No.18-2 at 3). According to a filed statement, Defendant Centurion has received 111 acceptances of those offers of employment and expects to receive more in the next few days. (*Id.* at 3). Defendant Centurion is additionally already paying salaries to a CQI nurse and a Behavioral Health Director. (*Id.* at 4). Defendant Centurion maintains that Plaintiff Corizon has lost employees and has been transitioning out of providing behavioral health services to TDOC. (Doc. No. 18-2 at 3). However, disputing this, Plaintiff submitted a declaration stating that it "has not lost any material number of employees during the transition process" and it "stands ready to provide full and

6

complete behavioral health services to the Tennessee inmate population in the coming months just as it has done for the past eight years." (Doc. No. 33 at 2).

Plaintiff's claim alleges a violation of the Sherman Act and seeks injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908). Plaintiff does not make a claim for monetary damages and seeks solely injunctive relief.

B. Procedural Background

On October 19, 2020, Plaintiff commenced this action by filing a Verified Complaint (Doc. No. 1) and the Motion. The Court ordered Defendants to respond to Plaintiff's Motion. (Doc. No. 9). Defendants thereafter filed responses in opposition to the Motion on October 22, 2020. (Doc. Nos. 16, 18). On October 23, 2020, the Court subsequently ordered supplemental briefing from the parties regarding whether the affirmative defense of laches applies in the case at hand. (Doc. No. 26). Plaintiff, State Defendants, and Defendant Centurion all filed supplemental briefing addressing the propriety (or lack thereof) of applying laches to bar the relief requested via the Motion. (Doc. Nos. 28, 30, 31). Not surprisingly, Defendants assert that laches applies here, and Plaintiff asserts that laches does not apply here.

**DISCUSSION OF LACHES**

Defendants have argued that the affirmative defense of laches should apply in this case. The applicability of laches[7] in a particular context often is, to say the least, an unpredictable matter. What the undersigned wrote decades ago about this general reality remains true today:

_____

[7] To promote clarity of analysis, the Court must pause to explain its terminology, which may differ substantially from the terminology used by cited cases or the parties herein. As the term is used herein by the undersigned, laches is "applicable" when a court rules that laches bars the particular equitable relief at issue, whereas laches is only "potentially applicable" when the court is not prohibited *ab initio* from applying laches by threshold considerations—such as laches being entirely supplanted by a particular statute of limitation or the fact that the kind of requested relief

7

[T]he law has long embraced a subjective, unpredictable and ad hoc approach to determining whether a claimant's remedy is barred by the lapse of time: laches. "Laches is an equitable doctrine which may be applied to deny relief to a party whose 'unconscionable delay in enforcing his rights has prejudiced the party against whom the claim is asserted.' " Laches generally applies only to equitable claims, although in some cases it will be applied to actions at law. Inevitably, laches has been compared to statutes of limitations, even to the point of being deemed a "quasi statute of limitations." Nevertheless, the two differ markedly in their mode of operation. Unlike statutes of limitations, laches is a flexible concept which eschews mechanical rules and instead is based on fairness.

In deciding whether to apply laches, most courts consider several factors, such as the nature and cause of the plaintiff's delay in asserting a claim despite the opportunity to assert it, the nature of the relief requested, the extent of the defendant's knowledge that the claim would be asserted, and the prejudice to the defendant if the claim is allowed. Other factors include the length of the delay, the loss of evidence, the opportunity of the plaintiff to have acted sooner, and whether the defendant or the plaintiff possessed the property in dispute, if any, during the delay. In a larger sense, " 'laches is principally a question of the inequity of permitting a [particular] claim to be enforced.' "

Moreover, application of laches clearly is discretionary with the trial court. To be sure, a trial court's discretion to apply laches is not limitless. Even courts that use a balancing approach recognize the requirements that the plaintiff " 'unreasonably delayed in [filing suit] and that the delay harmed the defendant.' " Some courts even frame their test for laches in terms of required elements rather than flexible factors. Those elements, however, are the same requirements referenced above. Those requirements are patently subjective and flexible.

Clearly, laches provides courts with considerable flexibility to decide whether to bar equitable remedies due to a delay in commencing suit. The law permits courts to use laches notwithstanding its ad hoc, subjective and unpredictable nature.

---

at issue is not the kind of relief subject to the equitable concept of laches—but may yet determine not to apply laches. *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227 (6th Cir. 2007), cited below, actually used the phrase "is even applicable," *id.* at 231, without including "potentially"; in context, however, the phrase clearly was meant to mean *potentially* applicable as that term is used herein. Notably, even where laches is "potentially applicable" as the Court uses that term, a district court cannot apply—lacks the discretion to apply—laches unless the court finds that its two required elements exist. Where the terminology of Plaintiff or Defendants, or of a cited case, for these concepts differs from the Court's terminology, the Court will convert such terminology into the Court's terminology.

Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L. J. 1015, 1065–67 (1997) (footnotes omitted). A district court thus enjoys considerable discretion to apply or decline to apply laches to a particular equitable remedy[8] under particular case-specific circumstances; flexibility exists, albeit to a lesser extent, even in jurisdictions recognizing required elements of laches. Thus, there is no magic formula to foretell whether the court should or will apply laches.

