# **EXHIBIT T**

waller

Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
P.O. Box 198966
Nashville, TN 37219-8966

615.244.6380 main
615.244.6804 fax
wallerlaw.com

W. Travis Parham
615.850.8721 direct
travis.parham@wallerlaw.com

June 12, 2020

**VIA E-MAIL AND HAND DELIVERY**
Maggie.Wilson@tn.gov

Maggie Wilson
Department of General Services, Central Procurement Office
312 Rosa L. Parks Ave., 3rd Floor
Nashville, Tennessee 37243

    Re: **Request for Proposals for Inmate Behavioral Services RFP # 32901-31202 Release 2 (the "RFP")**

Dear Ms. Wilson:

    We represent Corizon, LLC ("Corizon") in connection with the above-referenced RFP. We write to express serious concerns regarding how Corizon, the incumbent inmate behavioral health services provider to the Tennessee Department of Correction ("TDOC") and a respondent under the RFP, is being treated in connection with the RFP process, regarding the performance bond language of the RFP and regarding whether and how a serious conflict of interest is being handled.

    I will first address your recent correspondence with Corizon of June 4 and 5, 2020. On June 4, you, writing on behalf of the State, requested that Corizon withdraw its proposed exception to the mandatory performance bond requirement and set a deadline of noon on June 5 to do so. You stated that failure to withdraw the exception would render Corizon's proposal non-responsive and subject to rejection. On the morning of June 5, Corizon requested additional time to consider the request. At the end of the day on June 5, without giving Corizon the opportunity to respond substantively to the State's request that it remove the exception, the State refused to grant the requested extension and has presumably now rejected Corizon's proposal. We respectfully submit that TDOC/the State should reconsider this position.

    The RFP, in its present iteration, contains the following language: "The State shall require a Performance Bond upon approval of a contract pursuant to this RFP. The amount of the Performance Bond shall be a sum equal to one hundred percent (100%) of the contract's maximum liability and said amount shall <u>not</u> be reduced at any time during the period of the contract." RFP at § 1.10 (emphasis original).

    In the context of the RFP, the maximum liability language in the performance bond section effectively means that the State is requiring a performance bond of one hundred twenty-five million dollars ($125,000,000). The current bond for the precise same contract is one

# waller

June 12, 2020
Page 2

million dollars ($1,000,000). The proposed new bond represents a staggering twelve thousand four hundred percent increase (12400%) over the existing bond. To the best of my knowledge, a contract-over-contract increase of this size is unprecedented in State contracting.

The performance bonding requirement modification is not only unique within the State, the performance bond itself is inconsistent with the bonding requirement in many other states where Corizon provides services. Several states (including Michigan, Maryland and Wyoming) require no performance bond. Others require a one million dollar ($1,000,000) bond, the same amount TDOC requires under the current contract. The largest performance bond for any state where Corizon is currently providing services is only four million dollars ($4,000,000).[1]

TDOC has made no claim on the performance bond under the existing contract so the bonding change is not related to any experience TDOC has had with Corizon or any need that only recently became apparent. One must, therefore, naturally wonder what is driving the change. Speaking directly, it is difficult to conceive of a justifiable basis for a bond of the size demanded. This is not a massive construction contract where the State might pay vast sums and be at risk of a contractor bankrupting or otherwise going out of business prior to completion of the work. This is a services contract, performed annually, and with the State being able to terminate for any reason upon thirty (30) days written notice.

The State will pay the winning respondent for the services rendered in the month following the month when the services are provided. If the chosen respondent and ultimate contracting party became unable to perform during the life of the new contract, the State might incur additional or greater costs in bringing in a new provider. It could in no conceivable way, however, incur such costs in amounts anywhere remotely close to the entire value of the contract.

The performance bonding requirement is directly contrary to the State's interests. First, a third-party bond of that size is expensive and any respondent providing such a bond will necessarily include the cost of the bond in its pricing to the State. We estimate that the presently proposed bond will increase costs in the contract by several million dollars compared to the current bond size, or even a modest increase over that current bond amount. It particularly makes no sense to not reduce the bond as time passes and TDOC's financial exposure declines, but rather to continue to incur the costs associated with a bond for the entire amount for the entire term of the contract.

