# EXHIBIT 2

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| CORIZON, LLC, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>PRISCILLA WAINWRIGHT, in her )<br>official capacity as Director of )<br>Contracts Management for the State )<br>of Tennessee Department of )<br>Correction; TONY C. PARKER, in )<br>his official capacity as Commissioner )<br>for the State of Tennessee )<br>Department of Correction; )<br>MICHAEL F. PERRY, in his official )<br>capacity as Chief Procurement )<br>Officer for the State of Tennessee )<br>Central Procurement Office; )<br>MAGGIE WILSON, in her official )<br>capacity as Sourcing Account )<br>Specialist for the State of Tennessee )<br>Department of Correction; JOHN )<br>DOES 1-10, additional employees of )<br>the State of Tennessee operating in )<br>their official capacities; ~~and~~ )<br>~~Centurion of~~ )<br>~~Tennessee~~<u>CENTURION OF</u> )<br>TENNESSEE, LLC<u>; and WESLEY</u> )<br>LANDERS, in his individual )<br>capacity, )<br>)<br>    Defendants. )<br>)<br>)<br>)<br>)<br>) | Case No. 3:20-cv-0892<br><br>Judge Richardson<br>Magistrate Judge Frensley<br>Jury Demand |

~~4838-0443-9506~~4821-7795-9907

)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)

## ~~FIRST~~[PROPOSED] SECOND AMENDED COMPLAINT

Pursuant to Rule 15(a)~~(1)(B~~2) of the Federal Rules of Civil Procedure, Plaintiff Corizon, LLC ("Corizon") files this Second Amended Complaint ~~as.~~

## INTRODUCTION

This is a ~~matter~~case of ~~right~~now indisputable public corruption.  The open questions relate to the full scope of that corruption, the identification of all those involved, and the remedies for the same.

In 2019 and 2020, then Tennessee Department of Corrections ("TDOC") Chief Financial Officer (and now Defendant) Wesley Landers ("Landers") secretly worked with Centurion to help Centurion of Tennessee, LLC ("Centurion") win a publicly bid TDOC behavioral health contract (the "Contract") ultimately worth more than $120,000,000.00.  While the CFO of TDOC, Landers regularly sent

emails from his TDOC account to his private Gmail account and then on to Centurion Vice President Jeffrey Wells ("Wells") and others at Centurion that contained TDOC internal correspondence, drafts, and other materials related to the Contract solicitation and to the Contract. Access to these internal communications, insights and materials gave Centurion a material advantage in the solicitation process over all other competitors. In addition to these emails, there were likely hundreds of additional written or oral communications between Wells and Landers, that no longer exist or that have been conveniently forgotten.

Landers was obviously looking for something in return, and he got it when a Centurion affiliate hired him for a position in Georgia. Landers did not even have to interview for his new job. Although Centurion and its affiliates have thousands of employees, Steven Wheeler ("Wheeler"), Centurion's Chief Executive Officer, personally approved the Landers hiring. At the exact same time Landers was being hired, the performance bond required for the Contract increased from $1,000,000.00 to $118,000,000.00 and ultimately to more than $123,000,000.00. TDOC was responsible for this term, and the change meant that only Centurion, a company with a massive parent, could actually win the Contract at the end of the day. With what we know now, the timing and fact of this competition-eliminating change cannot reasonably be attributed to coincidence.

The State of Tennessee, although now fully aware of the wrongdoing of Landers and Centurion, has done nothing to date to address this egregious public corruption. Instead, it has stood arm in arm with Centurion, tacitly endorsing fraud and deceit in the solicitation of public contracts. Centurion still holds the Contract, reaping profits from despicable conduct that has eliminated competition in the prison health care services market.

This case is brought against Defendants Priscilla Wainwright ("Wainwright"), in her official capacity as Director of Contracts Management for the State of Tennessee Department of Correction ("TDOC"); Tony C. Parker ("Parker"), in his official capacity as TDOC Commissioner; Michael F. Perry ("Perry"), in his official capacity as Chief Procurement Officer for the State of Tennessee Central Procurement Office ("CPO"); and Maggie Wilson ("Wilson"), in her official capacity as Sourcing Account Specialist for TDOC. To the extent there may be yet unidentified individual State employees also engaged in the conduct identified herein or who must be enjoined to prevent the legal violation complained of herein, Corizon also names additional John Doe Defendants, who are individual State employees acting in their official capacities to violate Corizon's rights under federal law. All of these individuals, specifically named or referred to as "John Doe Defendants," are referred to collectively herein as the "State Employee Defendants."

Corizon also names Centurion ~~of Tennessee, LLC ("Centurion"), a private~~ ~~third party,~~ as a Defendant. Centurion is vicariously liable for the actions of Wells and others at Centurion who wrongfully obtained and shared information regarding the Request for Proposals associated with the Contract (the "RFP") and the Contract itself, acting at all times within the scope of their employment and for the benefit of Centurion. Finally, Centurion names Landers as a Defendant. Upon information and belief, Landers acted for his own personal gain and outside the scope of his employment with TDOC in assisting Centurion in connection with the Contract.

As to the State Employee Defendants, this Second Amended Complaint seeks only prospective, permanent injunctive relief, to prevent ongoing and future threatened violations of the Sherman Antitrust Act (the "Sherman Act"). The Sherman Act claims in this action against the State Employee Defendants are brought pursuant to the doctrine of *Ex Parte Young.* (209 U.S. 123 (1908)). The ~~claim~~claims against Centurion ~~seeks~~and Landers seek the full modicum of damages permitted under the Sherman Act (including lost profits and other consequential damages, treble damages and attorneys' fees) and under State law, along with declaratory and injunctive relief.

In support of its claims, Corizon states:

## INTRODUCTION AND OVERVIEW

1.      Corizon's Sherman Act claims arise, in primary part, out of a contract (the "Contract") in, an agreement relating to the Tennessee inmate health care services market (the "Market").

2.      The Contract is between Defendant Centurion and TDOC, and it states the terms under which Centurion will provide behavioral health services to inmates in Tennessee state prisons overseen by TDOC.

3.      The Contract was signed by Wheeler, Centurion's CEO, and Parker, TDOC's Commissioner, on August 20, 2020, following a solicitation and proposal evaluation process through which TDOC awarded the Contract to Centurion.

4.      The Contract went into effect on November 1, 2020, when Centurion replaced Corizon as the provider of behavioral health services to TDOC. The Contract solicitation process, the Contract terms, and the decision to award the Contract to Corizon's competitor, Centurion, were all overseen and approved by State Employee Defendants from both TDOC and CPO. TDOC was ultimately responsible for all material Contract terms, including setting the amount of the required performance bond (the "Performance Bond").

5.      During the solicitation and Contract approval process, the State Employee Defendants "went rogue." They abandoned past reasonable TDOC and

CPO policy and procedure that fostered competition in the Market – to the benefit of Centurion.

6.   The State Employee Defendants replaced established policy and procedure with Performance Bond and Contract requirements and terms that ~~eliminate~~eliminated competition in the Market to the benefit of Centurion and to the detriment of all other competitors. The result of ~~the~~ Defendants' actions are a Market in which Centurion will hold an illegal monopoly, in violation of the Sherman Act.

7.   The first Market competition-killing move was made long after the RFP had been initially issued and in the middle of the ~~Contract~~ solicitation ~~process~~ when the State Employee Defendants suddenly increased the ~~performance bond required for the Contract~~Performance Bond from $1,000,000.00 ~~the amount identified when the RFP was issued and~~ the amount historically required—to approximately $118,000,000.00 (the "Performance Bond Change" or simply the "Change"). At the time, $118,000,000.00 was the expected value of the Contract – that is, the amount TDOC would pay the winning respondent over the entire course of the Contract to perform the services.

8.   Nothing like the Performance Bond Change had ever happened before in the Market. There is no reasonable explanation for it, and, upon

information and belief, most respondents were flummoxed by it. Corizon assumed at first it was a mistake.

9.    Historically, TDOC and CPO have required only a modest, reasonable performance bond for services contracts in the Market. The State Employees Defendants' decision to astronomically increase the ~~performance bond~~Performance Bond required for the Contract makes no sense from a need or cost perspective.

10.    During the solicitation process and contemporaneous with the Performance Bond Change, ~~Wes~~Defendant Landers, the former ~~Chief Financial Officer~~CFO for TDOC, was ~~seeking employment opportunities with Centurion, the only respondent with the financial backing to meet the new performance bond requirement for the Contract~~secretly sending emails from his personal Gmail account about the inner workings of the solicitation to Wells, a Centurion Vice President, and others at Centurion. Upon information and belief, over the course of years, Landers secretly provided private information about TDOC contracts and solicitations to Wells and others at Centurion, giving Centurion a material advantage in all such procurement proceedings. Landers was ultimately rewarded by Centurion with a cushy job at an increased rate of pay for which he never even had to interview.

11.    ~~Landers, after the Performance Bond Change but prior to the completion of the solicitation process, left TDOC to take a job with Centurion.~~ Landers and Wells also communicated by the encrypted chat service "WhatsApp." "WhatsApp" serves no legitimate purpose as a communication vehicle for a public employee with respect to public business, but does serve to insulate such communications from public records requests. Apparently, neither Landers nor Wells had a need for "WhatsApp" after Landers joined Centurion. Landers had "WhatsApp" on his TDOC-issued cell phone, which he turned in following his departure from the agency, presumably knowing that it would be wiped, and did not use the app going forward. After the inception of this litigation, Wells deleted "WhatsApp" from his phone and also deleted text message communications with Landers. Using separately acquired software, Landers set his Gmail messages, including his sent messages, to auto-delete after a short period of time.

12.    ~~In a Declaration filed in this case, Landers has disclaimed influence over the Performance Bond Change, but he did not deny discussing the Change with his potential employers at Centurion, and admitted to being involved in the Contract solicitation process.~~ Limited communications, available to date only through Centurion's e-mail system, have survived. They show, amongst other things, that on January 3, 2020, Landers sent Wells a copy of a revised draft of the

RFP, which was not made publicly available until late February of 2020, giving Centurion almost two months of advance notice of the Performance Bond Change. Immediately after the Performance Bond Change was announced on February 26, 2020, Wes Landers formally accepted his sweetheart job offer from Centurion.

