# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| CORIZON, LLC, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:20-cv-00892 |
| | ) | |
| PRISCILLA WAINWRIGHT, in her official | ) | Judge Richardson |
| capacity as Director of Contracts Management | ) | Magistrate Judge Frensley |
| for the State of Tennessee Department of | ) | |
| Correction; TONY C. PARKER, in his official | ) | |
| capacity as Commissioner for the State of | ) | |
| Tennessee Department of Correction; | ) | |
| MICHAEL F. PERRY, in his official capacity | ) | |
| as Chief Procurement Officer for the State of | ) | |
| Tennessee Central Procurement Office; | ) | |
| MAGGIE WILSON, in her official capacity as | ) | |
| Sourcing Account Specialist for the State of | ) | |
| of Tennessee Department of Correction; | ) | |
| JOHN DOES 1-10, additional employees of | ) | |
| the State of Tennessee operating in their official | ) | |
| capacities; CENTURION OF TENNESSEE, | ) | |
| LLC; and WESLEY LANDERS, in his | ) | |
| individual capacity, | ) | |
| | ) | |
|     Defendants. | ) | |

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT CENTURION OF TENNESSEE, LLC'S
## MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

---

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

STANDARD OF REVIEW ........................................................................................... 9

    I.      Subject-Matter Jurisdiction ......................................................................... 9

    II.     Failure to State a Claim .............................................................................. 10

ARGUMENT ............................................................................................................... 10

    I.      Corizon Lacks Standing to Bring Its Antitrust Claims. ............................. 11

      A.    Corizon does not have Article III standing. ............................................ 11

      B.    Corizon does not have antitrust standing. ................................................ 14

    II.     Corizon's Antitrust Claims Are Barred by *Parker* and *Noerr-Pennington* Immunity. ..
..................................................................................................................... 19

      A.    *Parker* immunity bars Corizon's antitrust claims. ....................................... 19

      B.    *Noerr-Pennington* immunity bars Corizon's antitrust claims. .................................... 22

    III.    Corizon Has Failed to Plead Claims Upon Which This Court Can Grant Relief. ...... 23

      A.    Corizon has not plausibly pled a Sherman Act Section 1 claim. (Counts I & II) ....... 23

      B.    Corizon has not plausibly pled a Sherman Act Section 2 claim. (Counts III & IV) ... 31

      C.    Corizon has not plausibly pled a tortious interference claim. (Counts VI & VII) ...... 33

      D.    Corizon has not plausibly pled a claim under the Declaratory Judgment Act. (Count V) ......................................................................................................... 37

    CONCLUSION ...................................................................................................... 40

## INTRODUCTION

This is an *antitrust* case, not a case of "public corruption." [Doc. No. 74, p. 2]. Allegations of "public corruption and private dishonesty," however colorfully pled, are not antitrust violations. *See City of Columbia v. Omni Outdoor Advert., Inc*., 499 U.S. 365, 378–79 (1991) ("Congress has passed other laws aimed at combating corruption in state and local governments."); *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 539 (6th Cir. 2002) (holding that allegations of "public corruption" did not suffice to overcome *Parker* immunity to antitrust claims arising from government procurement). This antitrust case comes down to three decisions made by dozens of officials and employees of the State of Tennessee: (1) the State's decision to require a maximum liability performance bond *from the beginning* of the subject Request for Proposals ("RFP"), (2) the State's decision to disqualify Plaintiff Corizon, LLC ("Corizon") due to its refusal to abide by the RFP process, and (3) the State's decision to award the subject contract to Centurion of Tennessee, LLC ("Centurion") over the three remaining bidders.

The sensationalized pleadings and cries of "public corruption" are Corizon's attempts to distract from the true cause of its failure to win the Contract. On the eve of the RFP submission deadline, and months after the already extended deadline to submit questions to the State, Corizon objected to the performance bond requirement of the RFP. Despite receiving clarification from the State, Corizon then submitted a noncompliant bid, which again flouted the performance bond requirement. Rather than simply reject the bid, the State pointed out the problem and gave Corizon a chance to fix it. Corizon squandered that chance and instead asked for special treatment—another extension to further contemplate the now clear requirement. The State declined to grant Corizon special treatment, and Corizon's bid was not considered. Then, despite its previous complaints about the bond requirement and the RFP process, Corizon declined to protest the bid in accordance

with state law. It is this series of events and decisions made by Corizon, not the alleged conduct of Centurion, that caused Corizon not to win the Contract.

The Court denied Corizon's eleventh-hour motion for preliminary injunctive relief, noting that Corizon's Sherman Act claim was facially "ineffectual" without a TRO. [Doc. Nos. 35, 42]. Corizon admitted as much in its prior briefing. [Doc. No. 28, p. 1 ("If the Contract is allowed to go into effect . . . , much of the battle is lost for Corizon."); Doc. No. 35, p. 25]. But Corizon has now tripled down on its inapt antitrust theory, adding more ill-fitting claims. Corizon has also repackaged its abandoned bid protest as a claim for declaratory relief in this Court, ignoring State law and the State's rules just as it did during the RFP. The Second Amended Complaint makes much of documents produced during early discovery. Still, even after the production and review of *thousands* of documents, Corizon has not connected Centurion to the genesis of the maximum liability performance bond—the keystone of Corizon's entire antitrust theory. The two threads of Corizon's entire case—the performance bond requirement and allegedly improper communications between Centurion and Defendant Wes Landers—never intersect. Respectfully, Corizon's Second Amended Complaint should be dismissed.

## BACKGROUND

### Tennessee's Behavioral Health Services RFP

The Tennessee Department of Corrections ("TDOC") and the Tennessee Central Procurement Office ("CPO") issued an RFP for a new inmate behavioral health services contract on August 8, 2019 ("RFP Release 1"). [Doc. No. 74, ¶ 74]. Though Section 1.10 of RFP Release 1 stated that the RFP required a $1 million performance bond, the "*Pro Forma* Contract"— Attachment 6.6 to RFP Release 1—explicitly stated that "[t]he Performance Bond shall be in an amount equal to one hundred percent (100%) of the Maximum Liability . . ." [*Compare* Doc. No.

74, ¶ 78, *and* Doc. No. 74-1, § 1.10, *with* Exhibit 1, Attachment 6.6, p. 52, § E.2].[1] "Maximum Liability" in this context means the maximum obligation of the State in a variable-cost contract. As a result, the performance bond needed to cover the State's maximum liability under any contract executed as a result of the RFP. [Doc. No. 74, ¶ 87]. In short, the State included a maximum liability performance bond requirement—the alleged antitrust violation—in RFP Release 1 in August 2019.

### Wes Landers, the RFP Process, and Maximum Liability

Defendant Landers, former Chief Financial Officer of TDOC, served with TDOC for nearly eight years. [Doc. No. 74, ¶ 83]. As CFO, Mr. Landers communicated with many employees and executives of various contractors, including Jeffrey Wells, former Vice President at Centurion, and Tommy Alsup, former Vice President of Government Affairs at Corizon. A handful of his communications with Mr. Wells also addressed the subject RFP. [*Id.* ¶ 87]. As TDOC CFO, Mr. Landers exercised some measure of supervision over all of TDOC's finances, including ongoing contracts and RFPs. [*Id.* ¶ 83]. Though Mr. Landers would naturally review any maximum liability estimates for TDOC RFPs, *performance bond requirements* are ultimately the purview of CPO, an office over which Mr. Landers held no oversight. Tenn. Comp. R. & Regs. 0690-03-01-.07(2)(a). In other words, while Mr. Landers may have been involved in the RFP's maximum liability determinations, he was not involved in setting a "maximum liability *performance bond*." Corizon has not directly pled otherwise.

---

[1] Though Corizon has only selectively excerpted RFP Release 1, the Court may consider the document *in toto*, attached as Exhibit 1, without converting this motion to a motion for summary judgment. Corizon explicitly refers to RFP Release 1 in its Second Amended Complaint and RFP Release 1 is integral to its claims and is a matter of public record released for public review during the protest period. *See* Fed. R. Civ. P. 10(c); *Com. Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) (noting that a court may consider documents referenced in the complaint or a matter of public record when reviewing a motion to dismiss).

Mr. Landers chose to move on from his position with TDOC to return to his home state of Georgia. [Doc. No. 74, ¶¶ 30, 84]. *After* RFP Release 1, which already contained the maximum liability performance bond requirement, Mr. Landers explored employment with Centurion *of Georgia*, LLC. [*Id.* ¶¶ 84, 103]. Centurion *of Georgia* offered Mr. Landers a position, which began in March 2020. [*Id.* ¶¶ 84, 103].

### RFP Release 2

The State issued a revised RFP on February 25, 2020 ("RFP Release 2"). [*Id.* ¶ 104]. Among dozens of other edits, RFP Release 2 clarified that, consistent with the original *Pro Forma* Contract, a performance bond in the full amount of the State's maximum liability under the contract would be required, resolving the inconsistent language in RFP Release 1. [Doc. No. 74, ¶¶ 101, 104–05; Doc. No. 74-16, § 1.10; Doc. No. 17, ¶ 2]. In other words, "the Change" is a fiction of Corizon's creation. [*See* Doc. No. 74, ¶ 87(F) (showing that the maximum liability performance bond requirement had not changed from the initial posting); Exhibit 1, Attachment 6.6, p. 52, § E.2 (RFP Release 1 containing the maximum liability performance bond requirement)].