Turning to specific applicable legal standards binding upon it, the Court notes that "[i]n this circuit, laches is 'a negligent and unintentional failure to protect one's rights.' " *United States v. City of Loveland, Ohio*, 621 F.3d 465, 473 (6th Cir. 2010) (quoting *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)). Importantly, there is a threshold legal question, subject to *de novo* review, as to whether laches is even potentially applicable in the particular context at issue. *Chirco*, 474 F.3d at 231.

The Sixth Circuit is one of those courts that does prescribe required elements of laches. Assuming that laches is potentially applicable, the "party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *City of Loveland*, 621 F.3d at 473.

But even if the party can show both required elements of laches, the court is not required to apply laches; "dismissal under the laches doctrine 'is not mandatory and is appropriate only in

---

[8] Laches generally is potentially applicable to requested equitable relief (including but not limited to injunctions) sought in civil actions. *See Obiukwu v. United States*, 14 F. App'x 368, 369 (6th Cir. 2001); *Memphis A. Phillip Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 4279623, at *5 n.8 (M.D. Tenn. July 21, 2020). By contrast, laches generally is not potentially applicable to claims for money damages, although there are exceptions. As explained by another district court in this circuit, "[l]aches is an equitable doctrine and, as a general rule, remains inapplicable to legal claims for damages." *United States v. Robbins*, 819 F. Supp. 672, 674 (E.D. Mich. 1993) (citations omitted). By contrast, "[c]laims in equity, of course, invite equitable defenses, including laches." *Id.* at n.2.

9

the sound discretion of the court.' " *Stiltner v. Hart*, No. 5:13-CV-203-KKC-HAI, 2018 WL 3717209, at *1 (E.D. Ky. Jan. 24, 2018) (quoting *Towns v. Smith*, 395 F.3d 251, 256-57 (6th Cir. 2005), *report and recommendation adopted*, No. CV 5:13-203, 2018 WL 3716314 (E.D. Ky. Aug. 3, 2018)).

In other words, where laches is potentially applicable, the decision whether to apply it is within the sound discretion of the district court, inasmuch as the Sixth Circuit reviews "a district court's resolution of a laches question for an abuse of discretion." *Chirco*, 474 F.3d at 231 (quoting *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 589 (6th Cir. 2001)); *see also Czaplicki v. The Hoegh Silvercloud*, 351 U.S. 525, 534 (1956) ("'[T]he [application] of laches is a question primarily addressed to the discretion of the trial court'" (quoting *Gardner v. Panama R. Co.*, 342 U.S. 29, 30, (1951))). Notably, from a review of Sixth Circuit case law as a whole, it appears implicit that the district court is vested with discretion both as to the determination of whether the two elements of laches exist and to the subsequent decision (if it is even reached) whether to apply laches.

## ANALYSIS[9]

A. Laches is Potentially Applicable to Plaintiff's Requested equitable (injunctive) relief.

Plaintiff first argues that laches is not even potentially applicable in antitrust cases, such as the present case. It notes that other courts have held that laches is not even potentially applicable

---

[9] The Court has structured its discussion so as to address each of Plaintiff's arguments in turn not because it places any (non-existent) burden on Plaintiff to show that laches should not be applied, but rather because it believes that: (1) analytical clarity is maximized by examining the issues primarily with reference to Plaintiff's specific arguments rather than Defendants'; and (2) Defendants' arguments generally need not be discussed separately, because the gist of them will be adequately reflected in the Court's response to Plaintiff's arguments and the Court's own conclusions.

in Sherman Act cases. (Doc. No. 28 at 5-6). In particular it cites *Miami Int'l Realty Co. v. Town of Mt. Crested Butte, Colo.*, 579 F. Supp. 68 (D. Colo. 1984), for the proposition that "[n]umerous" courts "agree that laches and waiver 'have no place in a federal antitrust action.'" *Id.* at 77 (quoting *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 365 F. Supp. 1073 (D.N.J. 1973), *aff'd in part, vacated in part, rev'd in part*, 521 F.2d 1230 (3d Cir. 1975)). This sounds very promising for Plaintiff, but it turns out that this emperor has no clothes.

For the quoted proposition, *Miami Int'l Realty Co.* cited (only) three cases. The first is *Am. Motor Inns*, which stated that "[t]he common law defenses of laches, waiver and estoppel have no application in a federal antitrust action." 365 F. Supp. at 1098. But even if the reference to "the common law defense[ ] of laches" could be deemed to apply to a claim for "equitable" (as opposed to "common law") relief, the statement is unsupported. In support of the statement, the court in *Am. Motor Inns* cited only *South-East Coal Co. v. Consolidation Coal Co.*, 434 F.2d 767, 784 (6th Cir. 1970), and *Sola Elec. Co. v. Jefferson Elec. Co.*, 317 U.S. 173, 174, 63 S. Ct. 172, 173, 87 L. Ed. 165 (1942). But the first of these, from the Sixth Circuit, mentioned only waiver, and not laches, and did not even involve any request for equitable relief of any kind. And the second of these, from the Supreme Court, involved only estoppel, and not laches. *Miami Int'l Realty Co.* also cited *South-East Coal*, which, as indicated above, has nothing at all to say about laches. Finally, *Miami Int'l Realty Co.* cited *Semke v. Enid Auto. Dealers Ass'n*, 456 F.2d 1361 (10th Cir. 1972), which also did not involve laches.