---

[1] Centurion in the incumbent provider for TDOC's inmate general health services (i.e. general medical rather than behavioral services) contract. That contract, as you might imagine, is far larger than the behavioral services contract at-issue here. TDOC required a performance bond for general health services of only eight million dollars ($8,000,000). It is impossible to reconcile with intellectual integrity the difference between the proposed behavioral services performance bond and the general health services performance bond.

More importantly, the bonding requirement as written is antithetical to competition. State purchasing law is replete with references to the importance of competition to the State purchasing process. See e.g. Tenn. Code Ann. 12-3-501 (state contracts to be awarded by "competitive" sealed solicitations); Tenn. Code Ann. 12-3-801 (when possible, all procurement specifications and scopes of work for goods and services shall be worded or designed to permit open and competitive solicitation); Rule 0690-03-01-.12(1)(a) of the Comprehensive Rules and Regulations of the Central Procurement Office (the State shall use technical requirements and scopes of service that are non-restrictive); Rule 0690-03-01-.12(3) (all responses may be rejected if there is a lack of adequate competition); Amended Procurement Procedures Manual of the Central Procurement Office at Section 5 (competition should be involved in the procurement process to the maxim extent practicable).

Corizon is a substantial company with contracts in a multitude of states but it is not large enough to obtain a one hundred and twenty-five million dollar ($125,000,000) performance bond, particularly as a single bond for a single contract. Few companies are. Based on the attendees at the Pre-Response Conference and the entities with whom Corizon regularly competes, Corizon believes that the respondents submitting proposals include Spectrum Health Systems, Inc. ("Spectrum"), Wellpath, LLC ("Wellpath") and Centurion. Given their respective sizes, it is very difficult to imagine that Spectrum or Wellpath LLC can provide the required bond.[2] Centurion, given its affiliation with Centene Corporation ("Centene"), may be able to provide a bond of the required size. Having only one viable respondent does not constitute fair competition and does a great disservice to the State, particularly given the lack of business justification for the bond.

There are also other circumstances that cause great concern with respect to this procurement. The RFP, when originally issued on August 8, 2019 (the "Original RFP"), contained very different performance bond language. Section 1.10 of the Original RFP stated: "The State shall require a Performance Bond upon approval of a contract pursuant to this RFP. The amount of the Performance Bond shall be a sum equal to one million dollars ($1,000,000), and said amount shall **not** be reduced at any time during the period of the contract." See Original RFP (emphasis original). The language of the Original RFP was amended to require the much larger bond pursuant to Amendment Twelve issued February 25, 2020.

---

[2] We hope that TDOC, in reviewing responses, will study very carefully the A.7 Audited Financial Statements and the A.8 RFP Performance Bond attachments for all respondents. It is not enough for a respondent to simply represent that it can provide a one hundred and twenty-five million dollar ($125,000,000) bond. It should also be required to demonstrate the financial wherewithal to do so. Corizon provided a third-party statement as to its bonding capabilities. TDOC should require the same of all respondents and should, if it will not reconsider the amount of the bond and consider Corizon's proposal, ask all respondents to provide documented proof of the ability to meet the requirement. We believe you will find that they cannot do so.

It is our understanding that Wes Landers, TDOC's former Chief Financial Officer, is now employed by Centurion (or its parent, Centene). Mr. Landers provided written notice of his decision to resign from TDOC on February 6, 2020[3] and left on March 16 to join Centurion. Mr. Landers' LinkedIn profile describes his role with TDOC as including "directly assisting the Department's leadership on all strategic planning and tactical matters . . . ." As such, it seems likely that Mr. Landers' would have been intimately involved in the development of the RFP and any material changes thereto. The optics of Mr. Landers working at TDOC when the performance bonding language was originally drafted in 2019 and also when it was materially amended in late February of 2020 (after Mr. Landers knew he was leaving TDOC) to create a circumstance where only his soon-to-be employer could have the winning proposal for a then pending contract are, as you might imagine, highly troublesome.

Corizon does not wish to cast aspersions and has no means of knowing or of directly proving at this time that Mr. Landers or anyone else at TDOC has done anything improper.[4] The circumstances are, however, a more than reasonable cause for substantial concern. Corizon would like to receive assurances that the Chief Procurement Officer and the Central Procurement Office are aware of the Landers conflict situation and have properly vetted it. We would specifically appreciate knowing whether the following questions have been considered:

1) What role, if any, did Mr. Landers play in the development of the original performance bond language of the RFP and/or in the modification of the performance bond language from that contained in the original RFP to the language contained in the RFP at present?