13. Landers and Wells had been communicating about Landers joining Centurion essentially throughout the solicitation process on the Contract, and Landers and Centurion agreed to employment terms weeks before he formally announced his retirement from TDOC.

14. The RFP drafts Landers secretly sent to Wells show that Landers' direct report, Wainwright, was involved in the Performance Bond Change, and it is a reasonable assumption Wainwright would have communicated with her boss about the issue, as she regularly shared information with Landers regarding the RFP. Upon information and belief, Landers ultimately approved and supported the Change, because he knew it would benefit Centurion to the detriment of other bidders.

15. 13. Upon information and belief, after Centurion was awarded the Contract under terms only Centurion could meet, the State Employee Defendants and Centurion recognized that the Contract would not be sufficiently profitable for Centurion if the award value remained $118,000,000.00.

16. ~~14.~~ Upon information and belief, the reason for this discovered lack of profitability was because the cost of obtaining the ~~performance bond~~Performance Bond was so high that it would eat into Centurion's profits on the Contract.

17. ~~15.~~ Upon information and belief, in light of this realization, the State Employee Defendants and Centurion agreed to increase the award amount in the Contract to $123,000,000.00, ensuring that Centurion could provide the ~~performance bond~~Performance Bond and still make its planned profit on the Contract.

18. ~~16. Subsequent to~~Further illustrating the seemingly close relationship between TDOC and Centurion, after TDOC's award of the Contract to Centurion, the State Employee Defendants declined to hold Centurion to the timing requirements of the solicitation process for signing the Contract and providing the ~~required bond~~Performance Bond.

19. ~~17.~~ The Change and the follow-on agreements and pacts between the State Employee Defendants and Centurion all but ensure that only one participant in the Market—Centurion—will be able to win Market services contracts in the future. Either by explicit agreement or by an implicit agreement evidenced by their actions, Centurion and one or more of the State Employee Defendants have committed to an ongoing arrangement in the Market where a maximum liability

performance bond will be required for all Market services contracts, and Centurion will be the only respondent able to meet that requirement. In the implementation process, one or more of the State Employee Defendants and Centurion worked together to ensure that the award amount allows Centurion to still make a profit.

20. ~~18.~~ The solicitation and procurement process is supposed to foster competition, not eliminate it.

21. ~~19.~~ Relying on the Sherman Act, Corizon seeks a permanent injunction enjoining further performance of the Contract. Additionally, the issues raised in this case also have a broader implication for future contracts, like the inmate general ~~healthcare~~ health care services contract that will be the subject of competition in the near future.

22. ~~20.~~ Accordingly, Corizon also seeks a permanent injunction not only prohibiting the future performance of the Contract, which is the product of prior unlawful conduct, but also prohibiting the State Employee Defendants from imposing a maximum liability performance bond requirement in the competition for future inmate behavioral and/or health services contracts absent clear and express direction from the State legislature. Corizon also seeks damages from Centurion and Landers. Corizon also seeks attorneys' fees.

## PARTIES, JURISDICTION AND VENUE

23. 21. Plaintiff Corizon is a provider of ~~healthcare~~ health care services in correctional facilities throughout the United States. Corizon is a Missouri Limited Liability Company with its principal place of business at 103 Powell Court, Brentwood, Tennessee, 37207.

24. 22. Defendant ~~Priscilla~~ Wainwright ~~("Wainwright")~~ is sued in her official capacity as Director of Contracts Management for TDOC. Wainwright can be served with this Second Amended Complaint through filing and service on counsel through the Court's ECF system. ~~Upon information and belief,~~ Wainwright was directly involved in the solicitation process and ~~decisions~~ actions at issue.

25. 23. Defendant ~~Tony C.~~ Parker ~~("Parker")~~ is sued in his official capacity as Commissioner of TDOC. Parker can be served with this Second Amended Complaint through filing and service on counsel through the Court's ECF system. Upon information and belief, Parker was directly involved in the solicitation process and ~~decisions~~ actions at issue.

26. 24. Defendant ~~Michael F.~~ Perry ~~("Perry")~~ is sued in his official capacity as Chief Procurement Officer for the State. Perry can be served with this Second Amended Complaint through filing and service on counsel through the Court's ECF system. Upon information and belief, Perry was directly involved in the solicitation process and ~~decisions~~ actions at issue.

27.   25. Defendant ~~Maggie~~ Wilson ~~("Wilson")~~ is sued in her official capacity as Sourcing Account Specialist for TDOC.  Wilson can be served with this Second Amended Complaint through filing and service on counsel through the Court's ECF system.  Wilson was directly involved in the solicitation process and ~~decisions~~actions at issue.

28.   26. Defendants John Doe 1-10 are additional individual employees of the State of Tennessee who, acting in their official capacities, violated Corizon's rights under the Sherman Act in their processing, evaluating, and awarding of the Contract to Centurion and who continue to violate Corizon's rights and injure competition in the Market by performing the Contract with Centurion.  Corizon anticipates that additional discovery will reveal the identities of these specific individuals and the precise roles of each.

29.   27. Defendant Centurion is a Tennessee limited liability company with its principal place of business in St. Louis, Missouri.  Centurion can be served with this Second Amended Complaint through filing and service on counsel through the Court's ECF system.

30.   Defendant Wesley Landers is an individual who resides in Georgia.  He can be served at 4565 Dartford Road, Cumming, Georgia, 30040-0444.

31.   28. This case raises a federal question under the Sherman Act (15 U.S.C. § 1 *et seq*.), and thus, the Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  The

Court has supplemental jurisdiction over Corizon's state law claims against Centurion and Landers.

32. ~~29.~~ The Court has personal jurisdiction over the State Employee Defendants as they perform their official duties in Tennessee and over Centurion because it does business in Tennessee. The Court has personal jurisdiction over Landers because he engaged in the underlying events in this case while residing in this District, and the activities effected contracts performed or to be performed in this District.

33. ~~30.~~ This Court is the appropriate venue for this dispute, as the agreement in restraint of trade has been executed and occurred in this judicial district. *See* 28 U.S.C. § 1391 and 15 U.S.C. § 22.

## FACTUAL ALLEGATIONS

### General Background on the Provision of Health Care Services to Inmates in Tennessee

34. ~~31.~~ Individuals convicted of State law crimes and sentenced to prison in Tennessee receive health care services provided by the State.

35. ~~32.~~ These health care services include general medical care, as well as behavioral health services, like treatment for psychiatric issues, alcohol and drug abuse, and other mental issues such as depression and anxiety.

36. ~~33. The State~~ TDOC is not in the position to furnish the personnel and expertise required to efficiently and effectively provide these health care services

to all inmates, and thus ~~the State, primarily~~TDOC, in conjunction with ~~TDOC and~~ CPO, contracts with private companies, which have specialized experience in providing inmate health care services.

## The Market

37. ~~34.~~Until the events giving rise to this case, there have been several~~,~~ recognized companies that compete for Market contracts in Tennessee, including Corizon, Centurion, Wellpath, Wexford~~,~~ and, more recently, VitalCore.  Each of these companies has strengths and weaknesses, and they provided a full panoply of options for the State to consider when awarding a Market services contract.

38. ~~35.~~Of these entities, Centurion is not only the largest, but it is also financially backed by an enormous corporate parent – Centene, a Fortune 100 company with more than $60 billion in annual revenue.

39. ~~36.~~Corizon and Wellpath are headquartered in Tennessee, but other Market participants, including Centurion, are headquartered in other states.

40. ~~37.~~The Market has historically involved the same participants responding to solicitations for State contracts time and time again.

41. ~~38.~~Contracts in the Market are multi-year contracts that typically well exceed $100,000,000.00 in value.

42. ~~39. The State~~TDOC has historically solicited proposals for these contracts in broad categories within the Market.  For instance, ~~the State~~TDOC

would solicit proposals for the general inmate medical services contract and then separately solicit proposals for the inmate behavioral health services contract.

43. 40. The Market has, prior to the events giving rise to this case, been competitive and has functioned effectively.  In a typical scenario, TDOC/CPO would publish a Request for Proposals and the established, recognized private companies would respond.  They would each offer prices and services consistent with the reasonable solicitation requirements and fair competition.

44. 41. Generally throughout the country, contracts between a state agency and a private contractor in the inmate health care context sometimes, but not always, require a "performance bond," that is, an amount of money that the private contractor "posts," through a third-party surety, to reduce a state's risk by guaranteeing performance under a contract.

45. 42. Prior to the events giving rise to this case, the amount of the performance bond TDOC/CPO required for a Market services contract had never been anything remotely close to an outcome -determinative consideration in the solicitation process.

46. 43. This is because the terms of the Market services contracts proposed by TDOC/CPO have consistently required only a modest performance bond, generally less than 5% of the contract value, and often much less.

47. 44. This policy and practice is consistent with Tennessee law, which vests the CPO with the right, but not the obligation, to require an "appropriate" performance bond for a State contract. *See* Tenn. Code. Ann. § 12-3-502(i). CPO, in turn, defers to TDOC with respect to the need for and amount of a performance bond, if any, associated with a particular contract.

**Corizon's Business and Work in Tennessee**

48. 45. Corizon provides inmate health care services throughout the country, but is headquartered here in the Middle District, in Williamson County, Tennessee.

49. 46. Corizon has been in the inmate health care services business for more than 40 years, focusing on a science-based approach that protects inmate mental and physical health in a cost-effective and efficient manner.

50. 47. Corizon was awarded the previous two consecutive Tennessee inmate behavioral health care services contract contracts in 2012 (the "2012 Contract") and again in 2016 (the "2016 Contract"). In both instances, Corizon's contracts were awarded following an open and competitive solicitation process, in which the amount of the performance bond was not a material consideration.

51. 48. Since 2012, Corizon has performed its responsibilities and obligations under the Tennessee inmate behavioral health services contract with integrity and fairness and without complaint from the State.

52. ~~49.~~ Over the eight years, Corizon built a strong partnership with ~~the State~~TDOC, substantially improving the provision of behavioral health services to inmates in Tennessee.