### Proposal Submissions and Corizon's Violations of the RFP Process

Multiple bidders—Centurion, Corizon, WellPath, VitalCore, and Wexford—submitted proposals. [Doc. No. 74 ¶¶ 37, 140, 174]. Centurion, WellPath, VitalCore, and Wexford all expressed that they would comply with the performance bond requirements outlined in Section 3.3.1 and Section A.8 of Attachment 6.2. [*Id.* ¶ 111; Exhibit 2, pp. 9, 20].[2]

Corizon did not. [Doc. No. 74, ¶ 124]. Instead, nine months into the RFP and on the eve of the response deadline, Corizon challenged the mandatory RFP conditions set by the State. The

---

[2] The Court may also consider *in toto* RFP Release 2, attached as Exhibit 2.

deadline for vendor questions and comments passed on March 17, 2020. Three months after RFP

Release 2 and two months after the deadline for questions and comments, Corizon began to argue

about the State's performance bond requirement by email and in violation of the RFP's procedures.

[Doc. No. 74, ¶ 116; Doc. No. 74-2, p. 2]. Contending that the State made a mistake, Corizon

demanded that the State further amend the RFP to Corizon's liking. [Doc. No. 74, ¶ 117]. The

State refused to accede to Corizon's improper demands. [*Id.* ¶ 118 Doc. No. 74-18, p. 2]. Even

though the State repeatedly and explicitly informed Corizon that the requirement would not

change, Corizon submitted a bid with an alternative performance bond proposal, yet again in

violation of the RFP's procedures. [Doc. No. 74, ¶¶ 118, 124; Exhibit 2, Attachment 6.2, § A.8].

Under Tennessee Regulations, if a respondent provides "information that does not meet the

technical requirements of the solicitation, where the respondent knew or should have known the

submitted information was materially defective," the bid is nonresponsive and the State may reject

the bid. Tenn. Comp. R. & Regs. 0690-03-01.09.[3] As a result, the State was entitled to immediately

reject Corizon's bid as nonresponsive. Still, Defendant Maggie Wilson, on behalf of the State,

warned Corizon that the State would reject Corizon's proposal if it did not correct its noncompliant

performance bond arrangement. [Doc. No. 74 ¶¶ 125–26; Doc. No. 74-19]. In response, Corizon

asked for a special deadline extension to consider whether it would choose to comply with the

mandatory condition, again in violation of the RFP process. [*Id.* ¶¶ 127–28]. Corizon also stated

that compliance would increase its bid by 10%, yet again violating the RFP process. [*Id.*; Doc. No.

74-19]. Defendant Wilson rejected Corizon's request for special treatment. [Doc. No. 74, ¶ 129].

Counsel for Corizon submitted a letter to the State demanding that the State accept Corizon's

---

[3] Moreover, "[a] response that does not meet the requirements of a solicitation[,] . . . restricts the rights of the State or otherwise qualifies the proposal may be considered nonresponsive and the response may be rejected." Tenn. Comp. R. & Regs. 0690-03-01-.06(3)(b)(1)&(2).

nonresponsive bid or cancel the solicitation, yet again in violation of the RFP process. [Doc. No. 74-20]. The State disqualified Corizon from the RFP. [*Id.* ¶ 129].

### The Performance Bond Requirement Has No Effect on Competition

The State did *not* disqualify Centurion, WellPath, VitalCore, or Wexford, as each bidder committed to complying with the performance bond requirement in the RFP. Still, Corizon speculates that WellPath, VitalCore and Wexford could not secure a maximum liability performance bond. [Doc. No. 74, ¶ 138]. But WellPath, VitalCore, and Wexford each represented to the State that they *could secure* a compliant bond, undermining Corizon's conclusory statement to the contrary. [Doc. No. 18-1, Ex. A].[4] WellPath even provided letters from two entities that expressed willingness to provide a compliant bond to WellPath. [*Id.* at 7–8]. Ultimately, the State's "Score Summary Matrix" and pricing comparisons reflected close scores by the four compliant respondents. [Doc. No. 18-1, Ex. B]. Centurion had the highest score by a slight margin of 0.83 on a 100-point scale, and Centurion's annualized per-inmate-per-day bid was the lowest. [*Id.*;

---

[4] Corizon omitted the other respondents' submissions from its Second Amended Complaint, instead offering its own speculative assessment of the other respondents' bonding capabilities. [Doc. No. 74, ¶¶ 112, 138]. Even so, (1) these documents were a matter of public record during the public review portion of the RFP process, [Doc. No. 74-2, p. 3, ¶ 13]; (2) prior complaints referenced related documents, [Doc. No. 47, ¶ 80 (citing Doc. No. 18-3)]; (3) Corizon was aware of these documents before suing, [Doc. No. 28, p. 18 (identifying the breadth of RFP documents that Corizon reviewed before filing its complaint)]; (4) the record contains these documents, [Doc. Nos. 18-1, 18-2, 18-3]; and, (5) because Corizon is purporting to represent the Market in this antitrust action, the Market participants' representations on this point are integral to Corizon's claims. Thus, consideration of these exhibits does not convert this motion into a summary judgment motion. *See Manookian v. Flippin*, No. 3:19-CV-00350, 2020 WL 978638, at *2 (M.D. Tenn. Feb. 28, 2020) ("In considering a Rule 12(b)(6) motion, the Court may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to Defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims." (citing *Bassett v. National Collegiate Athletic Assn.*, 528 F.3d 426, 430 (6th Cir. 2008))).

Exhibit 3]. Accordingly, the State awarded the contract for inmate behavioral health services ("Contract") to Centurion. [Doc. No. 74, ¶ 140].

<b>Contract Amount & Post Award Events</b>

After the State awarded the Contract, the RFP file was opened for public inspection. [Doc. No. 74-2, p. 2]. Though Corizon objected to the RFP process and the maximum performance bond requirement, Corizon deliberately chose not to protest the award of the Contract to Centurion, even though doing so would have prevented the Contract from going into effect during the pendency of the protest. *See* Tenn. Code Ann. § 12-3-514(b).

Throughout the RFP process, the State shifted the schedule of events several times. [*Compare* Exhibit 2, § 2.1, *with* Doc. No. 74-2]. At all points during the RFP process, the State reserved the right, "at its sole discretion, to adjust the RFP Schedule of Events as it deems necessary." [Exhibit 2, § 2.2]; *see also* Tenn. Comp. R. & Regs. 0690-03-01.13 (stating that for "Contract Finalization and Negotiation[,] . . . communication and negotiation shall be conducted in a manner that is in the best interests of the State"). Though the pre-award target date for signing the Contract was July 31, 2020, Centurion and the State signed the Contract on August 20, 2020. [Doc. No. 74-21]. The Contract superseded the RFP Schedule of Events, and the Contract required Centurion to furnish the performance bond prior to the November 1, 2020 effective date. [*Id.*]. Centurion complied with that requirement. [Doc. No. 74-2, 74-21, 74-22; Doc. 74-16, p. 58, § E.2 ("The Contractor shall submit the [performance] bond no later than the day immediately preceding the Effective Date.")].

Corizon alleges that the "expected value" of the Contract was $118 million as of RFP Release 2. [Doc. No. 74, ¶ 7]. Corizon's bid, however, had an "expected value" of $125 million. [Doc. No. 74-20]. In any event, the "expected value" is neither the actual contract amount nor the

State's maximum liability. Based on the respondents' technical and cost proposals, the State evaluated the bid and target pricing that resulted from each submission. [Exhibit 3].[5] Though Corizon is familiar with the relationship between expected value, contract prices, and maximum liability, Corizon makes misleading, unsupported, and inaccurate allegations that the contract amount was "increased" from $118 million to $123 million after the award to Centurion.[6] The Contract itself refutes Corizon's allegations. [Doc. No. 74-21]. Section C.1 of the Contract provides that the "Maximum Liability" of the State will not exceed $123,513,819. [*Id.* at p. 49]. Section C.3, however, shows that the "Annual Average Daily Inmate Population" provides the methodology for calculating the Contract price. [*Id.* at pp. 49–50]. In the scenario represented in the first row of the chart in that section of the Contract, the expected population ranges from 13,694 to 15,136. [*Id.*]. At the high end of that inmate population range, the total Contract amount could approach $123 million. [*Id.*]. At the low end of that range, however, the Contract amount would be around $112 million. [*Id.*]. And if the population increases by 5% or less, the Contract amount will be between around $114 million and $120 million. [*Id.* at 49–50]. Put another way, the Contract price was never $118 million *or* $123 million. Rather, the Contract price was always a

---

[5] Exhibit 3 shows the per-inmate-per-day (PIPD) cost proposals and resulting contract pricing submitted by each of the bidders and is presumably the source for Corizon's allegation that Centurion's "expected value" bid was $118 million. The table in section C.3 of the Contract duplicates Centurion's exact PIPD figures from the "Target Pricing Round 2" table in Exhibit 3. [Doc. No. 74-21 at 50]. The Court may consider these evaluative documents for the reasons set out in footnote 2 because: (1) Corizon's Second Amended Complaint references the substance of these evaluation documents, [Doc. No. 74, ¶¶ 7, 15–16]; (2) the documents are central to Corizon's claims, [*id.*]; (3) these documents were a matter of public record during the public review portion of the RFP process, [Doc. No. 74-2, p. 3, ¶ 13]; and, (4) Corizon was aware of these documents before this action was filed, [Doc. No. 28, p. 18].

[6] Corizon alleges "upon information and belief" that the State increased the award amount to account for the cost of the maximum performance bond and ensure that Centurion still made a profit. [Doc. No. 74, ¶ 17]. Corizon pleads at least 38 of its other *material* allegations "upon information and belief.

range of potential values dependent on the actual inmate population during the five-year term, and the maximum liability was the most the State could be required to pay during that term. While the State corrected the maximum liability in the final Contract, it did not increase the Contract price.

## Procedural History

Though it chose not to protest the award, Corizon filed a complaint and motion for a TRO and preliminary injunction just days before the Contract went into effect. [Doc. Nos. 1, 2]. The Court denied Corizon's request for a temporary restraining order under the doctrine of laches and denied Corizon's request for a preliminary injunction on the same grounds. [Doc. Nos. 35, 42]. Centurion and the State timely moved to dismiss Corizon's complaint. [Doc. Nos. 43, 45]. On December 8, 2020, Corizon amended its complaint to formally add Centurion as a defendant, add four new causes of action, and shift the focus of its grievances to the alleged post-award conduct of Centurion and the State. [Doc. No. 47]. On April 27, 2021, Corizon again amended its complaint to add Wes Landers and sensationalized alternative theories of antitrust liability based on allegations of "public corruption." [Doc. No. 74].