Beyond *Miami Int'l Realty Co.*, Plaintiff cites only *Am. Motor Inns* and *Trollinger v. Tyson Foods, Inc.*, No. 4:02-CV-23, 2007 WL 1091217 (E.D. Tenn. Apr. 10, 2007), which quotes *Am. Motor Inns'* proposition that "'[t]he common law defenses of laches, waiver and estoppel have no

11

application in a federal antitrust action,'" but involved only estoppel and did not involve laches at all. *Id.* at *3 (quoting *Am. Motor Inns*, 365 F. Supp. at 1098).

So Plaintiff cites only three cases (*Miami Int'l Realty Co.*, *Am. Motor Inns* and *Trollinger*) that purport to say anything at all about whether laches is potentially applicable in antitrust cases. And only the first two of these actually deal with whether laches (as opposed to estoppel or waiver) is potentially applicable in antitrust cases. And the Court simply cannot rely on these old, out-of-circuit, and inadequately supported cases.

Plaintiff posits that laches (or, to put it more precisely, the absence of the applicability of laches) in a limited context could be outcome determinative of the timeliness of claims for equitable relief based on antitrust claims. Not surprisingly, though, the context is one in which only the antitrust *claimant* could be aided by the court choosing to consider laches in assessing whether such claims are time-barred. In other words, in an ostensible (but illusory) concession that laches *is* potentially applicable in certain antitrust contexts, Plaintiff conjures up a rule whereby laches potentially could save—but never *bar*—claims for equitable relief based on antitrust claims. In particular, Plaintiff cites cases that indicate that under certain circumstances, laches—instead of the four-year statute of limitations usually applied in antitrust cases—governs the timeliness of requests for equitable (instead of monetary) remedies. (Doc. No. 28 at 6-7); *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 (9th Cir. 2014). But Plaintiff would have laches stand in for the statute of limitations only where (i) the limitations period has already run; and (ii) the governing test for laches indicates that laches should *not* be applied; in other words, in antitrust cases, laches can be invoked to give a plaintiff more time to seek equitable relief than would be permitted by the applicable statute of limitations, but laches cannot be invoked to give the plaintiff less time to seek equitable relief than would be permitted under the applicable statute of limitations.

12

From this, Plaintiff extrapolates that since its antitrust claim was brought within the applicable four-year limitations period, the claim is necessarily timely irrespective of laches, which (according to Plaintiff) cannot properly be applied to claims for equitable relief based on antitrust claims filed within the applicable limitations period[10] (Doc. No. 28 at 7-8) (citing *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 197 L. Ed. 2d 292 (2017) (holding laches inapplicable in copyright infringement cases brought within the statute of limitations period)). In other words, moving beyond the issue of whether laches is potentially applicable to claims for equitable relief based on antitrust claims, Plaintiff now proposes that even if laches is potentially applicable in antitrust cases, it can never be applied unless the four-year limitations period has not run.[11] Plaintiff does not point the Court to any authority in the Sixth Circuit for the principle it suggests.

And the principle would lead to absurd results. For example, imagine a scenario where lengthy state contracts are awarded many years in advance, and the incumbent contractor, with years to go on its contract, but having lost the bid for the successive contract, concludes that it has

_____

[10] Plaintiff additionally makes the argument that "[r]efusing to allow Corizon to pursue the only relief that it can seek in the context of sovereign immunity and allowing Defendants to move forward with the Contract is tantamount to dismissal." (Doc. No. 28 at 9). The refusal by the Court to grant a TRO perhaps is tantamount to dismissal. But that does not mean that any such de facto dismissal would be either unwarranted or the Court's fault. Plaintiff cannot choose to not file a protest under a relevant Tennessee statute, not bring a suit for months, and then file for an injunction less than two weeks before a contract is supposed to go into effect and then blame the Court for taking away its "only relief." Plaintiff has done that to itself.

[11] As noted below, the Court simply cannot accept this proposal. On the other hand, it perhaps could accept the proposition—apparently widely recognized, if the Fifth Circuit has it right—that if equitable relief is sought on an antitrust claim filed *after* the expiration of the limitations period governing the claim, then there is a rebuttal presumption of prejudice to the defendant for purposes of the laches analysis. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982) (collecting cases). But the validity of that proposition is not at issue here.

13

discovered that the successive contract was awarded to a competitor due to some sort of antitrust violation. If Plaintiff's proposed principle is taken to its logical conclusion, the contractor could sit on the claim for years (up to four years), then file for an injunction the week before its contract expires, without any repercussions for having waited so long and likely putting everyone else (especially the state, the competitor, and the court) in a major bind. This can hardly be the right result. And for the undersigned, it will not be the result here, absent binding precedent requiring such result.