2) Did Mr. Landers have any role in connection with the RFP after the time he became aware of potential future employment with Centurion?

3) Did TDOC disclose Mr. Landers' new employment with Centurion to the Chief Procurement Officer per Section 8A. of Policy Number 2013-009 of the Central Procurement Office Business Conduct and Ethics Policy and Procedures (the "Conflict Policy")?

4) Did Centurion disclose Mr. Landers' new employment with Centurion to the Chief Procurement Officer per Section 8A of the Conflict Policy?

---

[3] Mr. Landers presumably knew he was joining Centurion at the time he sent out his February 6, 2020 notice letter.

[4] We note that Mr. Landers' LinkedIn profile shows his employment with TDOC ending in March of 2020 but it does not update his employment to identify Centurion as his new employer. It is certainly not unusual for someone to be slow in updating their online bio, but it is odd to see a bio that has been updated to identify the end of prior employment with no corresponding update for current employment.

    5)     Has Centurion been asked to confirm in writing and under oath that Mr. Landers had no involvement in Centurion's response to the RFP and provided no information regarding TDOC to Centurion?

    6)     Has Mr. Landers been asked to confirm in writing and under oath that he had no involvement in Centurion's response to the RFP and provided no information regarding TDOC to Centurion?

    7)     Has the Central Procurement Office taken any additional steps to determine whether Centurion has an Unfair Competitive Advantage, as that term is used in the Conflict Policy, as a result of Mr. Landers' employment?

    8)     Has the Central Procurement Office taken any additional steps to determine whether Centurion has an Organizational Conflict of Interest, as that term is used in the Conflict Policy, as a result of Mr. Landers' employment?

    9)     Has the Central Procurement Office avoided, mitigated or waived any Centurion Organizational Conflict associated with Mr. Landers' employment consistent with Conflict Policy and, if so, in what way?

Corizon, as you may or may not know, is particularly sensitive to this issue given its past experience with TDOC. In 2013, TDOC awarded a two hundred and forty-one million dollar ($241,000,000) contract to Centurion even though Corizon, the then incumbent, had submitted a fifteen million dollar ($15,000,000) lower bid. Centurion, at the time, employed the wife of Derrick Schofield, the then TDOC Commissioner. The situation was reported widely. See, e.g., June 12, 2013 Knoxville News Sentinel article (enclosed). The then chairman of the Legislature's Fiscal Review Committee, Bill Ketron, fairly described the prior circumstances as a "squirrely situation." Id. The present situation, given the language modification, the timing of the change, the lack of any possible business justification for such a massive bond and Mr. Landers' shifting employment, is an even more "squirrely situation," particularly if Corizon's bid is not even considered.

It should now be clear why Corizon is so concerned regarding the RFP and its accompanying process. Corizon does not want to have to pursue a bid protest following the issuance of the notice of intent and the opening of the file, but it insists upon fair treatment and a level playing field and will do what it must to protect its interests. If a conflict exists that has not been properly vetted and addressed and/or if the State simply recognizes that the performance bond requirement is not in the best interests of the State/TDOC, the State/TDOC/the Central Procurement Office should terminate the RFP and issue a new RFP that appropriately addresses the performance bond issue and allows for appropriate pricing consistent with the same. See Rule 0690-03-01-.06(3)(b)(1) and (3) (vi) (vesting the Chief Procurement Officer with discretion to cancel a solicitation and/or to reject all responses if proceeding with the procurement is detrimental to the best interests of the State). If the conflict has been properly vetted and

## waller

June 12, 2020
Page 6

addressed and found to not exist and the State is unwilling cancel the solicitation, TDOC should treat Corizon's proposal as responsive without requiring a massive performance bond.

     Please share this correspondence with the Central Procurement Office and its counsel and with Kelly Young, Inspector General for TDOC. I am happy to discuss these issues at any time. Corizon reserves all rights.

Very truly yours,

W. Travis Parham

WTP:sd
Enclosure
cc:    Jennifer Finger, Esq. (via e-mail only)