**Corizon's and ~~the State~~TDOC's Historic Experience with Performance Bonds**

53. ~~50.~~ The 2016 Contract, which expired on November 1, 2020, had a value of approximately $76,000,000.00. That is, the State paid Corizon $76,000,000.00 to provide behavioral health services to certain Tennessee inmates.

54. ~~51.~~ Consistent with prior practice, the 2016 Contract had a modest performance bond requirement of $1,000,000.00, approximately 1.3% of the value of the 2016 Contract.

55. ~~52.~~ For more than a decade, Corizon has sought to win contracts in the Market. Throughout that time period, TDOC/CPO have always required only a modest and "appropriate" performance bond to secure the performance of a Market services contract, typically much less than 5% of the maximum value under any given contract.

56. ~~53.~~ For example, in 2009, Corizon was awarded the general medical services contract in the Market (the "2009 Contract"). The 2009 Contract was worth more than $181,000,000.00. The performance bond on that contract was $5,000,000.00, or about 2.8% of the contract value.

57. ~~54.~~ This low ratio of performance bond to award value is consistent with Corizon's experience in other states where it provides inmate behavioral health services.

58. ~~55.~~ Corizon also does business with several states (including Michigan, Maryland, and Wyoming) that require no performance bond whatsoever for their inmate health care services contracts.

59. ~~56.~~ Throughout the course of Corizon's relationship with the State, TDOC has never suggested that any performance bond furnished by Corizon for a Market services contract was inadequate.

60. ~~57.~~ TDOC has likewise never made a claim on the performance bond of any Corizon contract with the State ~~of Tennessee~~or, upon information and belief, any other performance bond associated with any contract for behavioral health or general medical services.

## Requiring a Large Performance Bond
## Makes No Sense for Market Services Contracts

61. ~~58.~~ The previously existing policy and practice of TDOC and CPO to require a modest performance bond in a Market services contract makes sense and fosters competition.

62. ~~59.~~ Large performance bonds are typically ~~only~~ required only when there is a substantial risk that the contractor's failure to perform will expose the State to significant losses.

63. 60. The purpose of a performance bond in the context of a multi-year services contract is to reimburse the obligee for its expenses incurred in finding a replacement provider in the event the bonded provider defaults under the Contract.

64. 61. If the winning bidder stopped providing inmate behavioral health services to TDOC, the costs of finding a replacement would, of course, be much, much less than the value of the contract.

65. 62. Moreover, in a Market services contract, TDOC can track the quality of services provided and control the taxpayer investment by only paying for services only after they are rendered.

66. 63. Also, TDOC can terminate a Market services contract for any reason upon 30 days' written notice.  In sum, the terms of the Market services contracts and the circumstances under which they are performed provide the State with ample opportunity to control its risk.

67. 64. This is distinct from a setting where large performance bonds are reasonable, such as in the construction context.  In that context, the CPO/State agencies have required a "maximum liability performance bond," meaning that a construction contractor must provide a bond of 100% of the maximum value of the contract as a condition of being awarded the contract.

68. 65. A maximum liability performance bond in the construction context guarantees that, in the event of the contractor's default, the surety can be

called upon to step into the shoes of the contracting party and complete the construction in accordance with the contract plans and specifications and pay for any costs incurred in excess of the original contract amount. Because these construction costs can be considerable and estimates may be inaccurate, a maximum liability performance bond is industry standard in the construction context.

69. 66. Requiring a maximum liability performance bond for a Market services contract exceeding $100,000,000.00 serves no reasonable interest, increases taxpayer cost, and stifles competition.

70. 67. A surety will require a party seeking a large performance bond to have great financial strength and strong collateral as a condition of providing the bond.

71. 68. Regardless of the appropriateness of the bond to the circumstances, the surety will only underwrite the bond based on the provider's ability to reimburse the surety for losses incurred under the bond at that full bond amount.

72. 69. Inmate health care service providers are not set up like the massive companies that finance enormous construction projects. They lack that level of investment and financing, because their business model is obviously different.

4838-0443-9506 4821-7795-9907

**The Initial Solicitation Process for the Contract**

73. ~~70.~~ Solicitations for State inmate health services contracts begin with the State issuing a Request for Proposals ~~(an "RFP")~~. With the end of the 2016 Contract approaching, CPO and TDOC, through Defendant Wilson, ~~put out an~~issued the RFP for a new behavioral health services contract on or about August 8, 2019 ("RFP Release 1"). A true and correct copy of an excerpt from RFP Release 1 is attached as **Exhibit A**.

74. ~~71.~~ RFP Release 1 solicited proposals for a multi-year contract to provide behavioral health services for certain State-managed prison and inmate health care facilities throughout the State. Everyone involved in the bidding expected the value of the Contract to exceed $100,000,000.00.

75. ~~72.~~ The solicitation process, timeline, and delivery requirements are set forth in various amendments to the RFP.

76. ~~73.~~ The final RFP amendment ("RFP Amendment 18") set the following deadlines:

    (A)    July 16, 2020 for TDOC to issue an award decision;

    (B)    July 23, 2020 for any protest (i.e., the end of the open file period);

    (C)    July 31, 2020 for the Contract to be signed; and

(D)    August 4, 2020 for the delivery of the ~~required performance bond~~Performance Bond.

*See* RFP Amendment 18 attached as **Exhibit B**.

77.    ~~74.~~ Consistent with the policy and previous practice of requiring relatively modest, but reasonable, performance bonds in Market services contracts, RFP Release 1 stated that the winner of the Contract would be required to post a $1,000,000.00 performance bond.

78.    ~~75.~~ Section 1.10 of RFP Release 1 expressly states:

> The State shall require a Performance Bond upon approval of a contract pursuant to this RFP.  The amount of the Performance Bond shall be a sum equal to one million dollars ($1,000,000) and said amount shall <u>not</u> be reduced at any time during the period of the contract.

*See* RFP Release 1, **Exhibit A**, at § 1.10 (emphasis original).

79.    ~~76. The~~ RFP Release 1 also included a "bond form." The bond stated in RFP Release 1 is consistent with the bond form used when the amount of the performance bond is set at a small portion of the total maximum liability under the contract, referred to as a partial penalty bond.

80.    ~~77.~~ The bond form, the plain language of Section 1.10 of RFP Release 1, and the consistent, established CPO/TDOC practice of requiring a modest, reasonable performance bond for Market services contracts all clearly indicated that the performance bond for the Contract would be the same as the

performance bond for the existing behavioral health services contract, $1,000,000.00.

81. ~~78.~~ Over the next several months, respondents submitted questions to ~~Defendant~~ Wilson and worked on gathering and providing additional information in support of their proposals.

82. ~~79.~~ Corizon operated under the impression that the performance bond requirement would be $1,000,000.00, the same as the performance bond requirement of the 2016 Contract and, upon information and belief, other respondents—with the possible exception of Centurion—did as well.

### ~~Wes~~ Landers ~~Goes to Work for the Largest Respondent~~ Colludes with Centurion and the Performance Bond Requirement Skyrockets

83. ~~80. Wes Landers served as TDOC's CFO from approximately September 2012 until mid-March 2020. Since March 2020, he has been the Vice President of Operations for Centurion of Georgia. *See* Decl. of Wes Landers, Dkt. 18, Ex. 3.~~ Landers served as TDOC's CFO from approximately September 2012 until mid-March 2020.

84. From March 2020 to February 2021, he was the Vice President of Operations for Centurion of Georgia.

85. Landers' employment was recently terminated by Centurion after it became apparent that his misfeasance was going to come to light as a result of the lawsuit.

86. Although the RFP identified Wilson as the only appropriate State employee for purposes of communications between respondents and TDOC regarding the RFP, from at least February 2019 (but likely much earlier) through his formal hiring by Centurion more than a year later, Landers regularly and secretly sent private, sensitive internal communications among State officials to Wells and others at Centurion.

87. For instance, Landers and Wells shared the following communications:

(A) On March 21, 2019, Landers forwarded to Wells a lengthy February 27, 2019 email string between and among himself, Wainwright, and CPO's Kelly Johns ("Johns") discussing how TDOC/CPO might calculate maximum liability for purposes of the Contract (with "maximum liability," of course being the term of art ultimately tied to setting the amount of the outrageous performance bond). *See* **Exhibit C**.

(B) Also on March 21, 2019, Landers forwarded to Wells a February 27, 2019 email from Johns to Landers and CPO's Katherine Weaver titled "Behavioral Health RFP - max liab question." Attached to that email, which

was also forwarded by Landers to Wells, is a draft of the behavioral health RFP. Centurion thus had access to the behavioral health RFP approximately five months prior to other respondents. *See* **Exhibit D**. Wells forwarded this email and the draft RFP to Centurion's Vice President of Operations, Samantha Phillips ("Phillips") on July 13, 2019, about a month before the RFP was made publicly available. *See* **Exhibit E**. Upon information and belief, Wells and Phillips shared this e-mail and similar documentation with others within Centurion.

(C) On May 22, 2019, Landers forwarded an email chain containing email correspondence dating back to April 15, 2019, between and amongst Landers, Wilson, Wainwright, along with CPO's Kevin Bartels ("Bartels") and Nicholas Edwards ("Edwards"), discussing revisions and changes to the behavioral health RFP. Landers forwarded this email chain to Wells, Sean Hosman ("Hosman") and Marjorie Rist ("Rist"), two employees of a correctional industry consulting company called "Vant4ge," which was, upon information and belief, assisting Centurion with the bid for the Contract. Attached to this email was a current draft of the behavioral health RFP, again made available to Centurion and its consultants months before it was publicly available. *See* **Collective Exhibit F**. Tellingly, Landers' lead-in for the e-mail was, "As promised." The fact that Landers had previously promised to deliver the materials and the fact that he knew that the consultants Hosman and Rist were working with

Centurion despite the absence of any other communication identifying them illustrate clearly that Landers and Wells had other communications regarding the RFP that have not been disclosed.

(D)     On June 19, 2019, almost two months before the RFP was publicly available, Landers sent to Wells what is, upon information and belief, an internal draft TDOC/CPO spreadsheet entry showing the timing under which proposed events in the Contract solicitation process would likely take place and made sure that Centurion was immediately aware when the actual RFP was issued. *See* **Exhibit G**; *see also* **Exhibit H**, Landers forwarding to Wells Wilson's August 7, 2019 email publishing the RFP.