## STANDARD OF REVIEW

### I.  <u>Subject-Matter Jurisdiction</u>

Rule 12(b)(1) "provides for the dismissal of an action for lack of subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). "Where subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Moir v. Greater Cleveland Reg'l Transit Auth*., 895 F.2d 266, 269 (6th Cir. 1990) (citation omitted). A motion to dismiss for lack of subject-matter jurisdiction may present a facial or factual attack. A facial attack on subject-matter jurisdiction challenges a plaintiff's basis for subject-matter jurisdiction. *See Ohio Nat'l Life Ins. Co. v. United*

*States*, 922 F.2d 320, 325 (6th Cir. 1990). When ruling on a facial attack, "the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).

## II.   Failure to State a Claim

Rule 12(b)(6) motions to dismiss for failure to state a claim upon which relief can be granted require the Court to construe the complaint in favor of the plaintiff, accept the factual allegations set forth in the complaint as true, and determine whether the plaintiff's factual allegations present plausible claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court must accept the allegations of a complaint as true, the Court need not "accept as true legal conclusions or unwarranted factual inferences." *DIRECTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). Likewise, "[t]he mere fact that someone believes something to be true does not create a plausible inference that it is true." *In re Darvocet, Darvon & Propoxyphene Prod. Liab. Litig.*, 756 F.3d 917, 931 (6th Cir. 2014); *see Twombly*, 550 U.S. at 551 (finding a complaint insufficient even though it said, "Plaintiffs allege upon information and belief that [defendants] have entered into a contract, combination or conspiracy"); *16630 Southfield Ltd. P'ship v. Flagstar Bank*, 727 F.3d 502, 506 (6th Cir. 2013) (finding a complaint insufficient because the plaintiffs "merely alleged their 'belief'" through allegations made "upon information and belief").

## ARGUMENT

Corizon has tripled down on its misplaced antitrust and tortious interference theories. At bottom, Corizon asks the Court to (1) force the State to cancel the Contract, (2) force the State to

re-bid the Contract under Corizon's preferred terms, and (3) provide a windfall to Corizon at Centurion's expense. First, Corizon does not have Article III or antitrust standing to pursue its claims. Second, for three reasons—*Parker* immunity, *Noerr-Pennington* immunity, and a basic failure to allege sufficient facts to support the elements of its claims—Corizon has failed to state a claim upon which the Court can grant relief. Thus, this action should be dismissed.

## I. Corizon Lacks Standing to Bring Its Antitrust Claims.

The Second Amended Complaint fails to establish Article III standing or antitrust standing. As a core constitutional requirement, a plaintiff must have Article III standing for the Court to have subject-matter jurisdiction over this case under Rule 12(b)(1). Though distinct from Article III standing, claims under the Sherman and Clayton Acts also require "antitrust standing," which is "a threshold, pleading-stage inquiry" through which federal courts "have been 'reasonably aggressive' in weeding out meritless antitrust claims" via Rule 12(b)(6). *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449–50 (6th Cir. 2007) (quoting *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 403 (6th Cir. 1997)). Corizon has neither Article III standing nor antitrust standing.

### A. Corizon does not have Article III standing.

As a threshold jurisdictional matter, Corizon lacks Article III standing to bring its claims. The "irreducible constitutional minimum of standing" requires (1) an "injury in fact" (2) that was "caused" by the defendant's conduct (3) and is "redressable by a favorable decision." *Bearden v. Ballad Health*, 967 F.3d 513, 516 (6th Cir. 2020) (cleaned up). A plaintiff must plead facts sufficient to establish standing, just as a plaintiff must plead facts that establish the elements of its suit. *Id.* To establish an injury in fact, plaintiffs must show that they suffered "an invasion of a *legally protected* interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* (emphasis added). To establish causation, "the injury [must] be fairly traceable to the challenged action of the defendant . . . ." *PHI Air Med., LLC v. Tennessee*

*Dep't of Labor & Workforce Dev.*, No. 3:18-CV-0347, 2018 WL 6727111, at *3 (M.D. Tenn. Dec. 21, 2018) (citation omitted). To establish redressability, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (citation omitted).[7] More to the point, there is no "commutative theory of standing, by which a plaintiff borrows the injury of one cause of action in an effort to sustain standing in another; a plaintiff must demonstrate standing for each claim he seeks to press." *Am. Cricket Premier League, LLC v. USA Cricket*, 445 F. Supp. 3d 1167, 1175 n.6 (D. Colo. 2020) (cleaned up); *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

Here, to conjure standing, Corizon has blended its claims in the hope that the Court will not peer behind its commutative approach. But Corizon's exhibits contradict its allegations, and the remedies that Corizon seeks do not match the injuries alleged. First, Corizon has no redressable injury in fact arising from the Contract. Second, Corizon has no redressable injury in fact caused by Centurion relating to the RFP.[8]

### 1.  Corizon has no redressable injury in fact arising from the Contract.

First, Corizon does not have a redressable injury in fact arising from the Contract. To have a "legally protected interest" in the Contract, Corizon must show that it "has a right to relief if the court accepts [the plaintiff's] interpretation of the constitutional or statutory laws on which the complaint relies." *CHKRS, LLC v. City of Dublin*, No. 20-3435, 2021 WL 21808, at *3 (6th Cir. Jan. 4, 2021) (citation omitted). But Tennessee law does not give Corizon a legally protected

---

[7] "To have standing to seek declaratory relief, a plaintiff must show that he or she is subject to an actual, *present* harm or a significant possibility of *future* harm." *PHI Air*, 2018 WL 6727111, at *3 (emphasis added) (citation omitted).

[8] Centurion again notes that, as before, Corizon's claims against the State Defendants are still barred by sovereign immunity because the *Ex parte Young* exception is inapplicable in this case. *See Ex parte Young*, 209 U.S. 123 (1908). Centurion incorporates by reference its previous argument on this issue. [Doc. No. 44, pp. 5–7].

interest in the Contract. *See* Tenn. Code Ann. § 12-3-502(c) ("Submission of a response shall not create rights, interests, or claims of entitlement in any respondent . . . "). And antitrust laws protect competition, not individual competitors. *NicSand*, 507 F.3d at 451; *see also Am. Cricket*, 445 F. Supp. 3d at 1177 ("Indeed, case law about 'antitrust injury' makes fairly clear that the antitrust laws were not designed eliminate bidding processes where the party soliciting the bids predetermined the outcome."). In fact, an antitrust plaintiff can only seek an injunction "against *threatened* loss or damage by a violation of the antitrust laws . . ." 15 U.S.C. § 26 (emphasis added).

Any loss or damage that Corizon suffered arose from its disqualification from the RFP process, not the award of the Contract to Centurion. Corizon's allegation that it would have won the Contract is entirely speculative and inconsistent with the indisputable facts. In any event, injunctive and declaratory relief requires a "threat of a prospective injury," not the "existence of past injuries alone." *Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharm., Inc.*, 353 F. Supp. 3d 678, 687 (M.D. Tenn. 2018) (quoting *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579 (6th Cir. 2014)). The Contract itself is not an antitrust violation, and there is no redressable injury arising from the Contract.

### 2. Corizon has no redressable injury in fact caused by Centurion relating to the RFP.

Second, Corizon does not have a redressable injury in fact from the RFP process. None of the alleged actions by Centurion caused Corizon to suffer any injury. The bulk of Corizon's allegations focus on Centurion's alleged receipt of inside information, not any involvement in the creation of the maximum liability performance bond requirement. In the end, it was Corizon's procedural noncompliance that caused Corizon's "injury"—disqualification from the RFP.

The maximum performance bond requirement appeared in the portion of RFP Release 1 that Corizon conveniently omitted from its complaint exhibit. [Exhibit 1, p. 52, § E.2].

Nevertheless, for months, Corizon "operated under the impression" that the performance bond was the same as the 2016 Contract. [Doc. 74, ¶ 82]. After RFP Release 2, Corizon waited until May 20, 2020, well after the RFP deadline for "Questions & Comments," to challenge the requirement, [*Id.* ¶ 116; Doc. 74-2], then submitted a noncompliant bid. [Doc. 74, ¶ 124]. Corizon did not comply with the RFP's requirements or procedures, even though it knew they were mandatory. [Doc. No. 74-18, p. 3]. The State disqualified Corizon because it did not comply with the RFP's requirements, not because Centurion was the only bidder that could satisfy the bond requirement or because of the alleged improper communications between Wes Landers and Jeff Wells.

Put simply, Corizon caused its own injuries and removed itself from the competition between Centurion, Wexford, VitalCore, and WellPath. *Cheeks of N. Am., Inc. v. Fort Myer Const. Corp.*, 807 F. Supp. 2d 77, 92 (D.D.C. 2011) (finding a lack of standing for antitrust claims arising from alleged bid rigging for government contracts because "[plaintiff's] injury was not caused by any alleged anticompetitive conduct among [plaintiff's] competitors, but rather by [plaintiff's] own failure to comply with the bidding requirements."). At most, Corizon has identified a general procedural injury. "But deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient . . ." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). In sum, Corizon lacks Article III standing.[9]

### B. Corizon does not have antitrust standing.

Corizon has not established statutory antitrust standing to pursue its claims under the Sherman Act or the Declaratory Judgment Act.[10] In general, antitrust standing ensures that antitrust

---

[9] Because Corizon has not pled a basis for diversity jurisdiction for its state law claims and instead relies on supplemental jurisdiction, dismissal of Corizon's federal antitrust claims warrants dismissal of Corizon's state law tort claims, as well.