In fact, many courts—apparently recognizing laches's general potential applicability to equitable relief, and without any qualms whatsoever—have found laches potentially applicable (and indeed have applied laches) to bar claims for equitable relief based on antitrust claims. *E.g.*, *Advocacy Org. For Patients & Providers v. Mercy Health Servs.*, 987 F. Supp. 967, 970 (E.D. Mich. 1997) (barring the plaintiff's claim for equitable relief based on laches, after stating that "an injunction is an equitable remedy, and as such, the equitable defense of laches is applicable"); *Midwestern Mach. Co. v. Nw. Airlines, Inc*., 392 F.3d 265, 277 (8th Cir. 2004) (applying laches to bar claims brought under the Clayton Act); *Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1174 (C.D. Cal. 2000) (same); *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982) (dismissing antitrust claim to the extent it sought equitable remedies, based on laches). Therefore, the Court is satisfied that laches is potentially applicable here—*i.e.*, that the Court has the discretion to apply laches in an antitrust lawsuit, even if it is an action in equity brought within the statute of limitations period.

B.  The first element of laches, Plaintiff's lack of diligence, exists here.

Plaintiff next argues that even if laches is potentially applicable here, the Court should not apply it because neither of the two elements of laches (lack of diligence and prejudice) exists.

14

(Doc. No. 28 at 10). Regarding the first element, Plaintiff's argument essentially consists of a detailed timeline of the facts of this case, but the facts indicate to the Court that Plaintiff knew of its claims many months ago and choose not to bring them.

It is evident from the record that Plaintiff knew everything it needed to file the present lawsuit by July 24, 2020 at the latest,[12] and that Plaintiff choose not to file a protest which would

---

[12] It is actually evident that Plaintiff was already aware of much of the substance of this lawsuit as early as June 12, 2020. A letter to Maggie Wilson raised concerns about both the bond requirement and Lander's employment. (Doc. 32-1 at 5). However, from the language of this letter, it appears Plaintiff, though aware of many of the facts and circumstances in the Complaint, did not yet have as much information as it would have when submitting its draft protest six weeks later.

Plaintiff does state that in the August 26, 2020, disclosures it learned some additional information it did not have by July 24: the deadlines had been moved for Defendant Centurion and there had been an alleged $5,000,000.00 increase in the Contract price. (Doc. No. 28 at 18). However, these discoveries make up just a small (and inessential) part of Plaintiff's claims in its Complaint, and Plaintiff knew the bulk of the factual underpinnings of its Complaint much earlier than August.

Plaintiff does not point to anything in the September 1, 2020, production of documents that it needed to bring the present lawsuit, though it seems to imply that the Court should accept this September production as evidence that it did not delay. (*Id.* at 18). Additionally, Plaintiff seems to imply that its later document analysis (of either the August or September documents, as the supplemental brief is unclear) brought to light Landers' alleged behavior/conflict of interest. But the Court believes Plaintiff to have cited and quoted from these documents in its draft protest provided to Defendants on July 24, as previously discussed. (*Id.* at 19). And Plaintiff was complaining about Landers' alleged behavior/conflict as early as June 12.

Plaintiff also argues that it did not suffer any antitrust harm until the Contract was signed, but the Court is unpersuaded that this is the case. (Doc. No. 28 at 21). Without passing judgment on the merits of Plaintiff's antitrust claim (including the idea that what allegedly occurred in this case constitutes "bid rigging" for purposes of a *per se* antitrust violation), the Court notes that Plaintiff has proceeded under a theory of bid-rigging. (Doc. No. 3 at 18). It would follow that the injury would be incurred when the bid is rigged and the Contract is awarded to another party resulting in a harm to Plaintiff, not on the formality of the Contract being signed. *See e.g.*, *United States v. Dynalectric Co.*, 861 F.2d 722 (6th Cir. 1988); *United States v. W.F. Brinkley & Son Const. Co.*, 783 F.2d 1157, 1160 (4th Cir. 1986). Section 1 of the Sherman Act instructs that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. The Supreme Court has repeatedly interpreted Section 1 to bar only "unreasonable restraints of trade." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 98 (1984). Therefore, the Sherman Act does not even require a "contract" as Plaintiff seems to imply, a combination or conspiracy (all/any of which Plaintiff seems to allege, (Doc. No. 1 at 29)) would suffice for antitrust liability if it constitutes an "unreasonable restraint of trade." The Court

have stayed the contract award (essentially what Plaintiff now seeks through this lawsuit) pursuant to Tenn. Code Ann. § 12-3-514[13] at that time (Doc. 17-4). On that date, Plaintiff sent a letter to several state officials stating that Plaintiff "very seriously considered filing a protest related to [RFP 2]" and enclosing an unsigned protest that was ready to be filed by the then-expired deadline. (*Id.* at 1). Plaintiff explained its reasoning for choosing not to file the protest, stating: "[Plaintiff] ultimately decided to forego filing the protest out of respect for [Plaintiff's] past relationship with the State and TDOC and in recognition of the fact that we have no way of truly knowing whether wrongful conduct occurred." (*Id.*).

In the draft protest, Plaintiff makes claims essentially identical to those in the Complaint filed in this Court. For example, Plaintiff argues: 1) Landers accepted employment with Centurion prior to the change in RFP 1, 2) the performance bond was unjustifiably high, 3) Plaintiff was disqualified because it did not meet the standard, and 4) the performance bond precluded any bidders beyond Centurion from actually being able to provide the required performance bond (Doc. No. 17-4 at 3, 4, 11).[14] Additionally, though the Court does not doubt Plaintiff's need to hire

_____

therefore does not see why Plaintiff would need to have waited until receiving a copy of the Contract to protect its rights by filing with this Court.