(E)     On January 3, 2020, Landers forwarded to Wells a draft version of RFP Release #2 with the cover email between Wainwright and Landers, in which Wainwright says "CPO's review comments of Release 2.  My responses are noted in bold.  I have addressed many of the comments, but am still working through . . ." *See* **Collective Exhibit I**.

(F)     Attached to this January 3, 2020 email is a draft version of RFP Release #2, the document that made the Change to the performance bond.  That is, Landers sent Wells this document about two months before the Change was announced.  This draft version shows dozens of internal comments and discussions about the RFP.  As to the performance bond itself, which was

dramatically changed in this RFP Release #2, the draft shows the new maximum liability performance bond language and Wilson asking, "Has CPO Risk Management reviewed this section?" To which Edwards responds, "If this hasn't changed from the initial posting, why would risk mgmt. need to review again?" To which, Wainwright, in bold, responds "This is in keeping with current RFP and fee for service contract template language. Please advise if there are additional considerations of which TDOC is unaware." *See* **Collective Exhibit I**.

(G)    On January 15, 2020, Landers sent to Wells and Phillips, again another Centurion Vice President, an email between and among TDOC leadership (including Defendants Landers and Parker) titled "December 2019 Monthly Report for Behavioral Health," pointing out increases in caseload.    *See* **Collective Exhibit J**.    Again, Landers' unsolicited copying of a third party—Phillips—demonstrates the occurrence of other undisclosed communications.

(H)    Attached to this email was a report that *Corizon* sent to the State discussing various issues related to the then-current behavioral health contract. *See* **Collective Exhibit J.**

88.    In exchange for providing this dishonest and almost certainly illegal service of conveying private, inside, materially advantageous material to Centurion, Landers was rewarded with a job with the company. Wells began

recruiting Landers to Centurion no later than October 16, 2019, when Wells sent to Landers a copy of Centurion's summary of benefits information. *See* **Exhibit K.**

89. Landers had an incredibly smooth path to employment. He never even formally interviewed for the job.

90. With his employment at Centurion assured, Landers sent his "retirement" notice to TDOC on February 6, 2020. Landers forwarded that notice to Wells with the note "And that's wrap." *See* **Exhibit L.**

91. Even though Landers' retirement was supposedly not effective until March 15, 2020, he apparently was hired and working for Centurion by March 2, 2020, because on that date, Wells sent Landers an email saying, "First day on the job and screening your calls☺ *See* **Exhibit M.**

92. Landers and Wells communicated much more extensively than is outlined above. They regularly communicated via the encrypted chat service "WhatsApp," and their phone logs show regular, lengthy telephone discussions. After the filing of this lawsuit, Wells deleted WhatsApp from his telephone. Wells also deleted his text messages with Landers. Landers likewise took steps that he knew would result in the destruction of vital evidence, including turning in his TDOC-issued cell phone containing "WhatsApp," knowing that it would be wiped and/or disposed of, without telling anyone at TDOC that it contained

communications regarding TDOC business. Landers also used third-party software to set his Gmail to auto-delete his messages, including his sent messages.

93. 81. As shown by the above emails, as a senior leader on TDOC's executive team, Mr. Landers was directly involved in the behavioral health RFP. TDOC was ultimately responsible for all material terms in the Contract, including the amount of the Performance Bond.

94. Landers had at least bi-weekly meetings with Defendant Parker and other TDOC senior executives. *Id*He also regularly consulted with his subordinate Defendant Wainwright about the terms of the Contract.

95. 82. In these regular meetings, Mr. Landers provided updates to Defendant Parker on the Contract RFP process and gave direction to Defendant Wainwright. *Id*. That is, Landers was regularly involved in discussion about the RFP for this Contract with DefendantDefendants Parker throughand Wainwright throughout the bid solicitation, until he left TDOC to take a job at Centurion in March 2020. *Id*These updates were, upon information and belief, relayed regularly to Centurion, through Wells.

96. 83. True and correct copies of a series of e-mails from and to Landers that were produced by the State as part of the post-award open file disclosure process are attached as **Collective Exhibit CN** (the "Internal Landers Communications"). These communications demonstrate some, but not all, of the

communications Landers had within TDOC about the RFP. Indeed, this written correspondence ~~cannot~~does not capture, upon information and belief, the repeated, regular oral communications Landers had with ~~Defendant~~Defendants Parker and Wainwright throughout a substantial portion of the Contract solicitation process~~.~~

~~84.   In addition to his communications with Defendant Parker about the RFP, throughout early 2020, Landers repeatedly communicated, including through written correspondence, with Defendant Wainwright, TDOC's Director of Contracts Management, about the status of the procurement process for the Contract. *See* Internal Landers Communications, **Collective Exhibit C**.~~

97.   ~~85.~~At the same time as Landers was communicating with Defendants Parker and Wainwright (and potentially others within TDOC and CPO) about the Contract procurement process, he was also ~~pursuing private sector employment~~secretly communicating with Wells and others at Centurion about the behavioral health RFP and his new job.

98.   True and correct copies of a series of e-mails between Landers and Centurion that were produced by the State as part of the post-award open file disclosure process are attached as **Collective Exhibit ~~D~~O.** (the "Landers/Centurion Communications"). ~~Again, these~~These communications ~~undoubtedly~~of course do not~~, upon information and belief,~~ remotely capture the ~~complete~~ universe of communications between Landers and Centurion during this time period, because

Landers used his private Gmail account to furnish Centurion with inside information on the bidding process. As such, none of the highly inappropriate communications detailed in Paragraph 87 above were included in the post-award open file.

99. 86. Landers secured an offer of employment with Centurion, and, upon information and belief, that offer was in place by late January 2020. Upon further information and belief, Landers was planning to leave to public sector employment and become a Centurion employee at that time.

100. 87. Despite the fact that Landers negotiated and secured a lucrative job with one of the respondents under consideration, and the fact that he was conveying sensitive internal information about the bidding process, for months, he continued to communicate with Defendants Parker and Wainwright about the status and terms of the Contract solicitation. *See* Internal Landers Communications and Landers/Centurion Communications, **Collective Exhibits CN and DO**. Upon information and belief, the sum and substance of most, if not all, of these discussions was conveyed to Centurion by Landers to Wells through phone conversations, emails, text messages, or WhatsApp chats.

101. 88. At the same time, the State Employee Defendants revised RFP Release 1 was revised to require that the winning respondent post a performance bond equal to "one hundred percent (100%) of the awarded contract maximum

liability." Upon information and belief, TDOC consulted with Defendant Perry, the Chief Procurement Officer, in connection with the Performance Bond Change. Upon further information and belief, the decision to make the ~~performance bond~~Performance Bond a "maximum liability" bond was made ~~jointly~~ by TDOC ~~and Mr. Perry~~, including Landers.

102. ~~89.~~ Centurion is backed by a massive corporate parent, Centene, and is in a much better position to satisfy the new bonding requirement than the other Market participants.

103. ~~90.~~ On February 18, 2020, Landers formally accepted the employment with Centurion that, ~~upon information and belief,~~ had been offered to him weeks earlier, ~~i.e. before the Change had been made internally~~.

104. ~~91.~~ On February 25, 2020, Wilson ~~formalized~~publicized the Change, issuing a revised, amended RFP ("RFP Release #2") to the respondents with the requirement that the winning respondent provide a performance bond in the amount of the "maximum liability" of the Contract. A true and correct copy of an excerpt from RFP Release #2 is attached as **Exhibit ~~E~~P**.

105. ~~92.~~ RFP Release #2, issued February 25, 2020 states:

> The State shall require a Performance Bond upon approval of a contract pursuant to this RFP. The amount of the Performance Bond shall be a sum equal to one hundred percent of the contract's maximum liability and said amount shall <u>not</u> be reduced at any time during the period of the contract.

*See* RFP Release #2, **Exhibit E**, at § 1.10 (emphasis original).

106. ~~93.~~ The very next day, on February 26, 2020, Centurion delivered its "New Hire Welcome Packet" to Landers. *See* Landers/Centurion Communications, **Collective Exhibit ~~D~~O**.

107. ~~94.~~ The State's official records indicate that Landers "retired~~," but Landers certainly did not intend to stop working~~." A true and correct copy of Landers' March 16, 2020 TDOC Resignation Form produced by the State as part of the post-award open file disclosure process is attached as **Exhibit ~~F~~O. Landers, of course, started working at Centurion two weeks before that form was signed**.

108. ~~95.~~ Heightening the sense of dubiousness regarding the entire process, the Performance Bond Change was sudden and haphazard. The previously supplied "bond form" did not change, remaining consistent with a partial penalty bond.

109. ~~96.~~ Further, the Contract states that the amount of the ~~performance bond~~ Performance Bond will not decrease during the life of the Contract. This makes sense if the ~~performance bond~~ Performance Bond is modest and tied to the costs of a discrete event, such as the service provider ceasing services and a new provider needing to be found. It makes no sense in the context of a maximum liability ~~performance~~ bond. TDOC's actual (and nominal) risk drops as time passes. This is another reason why the ~~performance bond~~ Performance Bond

~~4838-0443-9506~~4821-7795-9907

requirement in RFP Release #2 does not reconcile with customary surety practices and norms, is not appropriate in the context of this services contract, and the circumstances surrounding its implementation are extremely suspect.

110. 97. The slapdash, haphazard way that a massive change was made to the terms of a very significant State contract demonstrates that the Change was not made consistent with customary protocols.

111. 98. Corizon, despite being a financially strong competitor and a very successful company, could not secure a $118,000,000.00 performance bond.

112. 99. Upon information and belief, no Market competitor other than Centurion could provide such a performance bond.

113. 100. Even if these companies could obtain approval for such an enormous bond, they would have to pay for it. The cost of an outsized performance bond would have to be factored into the overall proposal submitted to the State, which increases, in turn, the cost of a contract to the State (and thus to the taxpayer).

114. 101. Requiring a maximum liability performance bond in a Market services contract bears no rational connection to the magnitude of the risk incurred by the State, a point TDOC has implicitly recognized by consistently only requiring only a modest performance bond in connection with such contracts.