[10] Though Corizon's antitrust claims come from Sections 1 and 2 of the Sherman Act, a private cause of action for damages and equitable relief comes from Sections 4 and 16 of the Clayton Act.

laws do not "become a treble-damages sword rather than the shield against competition-destroying conduct that Congress meant them to be." *NicSand*, 507 F.3d at 450. Antitrust standing "is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws." *NicSand*, 507 F.3d at 449 (quoting *HyPoint Tech., Inc. v. Hewlett–Packard Co*., 949 F.2d 874, 877 (6th Cir. 1991)); *see Valley Prods.*, 128 F.3d at 402 (stating that, for antitrust standing purposes, "[w]ithout antitrust injury, no private antitrust action will lie at law or in equity."). "At a minimum, this requirement means that one competitor may not use the antitrust laws to sue a rival merely for vigorous or intensified competition." *NicSand*, 507 F.3d at 450.

To establish antitrust standing, "an antitrust claimant must do more than make allegations of consequential harm resulting from a violation of the antitrust laws, and that is true even when the complaint is buttressed by an allegation of intent to harm the claimant." *NicSand*, 507 F.3d at 449 (cleaned up). To evaluate whether an antitrust claimant has done more than merely allege consequential harm from an antitrust violation, a court must balance several factors, including:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Static Control Components, Inc. v. Lexmark Int'l, Inc*., 697 F.3d 387, 402 (6th Cir. 2012) (citation omitted). In short, antitrust standing "ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *NicSand*, 507 F.3d at 449 (citation omitted).

---

15 U.S.C. §§ 15, 26. Antitrust standing deals with the propriety of a particular plaintiff enforcing antitrust laws as a "private attorney general." *NicSand*, 507 F.3d at 457 (citation omitted).

An *antitrust* injury is a "necessary, but not always sufficient," condition of antitrust standing. *Id.* at 450 (citation omitted). "'Antitrust injury is (1) 'injury of the type the antitrust laws were intended to prevent' and (2) injury 'that flows from that which makes defendants' acts unlawful.'" *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 909 (6th Cir. 2003) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "To prove antitrust injury, the key inquiry is whether *competition*—not necessarily a *competitor*—suffered as a result of the challenged business practice." *CBC Companies, Inc. v. Equifax, Inc.*, 561 F.3d 569, 571–72 (6th Cir. 2009) (emphasis added); *see J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 485 F.3d 880, 887 (6th Cir. 2007) (requiring an antitrust plaintiff to demonstrate that "the alleged violation tended to reduce competition overall" and that "the plaintiff's injury was a consequence of the resulting diminished competition").

Corizon does not have antitrust standing because it does not have an antitrust injury. The State disqualified Corizon because it did not comply with the RFP's requirements, in both substance and form. [Doc. No. 74, ¶¶ 124–29]. Following substantial briefing from prior motions to dismiss, Corizon amended its complaint to add an after-the-fact explanation that it could not secure a compliant performance bond. [*Id.* ¶ 111]. But Corizon suggested to the State that it had not even explored its bonding capabilities for the RFP and needed more time to do so. [*Id.* ¶¶ 127; Doc. No. 74-19]. Corizon does *not* allege that it tried and failed to secure a compliant bond. [*Compare* Doc. No. 1, ¶ 89, *with* Doc. No 74, ¶ 127]. Likewise, the communications between Wes Landers and Jeff Wells, whether improper or not, bear no connection to Corizon's disqualification. There is thus no causal connection between the alleged antitrust violation and the alleged indirect harm to Corizon. Put simply, neither the performance bond requirement nor any information provided to Centurion by Wes Landers drove Corizon from the Market because of any

competition-reducing effects—Corizon removed itself from the Market for this particular RFP and the remaining bidders competed without Corizon.

At bottom, Corizon has not pled facts that show that Corizon or any other bidder would have won the Contract without a maximum performance bond requirement. Likewise, no unlawful monopoly has been created. In other words, the alleged "violation of the antitrust laws was not a necessary predicate to" Corizon's failure to win the Contract. *Valley Prods.*, 128 F.3d at 404 (cleaned up). Corizon alleges that "[e]xpert review of the finances of WellPath, VitalCore and Wexford shows that none of them have the equity or liquidity positions needed to support a performance bond of this size, duration and type of obligation." [Doc. No. 74, ¶ 138]. But Corizon provides no factual basis to support this speculative conclusion. Even in its Second Amended Complaint, Corizon does not allege that the bond requirement was dispositive, only that it could have been dispositive. Even so, the State's multifaceted evaluation metrics tightly grouped the four compliant submissions. [Doc. No. 18-1, Ex. B]. Thus, competition was not reduced by the maximum liability performance bond requirement—Centurion, Wexford, VitalCore, and WellPath all competed for the Contract after Corizon's procedural disqualification. No competition-reducing actions excluded Corizon from the RFP.

Likewise, Corizon does not have antitrust standing to bring its monopolization claims because it does not have an antitrust injury arising from these claims. By definition, the State was soliciting proposals to perform within the State's own monopoly over a traditional government service—behavioral health services provided to inmates incarcerated by TDOC. Corizon once held this grant of a temporary "monopoly"; now, Centurion does. But "[w]hen one exclusive dealer is replaced by another exclusive dealer, the victim of the competition does not state an antitrust injury." *NicSand*, 507 F.3d at 456; *see Am. Cricket*, 445 F. Supp. 3d at 1177 ("Being deprived of

that monopoly is not something the antitrust laws were designed to remedy."); *see also Byars v. Bluff City News Co*., 609 F.2d 843, 855 (6th Cir. 1979) ("An agreement with another distributor to replace the terminated distributor does not count as a conspiracy.").

Fundamentally, all of Corizon's antitrust claims stumble from the gate—Corizon has not defined an actionable antitrust market for its claims under Sections 1 and 2 of the Sherman Act. "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719–20 (6th Cir. 2003). Corizon defines the Market as "the Tennessee inmate health care services market." [Doc. No. 74, ¶1]. In other words, in the Market has a single purchaser—the State of Tennessee. [*Id.* ¶¶ 34–37]. "As a matter of common sense a single purchaser of a product cannot generally be considered a relevant market, lest we wish to clothe each and every sale with an antitrust suit." *Jayco Sys., Inc. v. Savin Bus. Mach. Corp.*, 777 F.2d 306, 320 (5th Cir.1985) (cited with approval in *Int'l Logistics Grp., Ltd. v. Chrysler Corp*., 884 F.2d 904, 909 (6th Cir. 1989); *see also City of New York v. Grp. Health Inc*., 649 F.3d 151, 156 (2d Cir. 2011) ("A single purchaser's preferences . . . cannot define a market."); *Expert Masonry, Inc. v. Boone Cty.*, 440 F.3d 336, 347 (6th Cir. 2006) ("there is no economic rationale to restrict, as a violation of Section 1, a buyer's latitude in selecting the entity from whom it will purchase products or services"); *Neptun Light, Inc. v. City of Chicago*, No. 17-CV-8343, 2018 WL 1794769, at *4 (N.D. Ill. Apr. 16, 2018) ("what the Complaint plainly takes issue with is not a lack of competition in a *market*, but a lack of competition with respect to one *customer* and one *contract*"); *Smalley & Co. v. Emerson & Cuming, Inc*., 808 F. Supp. 1503, 1512 (D. Colo. 1992), *aff'd*, 13 F.3d 366 (10th Cir. 1993) ("A relevant product market defined as one product sold to one customer does not make sense under the antitrust laws").

In fact, "the Seventh Circuit has decided that the loss of contracts with a single government purchaser is not cognizable as an antitrust injury." *Int'l Logistics*, 884 F.2d at 909 (citing *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 558 (7th Cir. 1980)). The reason is clear—the antitrust laws do "not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Hunt v. Crumboch*, 325 U.S. 821, 826 (1945); *see Havoco* 626 F.2d at 558 ("the mere fact that one party bid successfully against another party for a contract would be equivalent to an anticompetitive effect and would raise the specter of an antitrust action being used as a remedy for any tortious conduct during the course of the competition.").

Corizon lacks antitrust standing because it has not alleged an antitrust injury or defined an actionable market under antitrust law. Corizon caused its own disqualification through procedural noncompliance. And Corizon has not alleged facts sufficient to show that either the performance bond requirement or the Landers communications impacted competition—what antitrust laws protect. *See NicSand*, 507 F.3d at 451 ("The antitrust laws were enacted for the protection of *competition* not *competitors*." (cleaned up)). Without antitrust standing, Corizon fails to state an antitrust claim upon which this Court can grant relief.

## II.  Corizon's Antitrust Claims Are Barred by *Parker* and *Noerr-Pennington* Immunity.

Even if Corizon has standing, Corizon's first four causes of action, all arising under Sections 1 and 2 of the Sherman Act, are barred by *Parker* and *Noerr-Pennington* immunity.

### A.  *Parker* immunity bars Corizon's antitrust claims.

*Parker* immunity bars Corizon's claims against all Defendants, including Centurion. "[N]othing in the language of the Sherman Act or in its history suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature," and "[t]he Sherman Act gives no hint that it was intended to restrain state action or official action directed by

a state." *Parker v. Brown*, 317 U.S. 341, 350–51 (1943) (cleaned up). Thus, states and state officials enjoy "*Parker* immunity," which is also called "state-action immunity," from antitrust suits. *Id.* "The reason that state action is immune from Sherman Act liability is not that the State has chosen to act in an anticompetitive fashion, but that the State itself has chosen to act." *Hoover v. Ronwin*, 466 U.S. 558, 574 (1984). If "the State is acting as a sovereign," a court need not investigate whether "the sovereign acted wisely after full disclosure from its subordinate officers." *Id.* (cleaned up). Indeed, "'[o]rdinary errors or abuses in the administration of powers conferred by the state should be left for state tribunals to control,'" and "ordinary errors or abuses in exercise of state law" does not empower aggrieved parties to "forego customary state corrective processes in favor of federal antitrust remedies." *Kern-Tulare Water Dist. v. City of Bakersfield*, 828 F.2d 514, 522 (9th Cir. 1987) (cleaned up).