[13] Tenn. Code Ann. § 12-3-514 provides a RFP respondent an avenue to protest, to the chief procurement officer, a procurement within seven days after the respondent becomes aware (or should have become aware) of the facts giving rise to the protest. The contract award is stayed while the protest is considered.

[14] One thing notably missing from the draft proposal is an analysis of antitrust law. Instead, the draft focuses entirely on state law arguments. However, the letter explaining the decision not to file the draft protest does indicate that Plaintiff was already aware of this as a potential argument, noting that Plaintiff believed the bond requirement "hampers competition." (Doc. No. 17-4 at 1). Plaintiff argues that one of the reasons it has not delayed is that "antitrust law is complex requiring substantial research and analysis." (Doc. No. 28 at 20). Though the Court does not doubt this is true, there is only so much time such research should take; this kind of work is important and can be specialized, but no Herculean effort would have been required to take what had already been done and build on it to file a complaint and motion for TRO. Plaintiff and its counsel had most of

16

an expert in a case of this complication, the building blocks of the expert's argument are also apparent in several places throughout the draft protest.[15] (*Id.* at 6, 7). It is additionally apparent to the Court that, though the appendix with exhibits originally attached to the draft protest has not been filed with the Court, the citations therein and the quotations contained in the draft protest show that Plaintiff had many, if not all, of the documents filed in support of its Complaint in July, including the emails from Landers regarding his impending employment with Centurion and his alleged involvement in the RFP process. (*Id.* at 9, 10).

Plaintiff claims in its supplemental brief that it chose not to file the protest for a few reasons:

> Under Tennessee Code Annotated Section 12-3-514(e), the protest bond that [Plaintiff] was required to submit as a condition of protest was at-risk if the Chief Procurement Officer found that protest did not state on its face a valid basis for protest or if the protest committee determined forfeiture of the bond was appropriate for any other reason. [Plaintiff] was thus left in the unenviable position of having to risk nearly $6,000,000.00 in order to file a protest that the July 9, 2020 Bartels letter made clear would be futile. Although [Plaintiff] ultimately concluded that it could not file a protest given the grave financial risk presented, it prepared and delivered a copy of a highly detailed, unsigned protest to TDOC setting forth [Plaintiff's] position as to why TDOC was acting in error. Again, [Plaintiff] was diligently acting in an attempt to protect its rights and the integrity of the solicitation process.

(Doc. No. 28 at 14). The Court is unpersuaded by Plaintiff's excuses—namely, the bond requirement and the perceived futility—for not having filed an appeal pursuant to Tenn. Code Ann. § 12-3-514. Notably, neither of these issues was cited by Plaintiff in the July 24 letter attaching

---

the factual underpinnings of the potential antitrust argument in July, and the Court is unpersuaded that application of laches is precluded because Plaintiff had too much additional work to do and/or later thought of a complex legal issue it wished to raise and needed time to research it.

[15] The Court also notes that from the expert's list of documents consulted, (Doc. 5-3), it appears that Plaintiff possessed most of the documents consulted by the expert by the filing of the draft protest (with the apparent exception of the signed Contract and Defendant Centurion's bond confirmations).

the draft protest as reasons for not filing a protest. (Doc. No. 17-4 at 1). In fact, the draft protest directly refutes some of Plaintiff's arguments made in its supplemental brief.

Tenn. Code Ann. § 12-3-514 requires a protest bond in order to file a protest of a contract award, and the calculation of the protest bond equaled about $6 million for the Contract at issue. Tenn. Code Ann. § 12-3-514(c). In its draft protest, Plaintiff recognized that it was required to provide a protest bond and stated "[a] bond in the amount of $5,908,672 is attached hereto. Because [Plaintiff] has filed its protest timely and has provided the required bond, [Plaintiff] has satisfied the procedural prerequisites to pursuing a protest. Because the protest is timely filed, procedurally proper, and accompanied by the necessary bond, an automatic stay of the solicitation is now in effect." (*Id.* at 4). If paying this bond requirement were as big of an issue as Plaintiff leads the Court to believe in its supplemental briefing, the Court would expect to see an indication to that effect in the letter attached to the draft proposal and/or in the draft proposal itself. Instead, the Court sees the opposite, with Plaintiff including pre-drafted language indicating (without any angst) that the bond was attached.

Additionally, in the present action, Plaintiff has not raised any issue with paying a bond in conjunction with its application to this Court to enter a TRO. (Doc. No. 2-1 at 6) (leaving a blank for the Court to fill in a bond amount on Plaintiff's draft TRO order: "Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, Plaintiff shall post a bond in the amount of $_____ as security for costs and damages of any party found to have been wrongfully restrained.").