**Corizon Challenges the Changed Solicitation Terms**

115. ~~102.~~ Corizon repeatedly raised concerns with various State Employee Defendants about the Performance Bond Change.

116. ~~103.~~ On May 20, 2020, Thomas Alsup, a Corizon representative involved in the solicitation process, emailed Defendant Wilson, the individual identified in the RFP as the sole appropriate contact person for all RFP- and Contract-related communications, stating that the bonding requirement change was "highly unusual" and that "bond companies will not write a bond for the size value the State is requesting." True and correct copies of ~~communication~~communications between Alsup and Wilson are attached as **Collective Exhibit ~~G~~R**.

117. ~~104.~~ Alsup suggested the Change had been a misunderstanding, reminding Wilson that the prior contract had a $1,000,000.00 performance bond, which was industry standard and consistent with ~~the~~ TDOC's prior practice. *Id.*

118. ~~105.~~ Wilson responded on May 26, 2020, stating the bond requirement would not be changed. *Id.*

119. ~~106.~~ Alsup responded the same day, pointing out there was no State policy that supported such a massive performance bond in a Market services contract, and such large maximum liability performance bonds, per State policy, were traditionally reserved for the construction context. *Id.*

~~4838-0443-9506~~4821-7795-9907

120. ~~107.~~ Alsup explicitly asked Wilson to provide the State policy that would support such an enormous bond in a Market services contract. *Id.*

121. ~~108.~~ Wilson did not provide any such policy.

122. ~~109.~~ Alsup followed up with Wilson on June 1, 2020, providing the bonding requirement language for the inmate health services contract for the Commonwealth of Pennsylvania, a contract with a maximum value of approximately $250,000,000.00 and a $5,000,000.00 performance bond.

123. ~~110.~~ Wilson did not respond to ~~this~~that email.

124. ~~111.~~ Despite the Change, Corizon attempted to submit a reasonable proposal that did not require a 100% maximum liability performance bond.

125. ~~112.~~ In a June 4, 2020 letter back to Corizon in response to this submission, Wilson stated "it appears that exceptions were taken to the mandatory requirement for the Performance Bond . . . A response must not include alternate contract terms and conditions. If a response contains such terms and conditions, the State, at its sole discretion, may determine the response to be a nonresponsive counteroffer and reject it." True and correct copies of Wilson's June 4, 2020 letter to Corizon and Corizon's response to the same are attached as **Collective Exhibit ~~H~~S**.

126. ~~113.~~ Wilson informed Corizon that the alternative performance bond arrangement needed to be withdrawn, or TDOC would reject Corizon's proposal on that basis. *Id.*

127. ~~114.~~ The next day, Corizon responded, acknowledging Wilson's letter and stating that "Because of the unprecedented bond amount, Corizon Health needs additional time to make a determination on this exception. In addition, the result of this will likely result in a substantial price increase of approximately 10%." *Id.* That is, Corizon, while unable to actually secure a bond of the size required, correctly identified that the performance bond required by the State would require a significant increase in the Contract price.

128. ~~115.~~ Corizon requested an additional week to consider the matter. *Id.*

129. ~~116.~~ Wilson rejected Corizon's request ~~and~~. Corizon's submission was deemed non-responsive. ~~and~~ Corizon was ~~not considered for~~ disqualified from the potential Contract award. *Id.*

130. ~~117.~~ Corizon's legal counsel also reached out to CPO raising concerns about the changed bonding requirement and the involvement of Landers in the solicitation process — to no avail. *See* June 12, 2020 Letter from Corizon's Counsel to Defendant Wilson (the "Wilson Letter") attached as **Exhibit T**.

131. In the Wilson letter, Corizon directed specific, pointed questions to Wilson about Landers' involvement in the Contract solicitation:

  \*\*\*

  5) Has Centurion been asked to confirm in writing and under oath that Landers had no involvement in Centurion's response to the RFP and provided no information regarding TDOC to Centurion?

  6) Has Mr. Landers been asked to confirm in writing and under oath that he had no involvement in Centurion's response to the RFP and provided no information regarding TDOC to Centurion?

  7) Has the Central Procurement Office taken any additional steps to determine whether Centurion has an Unfair Competitive Advantage, as that term is used in the Conflict Policy, as a result of Mr. Landers' employment?

132. The State, through Bartels, an attorney for CPO, responded to the Wilson letter stating that CPO found no conflict. It is obvious, however, that CPO did not give Corizon's concerns meaningful attention and did not ask any of the

key questions that would have readily brought the wrongdoing of Landers and Centurion to light.

133. ~~118.~~ The State Employee Defendants never denied that Landers was involved in the consideration of the respondent submissions, or that he went to work for Centurion following the Change and while the solicitation process was ongoing. Nor have they identified any logical rationale for the Change.

134. ~~119.~~ There has been no indication that the State Employee Defendants plan to restore the performance bond requirement to more reasonable levels in future solicitations for service contracts in the Market. Upon information and belief, the State Employee Defendants intend to require a maximum liability performance bond on all future contracts in the Market.

135. Generally, the State Employee Defendants have, to date, chosen to look the other way despite the massive fraud that infected this solicitation process. The State's unwillingness to take action against Centurion is difficult to understand unless Landers is not the only bad actor.

**TDOC Awards the Contract to Centurion,
Disregards the Contract Terms, and Increases the Award Amount**

136. ~~120.~~ After the Change was formalized, Centurion, as part of submitting its ~~bid~~proposal, produced a letter to Wilson stating that Centurion had bonding capacity in excess of $500,000,000.00 in the aggregate and bonding capacity in excess of $100,000,000.00 for any individual contract. Centurion, of

course, had significantly more time than any other bidder to come up with the bond because they knew about the Performance Bond Change approximately six weeks earlier than any other bidder.

137. 121. No other respondents submitted a letter making similar representations and, upon information and belief, no other respondent was in a position to do so. As stated above and repeated here, Corizon did not have the ability to obtain a maximum liability performance bond for the Contract.

138. 122. No respondent provided demonstrable proof of an ability to provide the maximum liability performance bond during the solicitation process. Expert review of the finances of WellPath, VitalCore and Wexford shows that none of them have the equity nor liquidity positions needed to support a performance bond of this size, duration, and type of obligation.

139. 123. Upon information and belief, the Contract could not be awarded and approved without the agreement of Defendants Wilson, Parker, Perry, and Wainwright, who all, along with certain John Doe Defendants, approved the awarding of the Contract to Centurion, despite the deviation from longstanding practice.

140. 124. On July 16, 2020, consistent with the deadline set in RFP Amendment 18, Wilson notified the various respondents that the State intended to award the Contract to Centurion.

141. 125. The State Employee Defendants thereafter took deliberate actions to move the Contract toward implementation despite the fact that its terms are inconsistent with State policy and procedure, and despite the damaging impact to competition in the Market. These actions, taken in conjunction and agreement with Centurion, were in clear, unreasonable restraint of trade and entirely inconsistent with an open, transparent competitive bidding process.

142. 126. The RFP required that the Contract be signed by July 31, 2020, and that Centurion post the massive performance bond on or before August 4, 2020. That is, Centurion was obligated to have both signed the Contract and posted a performance bond of the amount of the Contract – at that time, $118,000,000.00 – by no later than August 4, 2020.

143. 127. These are clearly stated conditions, and any winning bidder was required to meet the conditions in that timeframe.

144. 128. After the deadline to protest the award expired on July 23, 2020, the State Employee Defendants, in agreement with Centurion, relieved Centurion of both deadlines, giving Centurion, upon information and belief, an open-ended extension to provide the performance bond.

145. 129. After Corizon learned of and pointed out this anomaly with respect to the timing to TDOC, Young, TDOC's Inspector General Kelly Young, told Wilson "I really don't have patience for them being whiny. . . ." A true and

correct copy of communications between Young and Wilson are attached as **Exhibit ~~I~~S**.

146.   At the time a protest would have been filed, Corizon had no hard evidence and no access to hard evidence that Landers was secretly helping Centurion because Landers was doing so outside of normal channels. Landers' improper communications with Wells were not in the open file materials, where they were supposed to be.

147.   Upon information and belief, Landers acted intentionally to keep his communications with Centurion regarding the RFP and the Contract out of the open file materials.

148.   Upon information and belief, neither TDOC nor CPO made any efforts to determine whether communications outside the proper channels had occurred in gathering the open file materials.

149.   ~~130. Additionally, again long~~Long after the time to protest the bid award had expired, the State Employee Defendants, in agreement and conjunction with Centurion, increased the amount of the award for the Contract from approximately $118,000,000.00 to more than $123,000,000.00.

150.   ~~131.~~ Corizon asked ~~the State~~TDOC/CPO to explain the reason for the post-award increase. ~~The State provided no~~No explanation was provided.

151. ~~132.~~ Upon information and belief, the amount of the award for the Contract was increased from $118,000,000.00 to $123,000,000.00 to provide for the additional funds Centurion would need to pay for the performance bond that it could not provide on August 4.

152. ~~133.~~ That is, upon information and belief, after the Contract was awarded to Centurion, and the parties thereto realized Centurion could not actually perform under its terms, TDOC agreed to increase the Contract award amount by $5,000,000.00 from approximately $118,000,000.00 to more than $123,000,000.00 to cover Centurion's additional costs associated with providing the maximum liability performance bond.

153. ~~134.~~ None of this latter conduct is remotely consistent with fair and open bidding, transparency, or competition. Instead, it demonstrates ~~the Defendants'~~ continued efforts to use an unreasonable bonding requirement as a tool to eliminate competition in the Market and award Market contracts to Centurion.

154. ~~135.~~ The Contract between TDOC and Centurion was signed on August ~~23~~20, 2020, and went into effect on November 1, 2020. *Id.* A true and correct copy of the Contract signed by the State and by Centurion is attached as **Exhibit ~~J~~U**.

155. 136. Although the precise date that Centurion provided the ~~required performance bond~~Performance Bond to TDOC is unknown, it could have been no earlier than October 8, 2020, the date it was signed and a date long after the delivery deadline set by RFP Amendment 18. A true and correct copy of Centurion's performance bond is attached as **Exhibit ~~K~~V**.