"Political subdivisions of states are beyond the reach of the antitrust laws . . . when they act pursuant to a 'clearly expressed state policy.'" *Jackson, Tenn. Hosp. Co., LLC v. W. Tenn. Healthcare, Inc*., 414 F.3d 608, 611–12 (6th Cir. 2005) (quoting *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 40 (1985)). The General Assembly "need not explicitly authorize anticompetitive conduct, as long as anticompetitive effect would logically result from the authority granted by the state." *Id.* (citations omitted). In application, the Sixth Circuit has held that Michigan law implicitly authorized anticompetitive conduct when Michigan's legislature empowered prisons to grant public contracts for the provision of telephone services, even amid allegations of "public corruption and private dishonesty." *See Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 539 (6th Cir. 2002).

Further, "[w]here a state is protected by state-action immunity, that immunity extends to private entities involved in the same course of dealing." *VIBO Corp. v. Conway*, 669 F.3d 675,

687–88 (6th Cir. 2012) (citation omitted); *see Jackson, Tenn. Hosp.*, 414 F.3d 608, 612 n.4 (6th Cir. 2005) (noting that state-action immunity would be worthless if it failed to immunize the private parties dealing with the states); *Manookian*, 2020 WL 978638, at *4 ("If a government actor is independently responsible for causing the alleged antitrust injury, once it is determined to be immune, the immunity should be extended to include private parties acting under its direction." (cleaned up)).

Here, the State Defendants administered the RFP for inmate behavioral health services under the General Assembly's statutory directives. *See* Tenn. Code Ann. §§ 12-3-501, 502. Under the General Assembly's affirmation that "performance bonds or other security may be required for any contract," the State determined that a maximum liability performance bond was "appropriate." *See id.* Corizon admits as much. [Doc. No. 47, ¶ 44]. Regardless of the wisdom or propriety of those actions, the State Defendants acted on behalf of the State under clear authorization, and it is reasonably foreseeable that the State Defendants may impose a performance bond that may prove difficult or prohibitive for some bidders. As a result, the State Defendants enjoy *Parker* immunity against Corizon's claims, both as to their procurement of the Contract and as to any future maximum performance bond requirements.

The State contracted with Centurion to provide traditional government services and supervises Centurion while doing so; thus, Centurion also enjoys *Parker* immunity. All bidders except Corizon cooperated with CPO and TDOC's exercise of its legislatively given discretion. As a result, Corizon's proper recourse, if any, are the political and adjudicatory procedures established by the State, not antitrust claims against current and former state officials and Centurion. "Run-of-the-mill bid protests can't be repackaged as antitrust claims." *Dakota Territory*

*Tours ACC v. Sedona-Oak Creek Airport Auth. Inc*., 383 F. Supp. 3d 885, 888 (D. Ariz. 2019) (cleaned up).

## B. *Noerr-Pennington* immunity bars Corizon's antitrust claims.

Corizon's antitrust claims against Centurion are also barred by the *Noerr-Pennington* doctrine. "Where private actors petition the government for action that would violate antitrust law, the Petition Clause [of the First Amendment to the U.S. Constitution] immunizes the actors from litigation in connection with their petitioning." *VIBO Corp. v. Conway*, 669 F.3d 675, 683–84 (6th Cir. 2012). "Where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint." *Id.* (cleaned up). "Petitioning" encompasses more than legislative lobbying and applies to private actors that "enter contracts with the government." *Id.* (quoting *Sanders v. Brown*, 504 F.3d 903, 912 (9th Cir. 2007)).

Illustratively, in *Omni Outdoor*, a federal jury found that several city officials conspired with a private business to enact zoning laws that excluded other businesses from competing in the billboard construction market, thereby violating Sections 1 and 2 of the Sherman Act. 499 U.S. at 369. Yet the Supreme Court held that the *Noerr-Pennington* doctrine immunized the private parties against the antitrust claims despite corruption allegations, expressly rejecting any exception rooted in conspiracies between government officials and private parties. *Id.* at 383. In other words, even though a jury concluded that public corruption led to anticompetitive actions, the supposed private conspirator could not have antitrust liability because of the *Noerr-Pennington* doctrine. *Id.*

Here, even if the Court accepts the implausible notion that Centurion engaged in a corrupt scheme to tilt the balance of the RFP, which it did not, the *Noerr-Pennington* doctrine forecloses any antitrust claim arising from such a scheme. *See Astoria Ent., Inc. v. Edwards*, 159 F. Supp. 2d

303, 322 (E.D. La. 2001), *aff'd*, 57 F. App'x 211 (5th Cir. 2003) ("[P]laintiff's recital that the alleged bribery, extortion and corruption abrogate antitrust immunity is simply an attempt to end-run the *Omni* decision, which clearly holds that illegal actions do not remove a case from the ambit of *Parker* or *Noerr–Pennington*.").

## III.    Corizon Has Failed to Plead Claims Upon Which This Court Can Grant Relief.

Even if Corizon sidestepped the standing and immunity barrier to its claims, Corizon has failed to state claims upon which the Court can grant relief.

### A.  Corizon has not plausibly pled a Sherman Act Section 1 claim. (Counts I & II)

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Since every agreement between parties could be a restraint of trade, "antitrust jurisprudence limits the range of restraints within the reach of antitrust law to agreements that *unreasonably* restrain trade." *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 723 (6th Cir. 2019) (citing *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 270 (6th Cir. 2014)).

Corizon has failed to state a Section 1 Sherman Act Claim arising from either the maximum liability performance bond requirement (Count I) or alleged improper communications between Defendant Landers and Centurion (Count II). To begin with, the rule of reason provides the appropriate framework because Corizon has not truly alleged a *per se* antitrust violation. That said, under either standard, Corizon has failed to plead a plausible antitrust conspiracy or antitrust injury. Corizon has also failed to plausibly plead that the maximum performance bond requirement was an unreasonable restraint on trade.

1. **If the Sherman Act applies, the rule of reason provides the proper analytical framework.**

Traditionally, "a restraint on trade may be found to be unreasonable *per se* or under the 'rule of reason.'" *Med. Ctr.*, 922 F.3d at 723 (citing *Se. Milk*, 739 F.3d at 270). "There is a presumption against applying the *per se* rule '[u]nless the restraint falls squarely into a *per se* category.'" *Id.* at 724 (quoting *Se. Milk*, 739 F.3d at 271). "When determining whether to use the *per se* rule or the rule of reason, courts must consider the type of restraint at issue—whether it is horizontal or vertical." *Se. Milk*, 739 F.3d at 272 (citing *Expert Masonry*, 440 F.3d at 344). Vertical restraints—agreements between parties "at different levels of the market structure"—"are subjected to the rule of reason." *Id.* (citation omitted). When "the restraint at issue appears to involve a vertical relationship," courts in the Sixth Circuit are generally "require[ed] . . . to apply the rule of reason." *Id.* at 273 (citation omitted).

Corizon implies that bid rigging, a *per se* Sherman Act violation, has occurred, and Corizon has argued as much in its preliminary briefs. [Doc. No. 3, pp. 17–18]. That assertion is incorrect. "Bid rigging" in the antitrust context "refers to *horizontal* price fixing whereby two or more suppliers (or occasionally *purchasers*) secretly fix the price at which they will bid." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 62 (1st Cir. 2004) (emphasis added) (citation omitted); *see United States v. Dynalectric Co.*, 861 F.2d 722, 1988 WL 117173, at *3 (6th Cir. 1988) (table) (stating that "[t]o establish bid-rigging," a plaintiff must show that the defendant "conspired with one or more of its *competitors* to manipulate the competitive-bidding process . . .").

Illustratively, in *Expert Masonry*, a disgruntled losing bidder alleged that a government purchaser conspired with one of the bidders to ensure that the preferred bidder won the contract. *Expert Masonry*, 440 F.3d at 345. The Sixth Circuit did not treat the allegedly rigged bid as

antitrust "bid rigging." *Id.* Instead, the Sixth Circuit observed that the "arrangement was transparently vertical in nature, as the buyer is downstream from the bidder" and "[t]he plaintiff did not allege that any other bidders participated in this purported scheme." *Id.* As a result, the Sixth Circuit applied the rule of reason framework, rather than finding a *per se* restraint on trade. *Id.*; *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 882 (2007) ("vertical price restraints are to be judged by the rule of reason").

Corizon broadly alleges RFP manipulation between current and former state officials and Centurion. This is not antitrust "bid rigging" between competitors. At most, Corizon's allegations constitute "sham bidding," a term sometimes used "to distinguish antitrust-prohibited bid-rigging from antitrust-neutral allegations that the party soliciting the bid did not conduct the bid process fairly." *Am. Cricket*, 445 F. Supp. 3d at 1179–80 (citing *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d 1066, 1089–90 (D. Colo. 2012)); *see Sitkin Smelting & Refin. Co. v. FMC Corp.*, 575 F.2d 440, 447 (3d Cir. 1978); *Dakota Territory*, 383 F. Supp. 3d at 888. Thus, even if the Court credits Corizon's speculative accusations, there is a vertical arrangement, and *Expert Masonry* makes clear that rule-of-reason analysis is required.