Given the scope of relief requested by Plaintiff pursuant to the Motion, and its potential countervailing harm to Defendants, Plaintiff must know that the Rule 65 bond could conceivably be very substantial. And yet Plaintiff notes, with no consternation, that "[t]he Court would also presumably require Corizon to post an injunction bond that would serve to make Defendants whole

18

if they can prove damages resulting from a grant of injunctive relief that later proved inappropriate." (Doc. No. 28 at 23 n.7). So Plaintiff represents simultaneously that paying a bond to this Court now is acceptable and feasible, but that paying it in accordance with Tenn. Code Ann. § 12-3-514 three months ago would not have been. Plaintiff provides no explanation as to how both representations could be true. One suspects that the explanation for this dichotomy is that Plaintiff figures that the instant Motion is supported both by Plaintiff's alleged *ability* to pay a Rule 65 bond now *and* by Plaintiff's alleged past *inability* to afford a bond three months ago. But absent an explanation as to how both could be true—such as a discussion as to how Plaintiff's finances improved materially in the months following late July—the Court is disinclined to place much stock in Plaintiff's claim (which is otherwise dubious, as noted above) that the financial onerousness of the bond somehow excuses the failure to file a protest in July.

Plaintiff further complains, by way of purported additional justification for not protesting the award of the Contract to Defendant Centurion, that under the Tennessee statute it could have lost its bond if the committee determined it should, for a variety of reasons.[16] However, Plaintiff is also required in a TRO bond to cover the damages of any party wrongfully restrained (which, considering the length of resolving a claim and the amount of money at stake, could easily surpass the $6 million bond the State would have required). Fed. R. Civ. P. 65(c). And yet Plaintiff does not blink at that possibility.

Plaintiff additionally counsels the Court in its supplemental briefing that to appeal the decision in accordance with Tenn. Code Ann. § 12-3-514 would be "futile." (Doc. No. 28 at 14). By this, Plaintiff seems to mean that since the CPO had already indicated in an email that it

---

[16] The statute specifies that a bond will be paid to the state if certain requirements are not met, the claim is brought in bad faith, the protest does not state on its face a valid basis, or "for any other reason approved by the protest committee." Tenn. Code Ann. § 12-3-514(c), (d).

19

disfavored Plaintiff's argument, the CPO manifestly was bound to reject Plaintiff's protest had it filed one. However, the alleged inevitability of rejection by the CPO did not stop Plaintiff from drafting a 19-page single spaced protest before deciding not to file it. Additionally, although Tenn. Code Ann. § 12-3-514 provides for initial review by the chief procurement officer, his or her determination is subject to review by the protest committee. Tenn. Code Ann. § 12-3-514(d), (e). And an appeal of the protest committee's decision can be made to the chancery court. Tenn. Code Ann. § 12-3-514(f). Therefore, it is apparent that, even if the chief procurement officer had been predisposed against Plaintiff's argument, Plaintiff's protest under Tenn. Code Ann. § 12-3-514 would not necessarily have been futile, since additional layers of review (including judicial review) were available.

Additionally, even if sending a draft protest were to somehow constitute diligent advocacy for Plaintiff's rights up to that juncture (July 24), the Court sees no actions taken by Plaintiff thereafter, and prior to the present lawsuit, that indicate Plaintiff was actively pursuing its rights.[17]

---

[17] Plaintiff has filed a series of emails between representatives of Plaintiff and the State. These extend from July into September 2020. (Doc. No. 32-3). However, Plaintiff's Complaint and arguments seem wholly based on documents and factual circumstances of which Plaintiff was aware in July. The Court is not convinced that there was sufficient reason for Plaintiff to wait and file the present lawsuit less than two weeks before Defendant Centurion's contract was set to go into effect. Though perhaps Plaintiff may have been hoping that the document production in September would contain additional information on which to base a complaint, Plaintiff had already passed up an opportunity to appeal pursuant to Tenn. Code Ann. § 12-3-514 when it possessed similar (if not exactly the same) documents presented to this Court in connection with the Verified Complaint. Additionally, Plaintiff moved in this case for expedited discovery. If Plaintiff felt the State was dragging its feet, Plaintiff could have filed the present action much earlier and moved for expedited discovery (as it has now done in the instant action). Plaintiff also claims that it did not know that Defendants would be terminating Plaintiff's 2016 Contract early (on November 1), instead of December 31, 2020, which created the present time crunch for resolving its request for a TRO. (Doc. No. 28 at 3; Doc. No. 33-2). However, Plaintiff has already had an opportunity to protest under the Tennessee statute and many months to file with this Court. The Court is not persuaded by Plaintiff's argument, which seems to imply that Plaintiff's original plan prior to the contract termination date being moved up was to file for a TRO and/or preliminary injunction nearer to the originally December 31 contract termination, which obviously would have

20

In making its determination that Plaintiff was not diligent in pursuing its rights, the Court finds particularly persuasive an opinion from within the Sixth Circuit, *Advocacy Org. For Patients & Providers v. Mercy Health Servs.*, 987 F. Supp. 967 (E.D. Mich. 1997). There, the court applied laches to a request for a TRO made in an antitrust suit that was brought on the eve of a pending merger:

> In this instance, the first requirement of laches is present. Plaintiffs have not been diligent in pursuing their request for a TRO. Plaintiffs have known about this proposed merger at least three months, and presumably longer since the merger was announced in December, 1996.
>
> Indeed, Linda Fausey, the attorney representing all the plaintiffs in this case, on or prior to August 19, 1997, filed a complaint with the FTC on behalf of two of the plaintiffs in this case, Advocacy Organization for Patients and Providers and Citizens for a Better Lansing, to stop the merger. Because that suit was filed with the FTC three months ago, this court sees absolutely no reason *the instant* lawsuit could not have been filed earlier. Plaintiffs need not have waited until the eleventh hour to file their 98 page complaint and request for a TRO with this court. This is inexcusable delay. . . .
>
> In short, this court finds that plaintiffs are attempting to throw a monkey wrench into the merger at a very late stage in the game. For this reason, this court finds that the request for a TRO should be denied.