137. The Contract provides that TDOC may terminate the Contract upon 30 days' notice, providing a mechanism for prompt termination of the Contract.

### **The Termination of Wells' and Landers' Employment**

156. As a result of the lawsuit, it became apparent that Landers' and Wells' wrongdoing was going to be revealed.

157. On February 11, 2021, Centurion, in an attempt to control the damage and, acting through Wheeler (again, Centurion's CEO), terminated the employment of Landers and Wells.

158. On February 16, 2021, Wheeler reached out to Parker, as the head of TDOC, by e-mail. Wheeler described his decisions to fire Landers and Wells, two egregious wrongdoers, as "a couple of the toughest decisions I have dome [sic] in my career." *See* February 16, 2021 Wheeler E-mail to Parker attached as **Exhibit W**.

159. Despite firing Landers and Wells, Wheeler incredibly put Phillips, who had also been the recipient of highly improper communications from Landers,

in charge of the TDOC Contract as Wells' replacement.  *See* Phillips' Texts with TDOC attached as **Exhibit X**.

### The Continuing Efforts to Hide and Obstruct

160.    On March 11, 2020, prior to Corizon's receipt from Centurion of the documents referenced in Paragraph 87 above, Corizon took the depositions of Landers and Wells.

161.    Landers and Wells produced none of the documents identified in Paragraph 87.

162.    Corizon learned during the deposition about the "WhatsApp" communications and the destruction of evidence referenced above.

163.    Landers acknowledged in his deposition that he had no business reason to communicate with Centurion regarding the behavioral health contract solicitation.

164. Landers stated that he had no specific or general recollection of using either of his cell phones to communicate with Wells or anyone else at Centurion while employed by TDOC regarding the RFP.

165. Landers likewise stated that any communications he had with Centurion using his Gmail account prior to the time he joined Centurion would have been regarding operations under a different contract between TDOC and Centurion.

166. Landers further testified that he never intentionally used his personal Gmail account to communicate with Centurion.

167. Landers was directly asked whether he sent RFP Release #2 to Wells before it was issued publicly. He stated: "You know, again, not to my recollection. It's unlikely." When asked whether it was possible that he did that, Landers stated: "No. I don't know. Maybe. But, again, that would be highly unusual." Landers went on to say that if he did send RFP Release #2 to Centurion, it would not have been intentional and the result of an accident of some sort.

168.  Wells was asked in his deposition whether he ever had any communications with any employee of any state agency, Tennessee or otherwise, during an ongoing solicitation other than the employee designated on the solicitation as the single point of contact.  Wells unequivocally answered "No."

169.  Wells was likewise directly asked about whether he received RFP Release #2 from Landers before it was issued publicly.  He stated:  "Not that I recall."

**Damage to the ~~Relevant~~ Market ~~From this Agreement~~from Defendants' Conduct**

170.  ~~138.~~ The Market is a specialized, critically important market in Tennessee.  Before the events giving rise to this case, it involved a handful of private contractors who, through the benefit of their experience and expertise, competed to provide cost-effective and supportive care and treatment to inmates housed in Tennessee prisons.

171.  ~~139.~~ This Market is of critical importance to Tennessee residents, who are ultimately funding the work done by these private companies and who have an indirect interest in seeing that inmates in Tennessee prisons have their health care needs met in a cost-effective, but also compassionate, manner.

172. ~~140.~~ The Market is also of critical importance to the inmates themselves, who have a direct interest in quality health services while they pay their debt to society and await reentry.

173. ~~141.~~ This Market has previously functioned efficiently. The State of Tennessee, pursuant to Tennessee law and the procurement policies and procedures that implemented that law, solicited proposals from time to time from established, recognized private inmate health care service providers to provide health care services to inmates.

174. ~~142.~~ Because of the specialized nature of the Market, the same several respondents were often involved. However, competitive responses were submitted by companies across the economic spectrum, from enormous companies backed by massive corporate parents like Centurion to smaller companies based in and outside of Tennessee.

175. ~~143.~~ The State's policy of tying procurement considerations to the cost-effective provision of quality services kept the Market running effectively, where all respondents had a reasonable opportunity to compete for a Market services contract.

176. ~~144.~~ The State Employee Defendants' decision to change the performance bond requirements—approximately 6 months after the original RFP

was issued—for the Contract and apparently for all Market services contracts thereafter eliminated competition in the Market.

177. ~~145.~~ Upon information and belief, only Centurion, backed by its massive corporate parent, Centene, is in the position to obtain the performance bonds required in the Contract and that will be required for Market contracts going forward.

178. ~~146.~~ The conduct and agreements between and amongst Centurion and one or more of the State Employee Defendants have given Centurion an unjustified and unearned monopoly in the Market.

179. ~~147.~~ The State Employee Defendants' actions are not supported by law or regulation, and the secret communications between Landers and a vice president of Centurion (and others associated with Centurion) are obviously completely inconsistent with law and regulation and are wildly improper.

180. ~~148.~~ Indeed, in its laws and regulations, the State has committed to (i) competitive, fair procurement for government contracts, (ii) not imposing unreasonable or outlandish terms that ~~only~~ benefit only certain entities, (iii) imposing only "appropriate" performance bonds, and (iv) avoiding actual and potential conflicts of interest in the solicitation process. *See e.g.* T.C.A § 12-3-501 (public contracts shall be awarded by "competitive sealed solicitations by the central

~~4838-0443-9506~~4821-7795-9907

procurement office") (emphasis added); T.C.A § 12-3-502(i) (procurement bonds are not required for State contracts/performance bonds "appropriate" in amount may be required).

181. ~~149.~~ For instance, ~~the~~ CPO, in recognition of the vital role fair and transparent public solicitation and purchasing plays in the State, has issued a comprehensive Business Conduct and Ethics Policy (the "Policy"), Policy Number 2013-009 (as amended August 17, 2017). A true and correct copy of the Policy is attached as **Exhibit ~~L~~Y**.

182. ~~150.~~ That Policy commits the State to full and open competition, transparency, and the avoidance of even the appearance of impropriety. The Policy is binding on all State employees involved in the procurement of government contracts. This Policy was violated to an extreme degree in this case. And CPO/TDOC have done absolutely nothing to rectify those violations. Again, the company directly involved in these improper communications, and which benefited from them, still enjoys the profits from its misconduct.

183. ~~151.~~ Paragraph 4 of the Policy states "[a]ll Central Procurement Office or Covered State Agency Personnel involved in public Procurement or Contract Administration must act in good faith and deal with the public in a fair and impartial manner. All Central Procurement Office or Covered State Agency Personnel must act with honesty and integrity and shall remove themselves from

Procurement or Contract Administration in the event they cannot act in good faith or conduct their work in a fair and unbiased manner."

184. ~~152.~~ Here, the State Employee Defendants abandoned settled policy and practice consistent with State law, instead embracing an irrational performance bond requirement that eliminated the competitive process that the relevant statutes and regulations are designed to foster.

185. ~~153.~~ Centurion and other Market participants are located in other states. The profits Centurion receives from the Contract are received and enjoyed by Centurion in other states.

186. ~~154.~~ Upon information and belief, goods used in connection with providing inmate behavioral health services to the State have in the past and will in the future be purchased outside the State.

187. ~~155.~~ In performing the 2012 and 2016 Contracts, physicians employed by Corizon have used medications manufactured outside the State and any respondent under the Contract will necessarily do the same.

188. ~~156.~~ Upon information and belief, the bonding company that Centurion used to obtain the bond for the Contract is based in Indiana. Upon information and belief, that same bonding company will be used by Centurion again when it obtains future Market services contracts.

189. ~~157.~~ The requirement of a maximum liability performance bond for Market contracts will unreasonably tie up a substantial portion of any Market participant's bonding capacity (which is generally not elastic), eliminating or substantially limiting the ability of any Market participant with an existing Market services contract from bidding on similar work in other states, further affecting interstate commerce.

190. ~~158.~~ As Corizon was the incumbent provider of behavioral health services to inmates in Tennessee, and had provided such services for eight years without complaint from the State, Corizon, if it had been given a fair opportunity to bid, would have been selected as the winning bidder of the Contract and/or would have had the term of the 2016 Contract extended pending a new solicitation and award.

**TDOC's Refusal to Address the Wrongdoing**

191. The Contract provides that TDOC may terminate the Contract upon 30 days' notice, providing a mechanism for prompt termination of the Contract.

That is, if TDOC wanted to sanction Centurion for the obviously improper actions that infected the bidding process for this Contract, it could easily do so.

192. TDOC could likewise disavow its intention to require unnecessarily large performance bonds on service contracts going forward.

193. To date, TDOC has failed to take that action, choosing instead to continue to work with a company that has demonstrated clearly that it has no respect for an honest solicitation process, and sending a message to companies that would compete for work with the State of Tennessee that flouting the State's laws, regulations, and rules regarding contract procurement will be accepted and, indeed, rewarded.

## CLAIMS FOR RELIEF

### COUNT I - VIOLATION OF 15 U.S.C. § 1
### (Against ~~All~~Centurion and the State Employee Defendants)
### Illegal ~~Contracts~~Contract in Restraint of Trade

194. ~~159.~~ Corizon re-alleges and asserts the foregoing paragraphs as if fully restated herein.

195. ~~160.~~ Defendants, by and through their anticompetitive actions as outlined herein, have entered a contract, combination, or conspiracy in restraint of trade and commerce. Centurion is liable for the acts of Wells and all other Centurion employees who worked to improperly obtain and use information and/or who otherwise worked to restrain trade to Centurion's benefit.

196. ~~161.~~ The terms of the Contract with Centurion—specifically the performance bond requirement—prevented every Market participant but Centurion from being able to compete for, and enter into the Contract. There is no indication the State Employee Defendants will not require a maximum liability performance bond for Market contracts in the future, and such requirement will, upon information and belief, be imposed going forward. Defendants, through their Contract and subsequent conduct, eliminated competition for inmate health care services in the relevant Market and thereby have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

197. ~~162.~~ The Contract and restraint of trade affects interstate commerce in multiple ways as set forth above.

198. ~~163.~~ In furtherance of their contract, combination or conspiracy in restraint of trade, Defendants agreed—in the course of solicitation and implementation of the Contract—to a performance bond requirement that would exclude all but Centurion from the inmate health care services Market.