### 2. Corizon has not pled the elements of a Sherman Act Section 1 claim.

Corizon's pleading deficiencies are fatal to the merits of its claim as well. To establish a prima facie case, either for a *per se* violation[11] or under the rule of reason, the plaintiff must prove: (1) a conspiracy (2) to affect an anticompetitive restraint (3) that proximately caused (4) the plaintiff's antitrust injury. *Se. Milk*, 739 F.3d at 272; *Expert Masonry*, 440 F.3d at 342–43. Corizon

---

[11] Even under the *per se* approach "a plaintiff must satisfy each element . . . in its allegations in order to survive pre-trial termination." *Med. Ctr.*, 922 F.3d at 724 (citation omitted).

has not adequately pled a Section 1 claim arising from either the maximum liability performance bond or the alleged improper communications.

### a. The maximum liability performance bond does not provide a basis for a Section 1 claim. (Count I)

Corizon has not adequately pled a Section 1 claim related to the maximum liability performance bond. To begin with, the "Change"—the supposed new appearance of the maximum liability performance bond in RFP Release 2—is a fiction. As shown by the excerpts conveniently omitted from Corizon's exhibits, the maximum liability performance bond was present at the genesis of the RFP. [Exhibit 1, Attachment 6.6, p. 52, § E.2]. A plaintiff must show "that an agreement between two or more economic entities exists since unilateral conduct would not violate this statute." *Se. Milk*, 739 F.3d at 270 (citing *Plymouth Whalers*, 419 F.3d at 469). And to establish a conspiracy or concerted action, the complaint must tend to *exclude* the possibility of independent action.[12] *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). In other words, the Second Amended Complaint must exclude the possibility that Centurion merely complied with the State's unilateral decisions. It does not. Even though Corizon has pored through thousands of documents and emails, none have provided any indicia of a conspiracy or agreement between Centurion and anyone from the State, including Mr. Landers, to include a maximum liability performance bond in the RFP. And despite Corizon's complaints about alleged improper communications between Mr. Landers and Mr. Wells, the State Defendants reiterated and stood by the bond requirement, announced the award of the Contract to Centurion, and then signed the Contract *months after* Mr. Landers left TDOC. In short, Corizon is "alleging, in essence, that [the

---

[12] Previously, Corizon only alleged a conspiracy among the State Defendants. Any alleged "conspiracy" between officials and employees of the State is barred by the intracorporate conspiracy doctrine. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984).

State] conspired to injure itself." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir. 1984).

*Twombly*, the seminal case for plausibility pleading, dealt with this exact pleading deficiency. 550 U.S. at 556–57. The Supreme Court held that "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* at 557. Rather, allegations of "parallel conduct" must, in context, firmly suggest a "preceding agreement, not merely parallel conduct that could just as well be independent action" or even "conscious parallelism." *Id.* at 553–54, 557. "It is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." *Id.* at 558.

The same analysis applies to Corizon's "upon information and belief" allegation that the State increased the Contract price from $118 million to $123 million to account for the cost of the performance bond. First, this allegation is rank speculation, unsupported by any factual allegations in the complaint or reasonable inferences from it. Second, the Contract itself contradicts this allegation through its self-contained methodology for calculating the actual contract price. And third, when compared to the bidders' projected cost submissions, it is clear there was no "increase" at all. [Exhibit 3]. Rather, the $118 million figure was one potential cost, based on one projected population, while the $123 million figure was the absolute maximum liability to the State. Thus, Corizon's alleged price increase is another "conclusory allegation" that "does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 557. Even still, "misrepresentation" in a bid "is not an antitrust claim." *Erie Cty. v. Morton Salt, Inc.*, 702 F.3d 860, 873 (6th Cir. 2012); *see Omni Outdoor*, 499 U.S. at 384 (stating that "deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned").

Corizon also has neither alleged an actionable market nor an injury to that market that Corizon may legitimately represent. The State considered four bids after the State disqualified Corizon because of its procedural noncompliance. Any allegation that the maximum liability performance bond requirement *would* have excluded every bidder is just speculation about an outcome that never happened. Centurion had the objectively best bid in terms of price and satisfaction of the State's technical requirements. Even if this RFP constituted sham bidding, which it did not, "buyers are free to choose from whom they will buy." *Expert Masonry*, 440 F.3d at 346. Corizon did not comply with the State's requirements while the other four RFP respondents did. Of the remaining bidders, the sole purchaser in the Market selected the best bid.[13] Remarkably (but unsurprisingly), Corizon believes that the State could only select Corizon's bid and asks the Court to swap Corizon's business judgment with the State's. But business judgment "is not a concern of the antitrust laws." *Id.* at 346.

### b. The alleged improper communications do not provide a basis for a Section 1 claim. (Count II)

Corizon has not adequately pled a Section 1 claim related to the alleged improper communications between Mr. Wells and Mr. Landers. These communications simply did not *reduce* competition. *NicSand*, 507 F.3d at 451 ("The antitrust laws . . . were enacted for 'the protection of *competition* not *competitors*."). Regardless, "other laws besides the Sherman Act, for example, unfair competition laws, business tort laws, or regulatory laws, provide remedies for various competitive practices thought to be offensive to proper standards of business morality." *Am. Cricket*, 445 F. Supp. 3d at 1177 (cleaned up).

---

[13] Corizon's bid appears to have roughly been $125 million *without* a maximum liability performance bond, while the State's maximum liability under the Contract with Centurion is only $123.5 million *with* a maximum liability performance bond. [*Compare* Doc. No. 74-21 *with* Doc. No. 74-20, p.1].

To gin up an alternative basis for its antitrust theory, Corizon speculates that these alleged communications prevent and deter health care providers "from competing for Market contracts because they recognize that the Market is infected with fraud and collusion, and the State Employee Defendants will do nothing to stop it." [Doc. No. 74, ¶ 226(A)]. But Corizon has not alleged that the claimed events have deterred or prevented any provider from bidding on future contracts in Tennessee. Corizon, the only complainant of the four other Market participants, has not even alleged that these events have deterred *it* from bidding on future contracts.

The Sherman and Clayton Acts simply are not an appropriate vehicle for Corizon's factual allegations. *See Michigan Paytel*, 287 F.3d at 538 (affirming the dismissal of antitrust claims despite repeated allegations of "public corruption and private dishonesty"); *Am. Cricket*, 445 F. Supp. 3d at 1170 (dismissing antitrust claims built upon allegations about "a corrupt bidding process"); *Dakota Territory*, 383 F. Supp. 3d at 888 (dismissing antitrust claims even though the plaintiffs "raised troubling allegations about how the RFP process was conducted"). Any agreement between Centurion and Mr. Landers "must actually or potentially harm consumers"— the State—to be anticompetitive. *SCFC ILC, Inc. v. Visa USA, Inc*., 36 F.3d 958, 965 (10th Cir. 1994) (citing *Stamatakis Indus., Inc. v. King*, 965 F.2d 469 (7th Cir. 1992). But Corizon alleges that these alleged improper communications allowed Centurion "to prepare a more competitive bid," which only benefits the State. [Doc. No. 74, ¶ 261].

Moreover, the alleged improper communications did not injure Corizon. The State disqualified Corizon before it evaluated the bids, meaning that Centurion could not have had an advantage over Corizon from these alleged improper communications. An *antitrust* injury is required as an element of a Sherman Act claim "in order to avoid the real possibility that the antitrust action could itself have anticompetitive consequences." *Expert Masonry*, 440 F.3d at 346–

47; *see Ace Beer Distrib., Inc. v. Kohn, Inc.*, 318 F.2d 283, 286 (6th Cir. 1963) ("Damage alone does not constitute liability under the [Sherman] Act"). It is more likely that fear of contrived antitrust claims by Corizon hampers competition in the Market.

### 3. Laches bars Corizon's claim for injunctive relief.

Just as laches barred Corizon's requests for a temporary restraining order and preliminary injunction, laches can and should bar Corizon's request for permanent injunctive relief. [Doc. Nos. 35, 42]. The Court's prior reasoning regarding Corizon's request for preliminary injunctive relief is equally applicable to Corizon's request for permanent injunctive relief. *Id.*; *see Oliver v. SD-3C LLC*, 751 F.3d 1081, 1084 (9th Cir. 2014) (stating that, when a plaintiff sought a permanent injunction on its federal antitrust claim, the "claim is subject to the equitable doctrine of laches"); *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982) (affirming dismissal of an antitrust claim for permanent injunctive relief based on laches).

Following the Court's denial of Corizon's motions for preliminary injunctive relief, the Contract has already started. As a result, Corizon cannot remedy the performance bond requirement through a permanent injunction of the Contract, bolstering the unreasonableness of Corizon's delay in seeking permanent injunctive relief. Likewise, the State and Centurion have completed all transitionary efforts, and the Court can reasonably infer that the State Defendants, along with Centurion and the inmates incarcerated with TDOC, would be prejudiced by the entry of a permanent injunction that unwinds a $100+ million contract months after its commencement. Centurion would incur substantial expense to unwind its relationship with the State, along with losing the time, effort, and money Centurion invested in taking over TDOC's behavioral health services, and inmates incarcerated with TDOC would face the same continuity of care issues that would have arisen from a preliminary injunction. [*See* Doc. No. 35, p. 24].

Because of the foregoing, the Court should exercise its discretion to bar Corizon's request for a permanent injunction based on laches. Corizon's undue delay is indistinguishable as between Corizon's requests for preliminary and permanent injunctive relief, and the prejudice resulting from that delay is even greater now that the Contract has commenced.

## B. Corizon has not plausibly pled a Sherman Act Section 2 claim. (Counts III & IV)

Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . " 15 U.S.C. § 2. Section 2 of the Sherman Act "does not prohibit monopoly simpliciter." *Berkey Photo, Inc. v. Eastman Kodak Co*., 603 F.2d 263, 273 (2d Cir. 1979). Instead, Section 2 claims require "a two-pronged showing: (1) that defendant possessed monopoly power in the relevant market and (2) that defendant engaged in the 'willful acquisition, maintenance, or use of that power by anti-competitive or exclusionary means as opposed to growth or development resulting from a superior product, business acumen, or historic accident.'" *J.B.D.L. Corp*., 485 F.3d at 887 (quoting *Conwood Co., L.P. v. U.S. Tobacco Co*., 290 F.3d 768, 782 (6th Cir. 2002). "An attempted monopolization occurs when a competitor, with a dangerous probability of success, engages in anti-competitive practices the specific design of which are, to build a monopoly or exclude or destroy competition." *Superior Prod. P'ship v. Gordon Auto Body Parts Co*., 784 F.3d 311, 318 (6th Cir. 2015) (quoting *Conwood*, 290 F.3d at 782).