*Advocacy Org. For Patients & Providers v. Mercy Health Servs.*, 987 F. Supp. 967, 970 (E.D. Mich. 1997). The facts here are similar: Plaintiff waited until less than two weeks before a large scale business transition to claim antitrust violations; Plaintiff has known about its concerns regarding the bidding process, with evidence to support them, since at least July (and possibly earlier); and Plaintiff by then had completed a lengthy draft protest which it choose not to file

---

presented similar laches issues. And in any event, Plaintiff learned on September 10 that the termination date had been moved up to October 31, (Doc. No. 33 at 1-2), thus leaving Plaintiff 51 days before the termination date. And yet Plaintiff waited until just 12 days remained before filing suit.

(indicating that Plaintiff could have filed either that protest or the instant lawsuit long before October 19).

The Court notes that the "lack of diligence" contemplated by this first element can be verbally conceived, alternatively, as "unreasonable delay." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 699 (2014) ("The gravamen of laches is the plaintiff's unreasonable delay, and the consequent prejudice to the defendant." (Breyer, J. dissenting)). With the November 1 implementation date for the Contract ever approaching, and with sufficient facts and a supporting theory to at least file an antitrust suit and seek a TRO, Plaintiffs nevertheless waited almost three months before filing suit on October 19. This is unreasonable delay.

For all of these reasons and those discussed above, the Court finds that Plaintiff has not acted with diligence in protecting its rights in this matter.

C.  The second element of laches, prejudice to Defendants, exist here.

Plaintiff additionally argues that laches should not apply because Defendants will not be prejudiced. (Doc. No. 28 at 22). However, the Court is satisfied that State Defendants as well as Defendant Centurion would be prejudiced if a TRO were granted.[18]

Defendant Centurion has been undertaking transition efforts to be able provide inmate behavioral health services in place of Plaintiff as of November 1. (Doc. No.18-2 at 2-4). Defendant Centurion has extended offers of employment to 185 of Plaintiff's employees. (Doc. No. 18 at 6; Doc. No. 18-2 at 2). Defendant Centurion has received 111 acceptances of those offers of employment and expects to receive more in the next few days. (Doc. No. 18 at 6; Doc. No. 18-2 at 2). Defendant Centurion is additionally already paying salaries to a CQI nurse and a Behavioral

---

[18] In reaching this conclusion, the Court credits the declaration of Samantha Phillips, (Doc. No. 18-2), whose description of the purported necessary steps of the transition process strikes the Court as unsurprising and unexceptional and, thus, credible.

22

Health Director. (Doc. No. 18 at 6-7; Doc. No. 18-2 at 4). State Defendants would also be harmed by having to suddenly shift from the party they have expected to provide this service for months (Defendant Centurion) to another party (Plaintiff). This shift would need to happen in less than a week, and this Court has previously noted that "the Court finds prejudice from the fact [that] if injunctive relief were granted at this late date, the State would have to take such action much more quickly than if Plaintiffs had sought such injunctive relief as soon as they should have; quicker action tends to mean more expensive and error-prone action." *Memphis A. Phillip Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 4279623, at *8 (M.D. Tenn. July 21, 2020) (citing *Crookston v. Johnson*, 841 F.3d 396, 399 (6th Cir. 2016)).

However, Plaintiff filed a declaration disputing the contentions of Defendant Centurion and noting that it "has not lost any material number of employees during the transition process" and it "stands ready to provide full and complete behavioral health services to the Tennessee inmate population in the coming months just as it has done for the past eight years." (Doc. No. 33 at 2). Even if it is true that Plaintiff has not lost a critical mass of its employees and could provide the services as before,[19] it strikes the undersigned as unfathomable that a transition back to Plaintiff would not inevitably cause substantial confusion, complications and expense. The Court finds that halting a contract implementation and transition to a new vendor, that has been ongoing for months, would be disruptive and prejudicial to the party that has been working towards implementation. This kind of disruption in Defendants' implementation plans is precisely the kind of prejudice that will support application of laches. *See Memphis A. Phillip Randolph Inst.*, 2020

---

[19] In her declaration, Samantha Phillips disputes this, in effect opining (based on her experience with TDOC and other transitions) that Plaintiff could not transition back into readiness to provide the services by November 1. The Court need not decide, at least at this juncture, where the truth lies here.

23

WL 4279623, at *8. And any gap or delay in behavioral health care services—which is far from unlikely, based on the current record, to result from any transition back to Plaintiff—would certainly prejudice the State, who is expected to provide those services, as well as the prisoners who rely on the services for care.