199. ~~164.~~ This agreement was clearly part of an overall design and plan between Centurion on the one hand and one or more of the State Employee Defendants (including, potentially, John Doe Defendants) on the other, to award Market contracts to Centurion going forward. This has been shown by the State Employee Defendants' continued support for using maximum liability performance bonds for Market contracts.

200. ~~165.~~ The State Employee Defendants' efforts to assist Centurion are also demonstrated by fact that when, upon information and belief, Centurion was not able to meet the performance bond requirement on time or without occurring additional costs, one or more of the State Employee Defendants agreed to waive the clear requirement of the RFP as to when the performance bond needed to be provided and to increase the maximum value of the Contract by the approximate amount that the bond would cost.

201. ~~166.~~ State Employee Defendants likewise waived the requirement of the RFP as to when the Contract had to be signed. These actions were entirely improper and consistent with the illegitimacy of the entire process. If Centurion

could not meet the requirements of the RFP, the Contract award should have been cancelled and rebid.

202. ~~167.~~ By entering into the Contract and increasing the Contract award from $118,000,000.00 to $123,000,000.00, ~~the~~ Defendants allowed Centurion to reap the same profits without paying any more for a maximum liability performance bond. Through this conduct, ~~the~~ Defendants have demonstrated a unity of purpose, as well as common design and understanding, to reduce or eliminate competition in the Market by maintaining a performance bond requirement that eliminates competition while ensuring that Centurion will always be able to obtain the Market ~~service~~services contract.

203. ~~168.~~ As is demonstrated by their continued insistence on proceeding with the Contract and supporting the imposition of the same bonding requirement in the future in this Market, Defendants possessed, and still possess, a conscious commitment to a common scheme designed to achieve an unlawful objective – that is, the elimination of competition in the Market.

204. ~~169.~~ Defendants' actions constitute a continuing agreement, understanding, and concert of action involving Market participants.

205. ~~170.~~ Defendants' actions have the purpose and effect of unreasonably restraining trade in the Market, the net effects of which are anticompetitive, and any purported procompetitive justifications are illegitimate and pre-textual.

206. ~~171.~~ Defendants' actions create a series of anticompetitive effects in the Market, including:

(~~a~~A) preventing and deterring inmate health care services providers in Tennessee and other states from competing for Market contracts because they cannot meet the unreasonable bonding requirement, at least without causing significant financial strain to their business;

(~~b~~B) depriving the taxpayer from enjoying the benefits of competition in this Market~~,~~ and forcing the taxpayer to incur substantial additional costs in funding inmate health care services contracts, with no ~~commiserate~~commensurate improvement in inmate health and wellness;

(~~c~~C) depriving inmates in the State of Tennessee from enjoying the same benefits of competition; and

(~~d~~D) reducing innovation and creativity in services in the Market.

207. ~~172.~~ Defendants' actions constitute a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 because ~~it is~~they are entirely void of redeeming competitive rationales.

208. ~~173.~~ Alternatively, Defendants' actions constitute a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the Rule of Reason. On their face, Defendants' actions restrict, and are intended to restrict, the method of competing in the Market, thereby restricting the number of competitors and causing prices in that market to

rise, maintain, or stabilize above competitive levels. The State Employee Defendants have market power in this Market and can enforce their competition-restricting agreement by using the legal authority of the State to preclude entrance into the Market or to restrict the method of competition in the Market. There is no legitimate business justification for the State Employee Defendants' agreement.

209. 174. Defendants' actions evidence an intent to deprive inmate health care services providers, other than Centurion, of a fair opportunity to compete in the Market. Through their actions, Defendants intend to reduce the number of providers of inmate health care services in Tennessee and the output of such services.

210. 175. Defendants' actions do not enhance, and in fact weaken, the public health and safety in Tennessee, and do not serve any legitimate public purpose.

211. Upon information and belief, Defendants' actions in Tennessee are part of a wider Centurion scheme to seek to obtain performance bond increases in multiple states.

212. 176. As a direct, proximate, and foreseeable result of Defendants' actions, Corizon has suffered or will suffer irreparable injury if the Contract continues to be performed and/or if future Market services contracts impose the

same maximum liability performance bond requirement, because Corizon will forever lose the opportunity to fairly compete in the Market for the Contract and subsequent contracts with the same or similar performance bond terms.

213. 177. Additionally, Corizon has incurred monetary damages from Centurion's ongoing, current, and successful restraint of trade.

214. 178. Centurion claimed it could—but actually could not—meet the RFP requirements with regard to signing the Contract timely and with regard to the performance bond because it could not sign the Contract by July 31, 2020, and could not furnish the required bond by August 4, 2020. Instead of recognizing that it could not meet the RFP terms, Centurion, outside of the recognized bidding procedure and thus in contravention of law, engineered ana side agreement with the State whereby it would be paid $5 million more under the Contract and would receive an extension of time to sign the Contract and provide the required performance bond. Centurion's conduct denied Corizon a fair opportunity to bid on the Contract and to maintain its rights as incumbent provider, and thus Corizon incurred damages.

215. 179. Upon information and belief, had all parties fairly and honestly bid on the Contract, and Centurion not misrepresented their ability to sign the Contract timely and furnish the required bond by the required date for the bid amount, Corizon, as the incumbent bidder who had successfully served the State

for eight years, would have been awarded the Contract and/or, at a minimum, the term of the 2016 Contract would have been extended pending a new solicitation.

216. ~~180.~~ Corizon is entitled to the damages resulting from Centurion's underhanded and anti-competitive conduct in obtaining the Contract, including lost profits and other consequential damages, plus treble damages and attorneys' fees, as provided in the Sherman Act.

217. ~~181.~~ Corizon is also entitled to prospective injunctive relief permanently enjoining Centurion and the State Employee Defendants from continuing the Contract and permanently enjoining the State Employee Defendants requiring maximum liability performance bonds in future health services solicitations absent clear and express direction to that effect from the State legislature.

## COUNT II - VIOLATION OF 15 U.S.C § 1
### (Against Landers and Centurion)
### Illegal Conspiracy in Restraint of Trade

218. Corizon re-alleges and asserts the foregoing paragraphs as if fully restated herein.

219. For at least a year, Defendant Landers secretly and illegally provided sensitive, internal, TDOC/CPO communications and materials to Centurion, primarily using Wells as his point of contact. Because Wells and the other Centurion employees referenced in this Amended Complaint were acting within

the scope of their employment, Centurion is liable for all of the misconduct of Wells and other Centurion employees.

220. Landers and Wells have deleted or allowed to be deleted reams of communications between them in an effort to cover their tracks and prevent the disclosure of their illegal conduct.

221. The communications that have been uncovered to date show that Landers and Centurion were engaged in a broad pattern of collusion that goes well beyond the communications that have been identified so far.

222. For instance, Landers forwarded sensitive internal government materials related to the Contract to Wells and two consultants at Vant4ge. There thus had to have been communications between Wells, Landers, and Vant4ge leading up to this improper exchange of information. Wells also forwarded Landers' communications within Centurion, including to Phillips, Vice President of Operations. Upon information and belief, at no time did Wells, Phillips, or anyone else at Centurion ever suggest that Landers stop sending them inside information or that they did not want or intend to use the information for their advantage.

223. The fundamental and agreed purpose of all of this communication was to ensure that Centurion was awarded the Contract. This is an obvious conspiracy in restraint of trade.

224. Defendants' actions constitute a continuing agreement, understanding, and concert of action involving Market participants.

225. Defendants' actions have the purpose and effect of unreasonably restraining trade in the Market, the net effects of which are anticompetitive, and any purported procompetitive justifications are illegitimate and pre-textual.

226. Defendants' actions create a series of anticompetitive effects in the Market, including:

(A) preventing and deterring inmate health care services providers in Tennessee and other states from competing for Market contracts because they recognize that the Market is infected with fraud and collusion, and the State Employee Defendants will do nothing to stop it.

(B) depriving the taxpayer from enjoying the benefits of free and fair competition in this Market and forcing the taxpayer to incur substantial additional costs in funding inmate health care services contracts, with no commensurate improvement in inmate health and wellness;

(C) depriving inmates in the State of Tennessee from enjoying the same benefits of competition; and

(D) reducing innovation and creativity in services in the Market.

227. Defendants' actions constitute a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 because they are entirely void of redeeming competitive rationales.

228. Alternatively, Defendants' actions constitute a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the Rule of Reason. On their face, Defendants' actions restrict, and are intended to restrict, the method of competing in the Market, thereby restricting the number of competitors and causing prices in that market to rise, maintain, or stabilize above competitive levels. There is no legitimate business justification for the conduct of Landers and Centurion.

229. Defendants' actions evidence an intent to deprive inmate health care services providers, other than Centurion, of a fair opportunity to compete in the Market. Through their actions, Defendants intend to reduce the number of providers of inmate health care services in Tennessee and the output of such services.

230. Defendants' actions do not enhance, and in fact weaken, the public health and safety in Tennessee, and do not serve any legitimate public purpose.

231. As a direct, proximate, and foreseeable result of Defendants' actions, Corizon has suffered or will suffer irreparable injury if the Contract continues to be performed because Corizon will forever lose the opportunity to fairly compete in the Market for the Contract.

232. Additionally, Corizon has incurred monetary damages from Defendants' ongoing, current, and successful restraint of trade.

233.　Upon information and belief, had all parties fairly and honestly bid on the Contract and Centurion had not had the benefit of inside information, Corizon, as the incumbent bidder who had successfully served the State for eight years, would have been awarded the Contract.

234.　Corizon is entitled to the damages resulting from Defendants' underhanded and anticompetitive conduct in obtaining the Contract, including lost profits and other consequential damages, plus treble damages and attorneys' fees, as provided in the Sherman Act.

## COUNT III - VIOLATION OF 15 U.S.C § 2
### (Against Centurion Only)
### Actual Monopolization of the Market

235.　~~182.~~ Corizon re-alleges and asserts the foregoing paragraphs as if fully restated herein.

236.　~~183.~~ Section 2 of the Sherman Act, in pertinent part, makes it unlawful to "monopolize, or attempt to monopolize, . . . any part of the trade or commerce among the several States . . ."