Corizon has failed to allege an actionable Section 2 claim under any theory because neither prong has been satisfied. First, Centurion holds no monopoly *power*. "Monopoly power consists of 'the power to control prices or exclude competition.'" *Smith v. N. Mich. Hosps., Inc*., 703 F.2d 942, 954 (6th Cir. 1983) (quoting *United States v. Grinnell Corp*., 384 U.S. 563, 571 (1966)). The

State, not Centurion, holds the power to control prices or exclude competition for the provision of health services to inmates. The Market that Corizon has defined is limited to five entities jockeying for the favor of a single purchaser, the State. The State can terminate the Contract or *any* "Market services contract" for any reason upon 30 days' written notice. [Doc. No. 74, ¶ 66]. The State can elect to provide health services itself or enter into exclusive contracts with a private entity to provide those services. In short, Centurion has no power to control prices or exclude competition. The single-purchaser Market is the State's unchangeable monopsony, not Centurion's monopoly.

Moreover, even if the holder of the Contract could be construed to hold "monopoly power," Corizon formerly held monopoly power and the replacement of one monopolist with another does not harm competition. *See NicSand*, 507 F.3d at 456 ("When one exclusive dealer is replaced by another exclusive dealer, the victim of the competition does not state an antitrust injury."); *Columbia River People's Util. Dist. v. Portland Gen. Elec. Co*., 217 F.3d 1187, 1190 (9th Cir. 2000) (holding that there cannot be a Sherman Act violation when one monopolist utility seeks to replace another in a "monopoly market" because this only affects competitors, not competition).

Second, Corizon has not identified any willful, attempted, or conspiratorial acquisition, maintenance, or use of monopoly *power* by anti-competitive or exclusionary means, rather than provision of a superior product and business acumen. Centurion submitted the best bid, and Corizon does not even attempt to argue that its bid was superior in any way. Likewise, there is no "dangerous probability of success" from any alleged scheme. At bottom, Corizon alleges that Centurion persuaded the State to implement a maximum liability performance bond requirement that would drive every competitor from the market except itself. Even if this were the case, the plan failed spectacularly because three of Centurion's four competitors were willing—and able— to comply with the requirement. Centurion eked out a narrow victory according to the State's

metrics, and the requirement did not change the outcome. Corizon also suggests that a monopoly came from collusion between Mr. Landers and Centurion, but Mr. Landers was no longer employed by the State when the State independently evaluated the RFP responses and concluded that Centurion's bid was the best. Further still, Mr. Landers is no longer a State official and has no influence over any future RFPs.[14] Similarly, Corizon's apples-to-oranges comparison of the expected value of the Contract and the State's maximum liability under the Contract fares no better. Corizon has not plausibly alleged that Centurion acquired, tried to acquire, or conspired to acquire monopoly power through anti-competitive or exclusionary means.

In sum, because Centurion holds no monopoly power and did not use anti-competitive or exclusionary means to acquire such power, Corizon has failed to state a Section 2 claim.

### C. Corizon has not plausibly pled a tortious interference claim. (Counts VI & VII)

Corizon also fails to state a claim for tortious interference. To state a claim for tortious interference with a business relationship, a plaintiff must plead facts sufficient to establish:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means and finally, (5) damages resulting from the tortious interference.

*Trau-Med of America, Inc. v. Allstate Ins. Co*., 71 S.W.3d 691, 701 (Tenn. 2002) (cleaned up).

Here, the Second Amended Complaint includes two tortious interference claims. Count VI alleges that Jeff Wells and Landers tortiously interfered with Corizon's business relationship with

---

[14] Even further still, Corizon's own "expert" suggested earlier that Centurion could not "accommodate" many contracts of this size. [Doc. No. 5, ¶ 56]. As far as monopolization strategies go, this would have been a poorly conceived strategy if it were in fact true.

the State through alleged improper communications that gave Centurion an advantage. Count VII alleges that Centurion interfered with Corizon's business relationship through misrepresentations in its bid. Neither Count VI nor Count VII alleges that Centurion tortiously interfered by causing the State to require maximum liability performance bond, in tacit acknowledgment that Centurion did not cause the State to create the requirement. Both counts fail on the first and last elements— existence of a business relationship and damages to a business relationship *caused by* tortious interference. Count VII also fails to allege any improper motive or improper means manifested through Centurion's bid and post-award conduct.[15]

Though Corizon has delineated its tortious interference claims based on Centurion's alleged conduct, Corizon's claims are better evaluated through the lens of the business relationships that have supposedly been harmed. Corizon has functionally identified two business relationships with the State: (1) Corizon's prior business relationship with the State under the 2016 Contract, and (2) a theoretical prospective relationship with the State through the RFP process. The distinction between these is important. *Cf. Walton v. Interstate Warehousing, Inc*., No. 3:17-CV-1324, 2020 WL 1640440, at *6 (M.D. Tenn. Apr. 2, 2020) (signaling the importance of delineating business relationships in intentional interference claims). Corizon alleges that Centurion caused the "premature termination" of Corizon's existing relationship—the 2016 Contract. Corizon also alleges that Centurion caused Corizon to lose a prospective relationship— the Contract. None of the alleged tortious acts in either Count caused Corizon to lose either relationship. Further, Count VII fails to establish improper motive or means.

---

[15] Centurion challenges the sufficiency of the pleadings to state other elements of these tortious interference claims, but these elements suffer the clearest deficiencies.

02555130 9

34

1. **Corizon has not adequately pled that Centurion caused a premature termination of Corizon's existing business relationship with the State. (Counts VI & VII)**

Corizon's existing business relationship with the State was ending, regardless of the outcome of the RFP process. This was the entire purpose of the RFP process—to replace the 2016 Contract.[16] While Corizon alleges that Centurion somehow caused the "premature termination" of the 2016 Contract by securing the Contract that would replace it, the same termination of the 2016 Contract would have occurred no matter who won the Contract. [Doc. No. 74, ¶ 273]. Corizon admits that TDOC can terminate contracts upon 30 days' written notice for any reason. [*Id.* ¶ 66]. Corizon merely speculates without a factual basis that the termination of the 2016 Contract was "premature" because the State *could* have elected to extend the 2016 Contract. Corizon has not tied any conduct by Centurion to the State's decision to terminate the 2016 Contract as it had always planned to do.

2. **Corizon has not adequately pled that Centurion tortiously interfered with any prospective business relationship between Corizon and the State. (Counts VI & VII)**

Corizon's prospective business relationship through the competitively bid Contract was mere wishful thinking. Corizon points to its incumbency as the only basis for its likelihood of winning the Contract. [*Id.* ¶ 266]. Corizon does not allege that it submitted a better bid, and incumbency was not a criterion that the State could even consider in evaluating RFP responses. *See* Tenn. Code Ann. § 12-3-502(e) ("Only criteria or factors set forth in the solicitation may be used in evaluating a response."). Corizon simply had no actionable business expectancy in the Contract. *Cf. EBI-Detroit, Inc. v. City of Detroit*, 279 F. App'x 340, 352 (6th Cir. 2008) ("Michigan

---

[16] It is also dubious that the 2016 Contract could supply an actionable "business relationship" with which Centurion could interfere. *See Crouch v. Pepperidge Farm, Inc.*, 424 F. App'x 456, 461 (6th Cir. 2011) (stating that "this tort protects *non-contractual* business relationships" (emphasis added)).

courts have already rejected the idea that a disappointed bidder has a valid business expectancy in a potential government contract."). Even more to the point, the alleged actions that prompt Corizon's tortious interference claims could not have caused Corizon to lose the Contract. In Count VI, Corizon alleges that Defendant Landers improperly communicated inside information that gave Centurion a "material advantage." Corizon does not describe any alleged advantage because in fact there was none; the State already disqualified Corizon for flouting the RFP's requirements. Again, Corizon's tortious interference claims ignore the RFP's maximum liability performance bond, and Corizon does not attribute the performance bond to Centurion for good reason: the State independently conceived the maximum liability performance bond requirement.

In Count VII, Corizon claims without any factual support that Centurion misrepresented its ability to comply with the RFP which caused Corizon to lose the Contract. But the sequence of events makes this impossible; the State had disqualified Corizon from the RFP for noncompliance *before* it evaluated Centurion's bid. As such, Centurion could not have caused Corizon to lose the Contract through alleged misrepresentations in Centurion's bid. *See Cheeks*, 807 F. Supp. 2d at 98 ("[Plaintiff] fails to demonstrate a causal connection between any alleged tortious interference and its failure to win infrastructure contracts (which . . . was caused by [Plaintiff's] own failure to comply with bidding requirements . . . ")). Still, WellPath, VitalCore, and Wexford *also* complied with the performance bond requirements for the RFP. Corizon has not tied any of the alleged tortious conduct to its disqualification from the RFP by the State.

### 3. Corizon has not adequately pled improper means or improper motive. (Count VII)

Corizon has not alleged improper means or improper motive in Count VII. Corizon has neither alleged, nor do the facts support, that Centurion's *predominant* purpose throughout the RFP process was to injure Corizon, rather than to win the Contract. Likewise, Corizon has

identified no conduct by Centurion in this count that is "improper" under the definition above. Corizon alleges that Centurion misrepresented that it could sign the Contract and furnish the bond in the time required. [Doc. No. 74, ¶¶ 269–70, 272]. Corizon has not plausibly alleged anything untoward or improper about a reasonable extension of deadlines that Centurion met well before the effective date of the Contract.[17] Corizon alleges that Centurion did not act "honestly and fairly" because it did not "advise TDOC that its maximum performance bond requirement was unreasonable and could only be met with a substantial increase in the Contract price." [Doc. No. 47, ¶ 271]. But WellPath, VitalCore, and Wexford also did not presumptuously "advise" the State, and, regardless, Centurion does not presume to impose its business judgment on the State. Centurion also did not misrepresent what its services would cost; Corizon has misconstrued "expected value" and "maximum liability" to muddle the facts.