Finally, Plaintiff argues that "Centurion's costs are not the result of delay, but rather the fact of transition itself." (Doc. No. 28 at 22). Respectfully, this is misleading; to the extent that it is true, it misses the mark. Certainly, if the TRO is not granted and Defendant Centurion's contract is never disturbed, then, yes, its transition costs all would have been the result of the transition, and not Plaintiff's delay. But if the TRO *were* granted—which is the relevant hypothetical situation here—Defendant Centurion's costs to date likely would have primarily or entirely been the result of Plaintiff's delay, because if Plaintiff had sought a TRO without delay, Defendant Centurion very likely would have immediately largely ceased its transition efforts pending resolution of Plaintiff's claims for injunctive relief.

D. The Court, having found the elements of laches satisfied, will not exercise its discretion not to apply laches.

As noted above, even though it found both elements of laches to exist here, the Court does have discretion not to apply laches. But it does not see a good reason to exercise that discretion. To the contrary, the Court finds that it should exercise its discretion to apply laches in the present case. Admittedly, as suggested above, a court generally cannot claim to know the "right" answer to the question of whether to apply laches in a particular context; indeed, this generally is a question that does not have a "right" answer. But it often has an answer that strikes the Court as particularly sound. And here the Court is more than satisfied, for the reasons discussed, that laches should apply in the present case.

24

Seeking to avoid this result, Plaintiff claims that Defendants are barred from the equitable defense of laches by the doctrine of unclean hands. (Doc. No. 28 at 24). To be clear, the Court understands perfectly why Plaintiff is suspicious that Defendants (or at least one of them) may have done something, to put it euphemistically, not entirely on the up-and-up. The Court, while taking no position on the validity of those suspicions, understands why Plaintiff would harbor them. But it clearly would be premature, on the current record, for the Court to conclude that any of the Defendants come into this Court with unclean hands. It is even more premature to say that the State Defendants and Defendant Centurion all have unclean hands, such that none of them should be able to assert laches to avoid prejudice he, she or it faces from Plaintiff's delay. What is not at all premature, based on the instant record, is the Court's conclusion that Plaintiff was not diligent and that Defendants have been prejudiced by Plaintiff's lack of diligence. And thus the Court will apply laches here.

**CONCLUSION**

Although, as suggested above, the undersigned recognizes the relative subjectivity and ambiguity of the elements, the Court finds decisively that the elements of laches do exist in this case. The Court finds unreasonable delay with no sufficient excuse by Plaintiff in waiting to file the instant lawsuit until less than two weeks before the contract date was set to start. The Court additionally finds prejudice to State Defendants and Defendant Centurion if the TRO were to be granted.

The Motion (Doc. No. 2) will be denied to the extent that it seeks a temporary restraining order prior to the November 1 Contract implementation date. The Motion remains pending to the extent that it seeks a preliminary injunction, although, as Plaintiff itself implies, (Doc. No. 28 at 1), any future injunctive relief could prove ineffectual absent a TRO. The Motion for Expedited

Discovery also will remain pending. The Court's conclusion that laches applies impacts how and when the Court goes forward in this case. The Court has its own preliminary thoughts, but it has formed no final opinion and wishes to hear the views of the parties. Accordingly, by November 3, counsel for the parties shall file notices to the Court regarding whether they believe a hearing is required to determine the propriety of a preliminary injunction, and regarding any thoughts they have about the procedure for addressing Plaintiff's remaining requested relief, which, the Court notes, is all injunctive in nature.[20]

An appropriate Order shall be entered.

_Eli Richardson_

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[20] Plaintiff has sued State Defendants in their official capacities. As suggested above, in its Complaint Plaintiff has requested solely injunctive relief, and not damages. Plaintiff argues that its claims fall within the *Ex parte Young* exception because Plaintiff seeks "only prospective, injunctive relief." (Doc. No. 3 at 12). The Court notes that Defendant Centurion has raised the issue that this suit should be dismissed because of sovereign immunity, arguing that Plaintiff does not seek prospective relief under the exception to the *Ex parte Young* doctrine. (Doc. No. 18 at 9). This may understandably raise in observers' minds the question of whether the Court should even be deciding the limited applicability of laches at this time, prior to resolving the issue of whether it has subject-matter jurisdiction. The short answer is that the Court may do so because when faced with multiple assertions that it should not take any merits-based action on a case, the Court may choose among them and need not address an assertion of lack of subject-matter jurisdiction before the other assertion(s). *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431, 127 S. Ct. 1184, 167 L.Ed.2d 15 (2007) ("[A] federal court has leeway to choose among threshold grounds for denying audience to a case on the merits [including alleged lack of subject-matter jurisdiction]." (citations and internal quotation marks omitted)). That is, in part, because there is no mandatory sequencing of jurisdictional issues, and indeed a waivable jurisdiction challenge like personal jurisdiction can be decided before a non-waivable one like subject-matter jurisdiction. *Id.* This means, among other things, that the Court can decide the applicability of laches before deciding whether it has subject-matter jurisdiction. *See Singh v. Joshi*, 152 F. Supp. 3d 112 (E.D.N.Y. 2016) ("Before turning to the merits of plaintiffs' preliminary injunction request, the Court must address three threshold matters [*i.e.*, requested transfer of venue, alleged lack of standing, and alleged applicability of laches]. Since each is distinct from the merits, the Court may address them in any order." (citing *Sinochem Int'l Co.*, 549 U.S. at 431, 127 S. Ct. 1184)). The Court therefore makes no determination on if *Ex parte Young* would allow Plaintiff to bring its claim.

26