237.　~~184.~~ The Market affects trade and commerce between the states as discussed and identified above.

238.　~~185.~~ In violation of Section 2, Centurion has used its monopoly power to foreclose competition, to gain a competitive advantage, or to destroy competition in the Market.

239. 186. Through the anticompetitive and deceptive acts identified throughout, Centurion has obtained monopoly power in the Market. It is the only Market participant able to furnish the maximum liability performance bonds that the Defendants agreed to require in the Contract and apparently for all Market contracts going forward.

240. 187. Centurion did not acquire its monopoly power by providing superior service, or through business acumen. Rather, its monopoly power in the Market was willfully acquired through anti-competitive, exclusionary, and deceptive means.

241. 188. Throughout this process, including through its solicitation of Mr. Landers to move from TDOC in exchange for his provision of inside information about the bidding process for the Contract, Centurion has engaged in anti-competitive practices, the design of which werewas to eliminate competition in the Market and afford itself a monopoly in the Market.

242. 189. Centurion's activities and its agreements with the State Employee Defendants have not just reduced, but actually eliminated, competition in the Market, and Corizon's losses—in the ability to fairly compete and obtain Market contracts—arise directly from that loss of competition.

243. 190. Corizon is entitled to the damages resulting from Centurion's underhanded and anti-competitive conduct in obtaining the Contract and

monopolizing the Market, including lost profits and other consequential damages plus treble damages and attorneys' fees, as provided in the Sherman Act.

### COUNT ~~III~~IV - VIOLATION OF 15 U.S.C. § 2
### (Against Centurion only
### and, in the Alternative, to the Actual Monopolization Claim)
### Attempted Monopolization of the Market

244. ~~191.~~ Corizon re-alleges and asserts the foregoing paragraphs as if fully restated herein.

245. ~~192.~~ Alternatively, to the extent Centurion has not fully obtained a monopoly in the Market, it is still in violation of Section 2 for attempting to do so.

246. ~~193.~~ Through its actions and course of conduct, Centurion has had a specific intent to monopolize the Market.

247. ~~194.~~ Centurion has engaged in anti-competitive conduct throughout the course of this effort, including offering a lucrative salary and benefits to a senior TDOC employee ~~involved in~~who was providing Centurion with inside information throughout the bidding process for the Contract, and misrepresenting its ability to furnish the requirements of the Contract.

248. ~~195.~~ Given that there is no indication that the State Employee Defendants will not continue to require a maximum liability performance bond for future Market services contracts, there is a dangerous probability that Centurion will be successful in its attempted monopolization of the Market.

249. 196. Corizon is entitled to the damages resulting from Centurion's underhanded and anti-competitive conduct in obtaining the Contract and its attempted monopolization of the Market, including lost profits and other consequential damages, plus treble damages and attorneys' fees, as provided in the Sherman Act.

## COUNT IV V - Declaratory Judgment
## (Against Centurion Only)

250. 197. Corizon re-alleges and asserts the foregoing paragraphs as if fully restated herein.

251. 198. As set forth above, Corizon contends that the Contract violates the Sherman Act and procurement law in multiple respects.

252. 199. Corizon further contends that the Contract, as a result of the violation of the Sherman Act and procurement law, is illegal and void as a matter of law.

253. 200. Centurion disputes Corizon's contentions.

254. 201. The Court should declare that: (A) the Contract was entered into in violation of the Sherman Act; and procurement law; (B) the Contract is, as a consequence of such violation, illegal and void as a matter of law; and (C) that Centurion should be required to disgorge all profits earned under the Contract.

## COUNT ~~V~~VI - Tortious Interference with Business Relations
## (Against Centurion and Landers Only)

255.   Corizon re-alleges and asserts the foregoing paragraphs as if fully restated herein.

256.   At the time of the bidding of the Contract, Corizon was the incumbent bidder, having obtained the inmate behavioral health services contract in 2012 and having been awarded that contract again in 2016.   Thus, at the time of the bidding of the Contract, Corizon had an existing business relationship with the State.

257.   Centurion, as one of the few participants in the Market who had likewise bid on the behavioral health services contracts in prior years, knew of Corizon's business relationship with the State.

258.   Corizon, as the incumbent bidder, was most likely to again obtain the award of the Contract and was best situated to continue to provide behavioral health services to TDOC.

259.   Centurion, acting through Wells and others, and with Landers, intentionally and improperly interfered with Corizon's relationship with the State.

260.   Centurion, acting through Wells and others, fostered a relationship with Landers, and they agreed that Landers would use his position as CFO of TDOC to furnish Centurion with private, internal, non-public information about the bidding process, in a way that affords Centurion a material advantage in the bidding process.

261. Centurion used the information provided to prepare a more competitive bid than it would have otherwise been able to do, because it had the benefit of knowing the State's internal calculations and thought processes.

262. The intent of Landers and Centurion was to end Corizon's relationship with the State.

263. The means used by Landers and Centurion were obviously improper, involving the illegal transmission of inside information about the bidding process.

264. Corizon has been damaged by the tortious interference including lost profits, both from the premature termination of the 2016 Contract and/or the loss of the Contract, and other consequential damages, including money spent by Corizon competing for a Contract that it could never win.

## COUNT VII - Tortious Interference with Business Relations
## (Against Centurion Only)

265. ~~202.~~ Corizon re-alleges and asserts the foregoing paragraphs as if fully restated herein.

266. ~~203.~~ At the time of the bidding of the Contract, Corizon was the incumbent bidder, having obtained the inmate behavioral health services contract in 2012 and having been awarded that contract again in 2016. Thus, at the time of the bidding of the Contract, Corizon had an existing business relationship with the State.

267. ~~204.~~ Centurion, as one of the few participants in the Market, who had likewise bid on the behavioral health services contracts in prior years, knew of Corizon's business relationship with the State.

268. ~~205.~~ Corizon, as the incumbent bidder was most likely to again obtain the award ~~again~~ of the Contract and was best situated to continue to provide behavioral health services to TDOC.

269. ~~206. Centurion intentionally and improperly interfered with Corizon's relationship with the State, by~~ By representing that it could meet the State's requirement to sign the Contract by July 31, 2020, and/or to furnish a maximum liability performance bond in the bid amount by August 4, 2020, Centurion misled the State regarding its ability to comply with the requirements of the RFP.

270. ~~207.~~ Upon information and belief, Centurion knew that it could not meet the requirements of the RFP at the time of the award and had no intention of doing so.

271. ~~208.~~ If Centurion had been acting honesty and fairly, it would have followed Corizon's course, which was to advise TDOC that its maximum liability performance bond requirement was unreasonable and could only be met with a substantial increase in the Contract price.

272. ~~209.~~ Instead, in an attempt to drive Corizon out of the competition and disrupt Corizon's existing business relationship with the State, Centurion

4838-0443-9506 4821-7795-9907

misrepresented its ability to sign the Contract by July 31, 2020, and get the bond by August 4, 2020, and misrepresented what its services would cost.

273. ~~210.~~ Through these misrepresentations, Centurion obtained the Contract award, resulting in the premature cessation of the 2016 Contract and in the termination of Corizon's relationship with the State.

274. ~~211.~~ Only after the period of time for making a bid protest passed, did Centurion not meet the signature requirement and obligation to provide the performance bond by August 4 and, upon information and belief, advised the State Employee Defendants that they would have to increase the Contract award amount to cover the cost of the bond.

275. ~~212.~~ Corizon has been damaged by Centurion's misconduct, including lost profits, both from the premature termination of the 2016 Contract and/or the loss of the Contract, and other consequential damages.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Corizon respectfully requests relief from the Court as follows:

~~a)~~ A) Trial by a jury of six (or the smallest permissible number of jurors) of all claims properly decided by a jury;

b) B) An award of all damages properly recoverable from Centurion and Landers, jointly and severally, for its their violation of the Sherman Act, including lost profits, consequential damages, and treble damages;

c) C) An order under the Sherman Act and *Ex Parte Young* permanently enjoining Defendants from further performing the Contract and requiring that a new solicitation take place;

d) D) An order under the Sherman Act and *Ex Parte Young* permanently enjoining the State Employee Defendants from requiring maximum liability performance bonds in future health services solicitations absent clear and express direction to that effect from the State legislature;

e) E) A declaratory judgment holding that: (1) Centurion's Contract with TDOC is illegal under the Sherman Act and void; procurement law; (2) the Contract is, consequently, void; and (3) Centurion is obligated to disgorge all profits received under the Contract;

f) F) An award of all damages properly recoverable from Centurion and Landers, jointly and severally, for interference with business relations;

G) g) An award of attorneys' fees, costs, pre- and post-judgment interest; and

h) H) Such other and further relief as the Court deems just and proper.

Respectfully submitted,

s/ W. Travis Parham
W. Travis Parham, TN BPR #016846
Andrew A. Warth, TN BPR #027606
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone: (615) 244-6380
Travis.Parham@wallerlaw.com
Drew.Warth@wallerlaw.com

*Attorneys for Plaintiff,*
*Corizon LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on ~~December~~April 8, 2020, the foregoing document was filed with the court via the court's Electronic Case Filing System, which will serve notice of such filing as indicated below:

Dianna Baker Shew
Senior Assistant Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202-0207
dianna.shew@ag.tn.gov

*Attorneys for the Individual Defendants*

W. Scott Sims
R. Mark Donnell, Jr.
Michael R. O'Neil
Sims Funk, PC
3322 West End Ave., Suite 200
Nashville, TN 37203
ssims@simsfunk.com
mdonnell@simsfunk.com
moneil@simsfunk.com

*Attorneys for Defendant*
*Centurion of Tennessee, LLC*

s/ W. Travis Parham

~~4838-0443-9506~~4821-7795-9907

Document comparison by Workshare 10.0 on Friday, April 9, 2021 4:16:16 PM

| Input: | |
|---|---|
| Document 1 ID | netdocuments://4838-0443-9506/9 |
| Description | Corizon First Amended Complaint |
| Document 2 ID | netdocuments://4821-7795-9907/7 |
| Description | Corizon Second Amended Complaint |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 578 |
| Deletions | 382 |
| Moved from | 5 |
| Moved to | 5 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 970 |