In sum, under the facts alleged, Corizon did not have a cognizable business relationship with the State that was actually harmed by Centurion's supposed tortious acts, and the conduct that forms the basis for Count VII was not improper or borne out of improper motives.

### D. Corizon has not plausibly pled a claim under the Declaratory Judgment Act. (Count V)

Corizon's catchall claim under the Declaratory Judgment Act ("DJA") also fails. The DJA provides a remedy, not an independent source of jurisdiction. *See Toledo v. Jackson*, 485 F.3d 836, 839 (6th Cir. 2007). Even if the Court has jurisdiction, the declaratory remedy created by the DJA is discretionary. *Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs., Inc*., 16 F. App'x 433, 437 (6th Cir. 2001). To that end, Courts consider five factors:

> (1) whether the judgment would settle the controversy; (2) whether
> the declaratory judgment would serve a useful purpose in clarifying

---

[17] As the Court observed about the original complaint, Corizon's allegations about the extension of the post-award deadlines and alleged increase in the Contract price "make up just a small (and inessential) part of Plaintiff's claims." [Doc. No. 35 at 15, n.12].

02555130 9

Case 3:20-cv-00892   Document 83   Filed 05/11/21   Page 39 of 43 PageID #: 2238

identified no conduct by Centurion in this count that is "improper" under the definition above. Corizon alleges that Centurion misrepresented that it could sign the Contract and furnish the bond in the time required. [Doc. No. 74, ¶¶ 269–70, 272]. Corizon has not plausibly alleged anything untoward or improper about a reasonable extension of deadlines that Centurion met well before the effective date of the Contract.[17] Corizon alleges that Centurion did not act "honestly and fairly" because it did not "advise TDOC that its maximum performance bond requirement was unreasonable and could only be met with a substantial increase in the Contract price." [Doc. No. 47, ¶ 271]. But WellPath, VitalCore, and Wexford also did not presumptuously "advise" the State, and, regardless, Centurion does not presume to impose its business judgment on the State. Centurion also did not misrepresent what its services would cost; Corizon has misconstrued "expected value" and "maximum liability" to muddle the facts.

In sum, under the facts alleged, Corizon did not have a cognizable business relationship with the State that was actually harmed by Centurion's supposed tortious acts, and the conduct that forms the basis for Count VII was not improper or borne out of improper motives.

### D. Corizon has not plausibly pled a claim under the Declaratory Judgment Act. (Count V)

Corizon's catchall claim under the Declaratory Judgment Act ("DJA") also fails. The DJA provides a remedy, not an independent source of jurisdiction. *See Toledo v. Jackson*, 485 F.3d 836, 839 (6th Cir. 2007). Even if the Court has jurisdiction, the declaratory remedy created by the DJA is discretionary. *Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs., Inc*., 16 F. App'x 433, 437 (6th Cir. 2001). To that end, Courts consider five factors:

> (1) whether the judgment would settle the controversy; (2) whether
> the declaratory judgment would serve a useful purpose in clarifying

---

[17] As the Court observed about the original complaint, Corizon's allegations about the extension of the post-award deadlines and alleged increase in the Contract price "make up just a small (and inessential) part of Plaintiff's claims." [Doc. No. 35 at 15, n.12].

02555130 9

Case 3:20-cv-00892   Document 83   Filed 05/11/21   Page 39 of 43 PageID #: 2238

the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for res judicata'; (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Id.* at 437–38.

To begin with, several facial deficiencies in Corizon's claim should compel the Court to deny declaratory relief. First, Corizon asks the Court to declare that the Contract, not the RFP process that led to the Contract, violates the Sherman Act and procurement law. Yet Corizon only seeks this declaration against Centurion and omits the other party to the Contract—the State. Apart from the facial impropriety of a declaration made in absence of a party to the Contract, any declaration made without the State as a party would not settle any controversy. Second, Corizon asks the Court to declare that "Centurion should be required to disgorge all profits earned under the Contract." [Doc. No. 74, ¶ 254]. This would be an advisory opinion about remedies, not a judgment on legal relations. And because Corizon does not ask the Court to declare a recipient of any disgorged profits, Corizon has shown that it merely seeks to injure Centurion, not clarify rights.

Beyond these facial deficiencies, there are other reasons to deny Corizon's request for declaratory relief. First, it is not appropriate to declare that the Contract violates "procurement law." Second, it is not appropriate to declare that the Contract violates the Sherman Act.

### 1. Declaratory relief is not appropriate for unidentified violations of "procurement law."

The Second Amended Complaint newly asks the Court to declare that the Contract (not the RFP process) violates "procurement law." But Corizon does not point to any specific law. In any event, this is a transparent attempt to protest the bid outside the procedures for doing so. Corizon's

only remedy for judicial review was a common law writ of certiorari, and Corizon forfeited that claim by failing to exhaust its administrative remedies.

Under Tennessee law, "[t]he appropriate mechanism to challenge the action of a governmental board or body depends on the nature of the function that is at issue." *Duracap Asphalt Paving Co. Inc. v. City of Oak Ridge*, 574 S.W.3d 859, 864 (Tenn. Ct. App. 2018). If an agency exercised an administrative function—such as deciding the appropriate contractor following an RFP—a common law writ of certiorari, not an action for declaratory judgment, is appropriate. *Id.* at 864–65. This is true even when aggrieved parties try to bypass administrative remedies that would themselves provide for certiorari review. *Id.* at 867. Further, "when a statute provides an administrative remedy, one must exhaust this administrative remedy prior to seeking relief from the courts." *Thomas v. State Bd. of Equalization*, 940 S.W.2d 563, 566 (Tenn. 1997).

Corizon's remedy under Tennessee law is a writ of certiorari, not declaratory relief. *See* Tenn. Code Ann. § 12-3-514(l) (stating that judicial review of any appealed bid protest "shall be by common law writ of certiorari."). Parties cannot bypass the exclusive statutory remedies through a declaratory judgment action. *See State ex rel. Moore & Assocs., Inc. v. West*, 246 S.W.3d 569, 581 (Tenn. Ct. App. 2005). And Corizon was *required* by statute to exhaust its administrative remedies before seeking judicial review of the propriety or legality of the award. *See* Tenn. Code Ann. § 12-3-514(j) ("A protesting party shall exhaust all administrative remedies provided in this section prior to the initiation of any judicial review of a protest.").

In sum, Corizon's sole remedy to challenge the Contract under state procurement law was a common law writ of certiorari, not a declaratory judgment action. Corizon then forfeited that avenue by failing to exhaust its administrative remedies. This declaratory claim would not settle

the controversy or serve a clarifying purpose. Instead, Corizon is engaging in procedural fencing in a manner that undermines state jurisdiction over the adjudication of claims by aggrieved bidders.

## 2. Declarative relief is not appropriate for Corizon's claims under the Sherman Act

On top of damages and injunctive relief, Corizon seeks a declaration that the Contract "was entered into in violation of the Sherman Act" and is "illegal and void as a matter of law." [Doc. No. 74, ¶ 254]. As addressed, Corizon's Sherman Act claims cannot pass muster, so Corizon's claim for declaratory relief must fail as well. Additionally, Corizon omission of the State from the claim deprives the State from having a chance to adequately respond to Corizon's request for declaratory relief. Again, Corizon tries to subvert the system.

## CONCLUSION

The Second Amended Complaint "states no set of facts which, if true, would constitute an antitrust offense, notwithstanding its conclusory language regarding the elimination of competition and improper purpose." *Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*, 691 F.2d 241, 243–44 (6th Cir. 1982). "When stripped to its essential allegations, the complaint does no more than state plaintiff's commercial disappointment at losing [the State's] patronage—the recurrent case of the jilted supplier who loses a franchise and accuses the new suitor of attempting to monopolize something." *Id.* (cleaned up). Indeed, it is "hard to ignore the suspicion that the facts have been forced into an antitrust mold to achieve federal jurisdiction." *Car Carriers*, 745 F.2d at 1110. Centurion asks the Court to dismiss Corizon's Second Amended Complaint with prejudice.

Dated: May 11, 2021      Respectfully submitted,

/s/ W. Scott Sims
W. Scott Sims (#17563)
R. Mark Donnell, Jr. (#30136)
Michael R. O'Neill (#34982)
SIMS|FUNK, PLC
3322 West End Ave, Suite 200
Nashville, TN 37203
(615) 292-9335
(615) 649-8565 (fax)
ssims@simsfunk.com
mdonnell@simsfunk.com
moneill@simsfunk.com

*Attorneys for Centurion of Tennessee, LLC*

## CERTIFICATE OF SERVICE

I certify that a true and exact copy of the foregoing has been served upon Filing Users via the electronic filing system on May 11, 2021, upon the following:

W. Travis Parham
Andrew A. Warth
Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
travis.parham@wallerlaw.com
drew.warth@wallerlaw.com
*Attorneys for Corizon, LLC*

Dianna Baker Shew
Senior Assistant Attorney General
Shanell Lanette Tyler
Chris Dunbar
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
dianna.shew@ag.tn.gov
shanell.tyler@ag.tn.gov
chris.dunbar@ag.tn.gov
*Attorneys for the State Defendants*

And by U.S. Mail upon:

Wesley Landers (*pro se*)
4565 Dartford Road
Cumming, Georgia 30040

/s/ W. Scott Sims