# Exhibit 2

IN THE CIRCUIT COURT OF COLE COUNTY, MISSOURI

| | | |
|---|---|---|
| CORIZON, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OFFICE OF ADMINISTRATION, | ) | Case No. _____ |
| State of Missouri, | ) | |
| Serve: Sarah Steelman | ) | Division No. _____ |
| Commissioner of Administration | ) | |
| Capitol Building, Room 125 | ) | |
| Jefferson City, MO 65101, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DIVISION OF PURCHASING AND | ) | |
| MATERIALS MANAGEMENT, | ) | |
| Office of Administration, State of Missouri, | ) | |
| Serve: Karen Boeger | ) | |
| Director | ) | |
| Harry S. Truman State Office Bldg. | ) | |
| 301 West High Street, Room 630 | ) | |
| Jefferson City, MO 65101 | ) | |
| | ) | |
| Defendants. | ) | |

**VERIFIED PETITION FOR DECLARATORY JUDGMENT, TEMPORARY RESTRAINING ORDER, AND PRELIMINARY AND PERMANENT INJUNCTION**

Corizon, LLC ("Corizon") seeks an order voiding an unlawful procurement for state services and an order temporarily, preliminarily and permanently restraining and enjoining the Office of Administration from entering into any contract resulting from the unlawful procurement. During the procurement process for health care services for Missouri correctional facilities, Defendants engaged in multiple unfair and unlawful practices that rendered the procurement process unfair, unlawful, unreasonable, arbitrary, and capricious, and denied incumbent vendor Corizon a fair and equal chance to compete for a re-award of the contract.

Electronically Filed - Cole Circuit - August 29, 2021 - 12:59 PM

Defendants employed four unfair practices that denied Corizon a fair and equal opportunity to compete for the contract:

- ➤ Defendants did not require vendors' proposals to be free of false and misleading material information throughout the procurement process as required by Chapter 34 and their own rule, 1 CSR 40-1.060(8). This allowed vendor Centurion of Missouri, LLC ("Centurion") to obtain an unfair advantage over Corizon and other vendors by remaining silent during the procurement process when material information in its proposal to which Defendants applied evaluation and scoring criteria—information that it claimed made it superior over Corizon and other vendors—became false and misleading, rendering its proposal corrupt. As a result, Defendants' evaluators unknowingly applied the evaluation and scoring criteria to award Centurion points based on misleading and false information, which culminated in Defendants awarding the Contract to Centurion when Defendants should have disqualified or rejected Centurion's proposal. Defendants' unfair, unethical and unlawful process allows vendors like Centurion to employ without consequence bait and switch tactics to gain an advantage over other vendors and obtain State contract awards.

- ➤ Defendants unfairly, unreasonably, arbitrarily, and capriciously applied the evaluation and scoring criteria in the RFP to Corizon's proposal due to bias against Corizon arising from strained relationships between Corizon and the DOC, refusing to award points due to Corizon.

- ➤ Defendants unfairly and unlawfully awarded the contract to Centurion because its proposal was nonresponsive and it engaged in misconduct during the bidding process that required it to be disqualified.

- ➤ Defendants unfairly used cost criteria that are unlawful as applied and will result in the unnecessary expenditure of millions of state tax dollars because the vendor's proposal that Defendants deemed the lowest and best exceeds the cost of the lowest vendors' proposal by over $300 million.

It is a cornerstone of the bidding process and being a good steward of taxpayer dollars that state contracts be awarded based on a truthful, ethical, and transparent process requiring the evaluation and scoring of proposals containing accurate and complete information. That didn't happen here. The process was unfair and unethical because Defendants allowed the evaluation and scoring of a corrupt proposal rather than disqualifying it or rejecting it as nonresponsive, which gave Centurion an advantage over Corizon and other vendors and did not ensure the

contract was awarded to the lowest and best vendor providing a proposal free of false and misleading information as required by Missouri law.

Centurion's proposal:

- Touted the company as a proponent of transparency, respect, trust, and open communication in its relationships with clients;

- Represented that its corporate leadership team was vastly superior over those of other vendors' in terms of stability, strength and experience;

- Vowed that corporate team member Jeffrey Wells ("Wells") would be in charge of contract performance in Missouri and "make sure that [Centurion] provided 'best-in-class services,'" asserting throughout the level and significance of Wells' participation; and

- Boasted about Centurion winning a new contract award from Tennessee for the provision of similar services to the Tennessee DOC ("TDOC"), and stated that it—unlike other vendors, including Corizon—had never lost a contract award for "negative reasons."

Some of this information was misleading when provided and all of it became false during the procurement process. *During the Defendants' procurement process*, it is undisputed that:

- Centurion was caught red handed violating Tennessee "rules and regulations in place to insure fairness and transparency in the procurement process" for the Tennessee DOC contract—the contract that Centurion's proposal boasted to Defendants Centurion won based on its superiority over other vendors, including Corizon.[1]

- Centurion produced documents in litigation Corizon filed to challenge the TDOC contract award that showed Centurion senior executives, primarily Wells, had numerous prohibited, unethical communications about the Tennessee RFP with the TDOC's CFO. Other documents showed Centurion rewarded the CFO's misconduct with a Vice President job at Centurion.[2]

- When Centurion was forced to reveal its and the TDOC's CFO's misconduct to Tennessee procurement officials, Centurion fired Wells and the former TDOC CFO in a clear attempt to mitigate its damages.

- Centurion immediately notified Tennessee of Wells' termination.

---

[1] *See* Exhibit 6, at Ex. 25 (Tennessee DOC press release).

[2] *See* Exhibit 6, at Exs. 5, 6, 7, 9, 10, 14, 15, 16, 17, 18 (Communications between Wells and the Tennessee DOC's CFO).

- Centurion remained silent in Missouri regarding its firing of Wells despite Wells being the centerpiece of its Missouri proposal and its representations to Missouri that it would have open communications and be transparent. Centurion, however—*the day after producing evidence of its misconduct to Tennessee procurement officials and over a month after it fired Wells for his role in the misconduct*— did deem it necessary to alert Defendants of changes to its corporate pharmacy team.

- Centurion, despite telling the State it would have open communications and be transparent, similarly chose not to advise Defendants of its violations of Tennessee law during the procurement process for the Tennessee DOC contract.

- Because of Centurion's violations of Tennessee procurement law, Tennessee decided to re-issue the Tennessee DOC contract for bid and award, meaning it withdrew the new contract award that Centurion's proposal boasted to Defendants that it won. Tennessee procurement officials have testified that if they had known of Centurion's misconduct during the procurement process they would have disqualified Centurion from participating in the RFP.[3] It is Corizon's understanding that Tennessee procurement officials have not yet decided if Centurion will be disqualified from the re-bid of the contract.

- Centurion, despite telling the State it would have open communications and be transparent, chose not to advise Defendants that it no longer had the new Tennessee contract award.

Knowing disclosure of these developments would impact Defendants' evaluation and scoring of its proposal and could destroy its chances of a contract award, Centurion remained silent to gain an unfair advantage over Corizon and other vendors contrary to Missouri law governing the procurement process. So much for Centurion's promises to Defendants in its proposal that it would have open communication, show respect, be transparent, be accountable and be trustworthy. Centurion's conduct was unfair, unethical and unlawful, and should have resulted in its proposal being disqualified for containing false and misleading information or rejected as nonresponsive.

---

[3] *See* Exhibit 11.

4

Compounding Centurion's misconduct, Defendants failed to require Centurion to disclose that material information in its proposal had become false and misleading, or to discover Centurion's concealed information on their own, investigate it, and apprise their evaluators. As a result, when the evaluators applied the evaluation and scoring criteria in the RFP, they did not know the integrity and veracity of Centurion's entire proposal was compromised because Centurion's proposal contained significant false and misleading information. Defendants' evaluators' comments in their Subjective Evaluation show that they awarded points to Centurion based on information that was not true at the time of evaluation. It is impossible to know how the evaluation of complete and accurate information from all vendors would have impacted their application of the evaluation and scoring criteria in the RFP and the contract award.

What is clear, however, is that the procurement process was unfair and unlawful, giving Centurion an advantage over Corizon and other vendors such that Defendants' contract award to Centurion is void as a matter of law. The appropriate remedy is for the Court to temporarily, preliminarily and permanently enjoin and restrain the state from entering into or proceeding with any contract produced by the unfair and unlawful process, withdraw the contract award to Centurion, rebid the contract, disqualify Centurion from rebid participation, and extend Corizon's contract until the rebid is complete.

For its cause of action, Corizon states as follows:

1.      Corizon, LLC is a Missouri limited liability corporation in good standing.

2.      The Office of Administration ("OA" or "State") is a state agency authorized to procure services for the State of Missouri and its various departments. The Division of Purchasing and Materials Management ("Division") is the division of OA responsible for procuring supplies, equipment and services for the State of Missouri.

3.     All Defendants reside in Missouri.

4.     Venue is proper in this Court under § 508.010, RSMo.

5.     This Court has jurisdiction under § 536.150, Chapter 526, and Chapter 527 of the Revised Statutes of Missouri, and Missouri Supreme Court Rules 87 and 92.

**RFPS30034902100318 (Comprehensive Health Care Services)**

6.     Corizon has the existing contract with OA to provide statewide medical and mental health care services to the Missouri Department of Corrections ("DOC"). Currently, the contract is set to expire on October 31, 2021.

7.     Corizon has partnered with the DOC to provide health care services to offenders housed in Missouri correctional facilities since 1992.

8.     On or about August 27, 2020, Defendants issued a request for proposals to award a Comprehensive Health Care Services contract replacing Corizon's existing contract, identified as RFPS30034902100318 (the "RFP").

9.     Defendants issued five addendums to the RFP. A true copy of Addendum No. 5, which contains the original RFP and all addendums, is attached as **Exhibit 1** and incorporated herein by reference.

10.    The RFP specified the manner that all vendors' proposals would be evaluated and scored. Per the evaluation criteria in the RFP, a vendor could earn a maximum score of 200 points. *See* Exhibit 1, ¶ 6.6.1. The point breakdown was as follows:

6

| Category | Element | Points |
|---|---|---|
| COST PROPOSAL | | 80 points |
| | | |
| TECHNICAL PROPOSAL | | 110 points |
| Proposed Methodology, Approach, and Work Plan | | 30 points |
| | Healthcare Services | 4 points |
| | Medical Care Services | 4 points |
| | Mental Health Care Services | 4 points |
| | Staffing Plan | 10 points |
| | Implementation Plan | 8 points |
| Team Qualifications | | 20 points |
| | Corporate Team | 10 points |
| | Statewide Administrative Team | 10 points |
| Vendor Information and Past Performance | | 60 points |

| Category | Element | Points |
|---|---|---|
| | Overall Relevant Vendor Medical Care Experience | 10 points |
| | Overall Relevant Vendor Mental Health Care Experience | 10 points |
| | Case Studies/References | 40 points |
| MBE/WBE PARTICIPATION | | 10 Points |
| TOTAL | | 200 points |

11.     RFP paragraph 6.6.1 and Attachment 139 identified the scoring criteria to be used by Defendants' evaluators when subjectively evaluating the vendors' Technical Proposals. Specifically:

- Table 1 identified the adjectival ratings and their definitions that would be used in evaluating each of the five elements that are part of the Proposed Methodology, Approach, and Work Plan evaluation criterion.  Table 2 identified the point values for each of the adjectival ratings for the specific elements of Proposed Methodology, Approach, and Work Plan.
- Table 3 identified the adjectival ratings and their definitions that would be used in evaluating each of the two elements that are part of the Team Qualifications evaluation criterion.  Table 4 identified the point values for each of the adjectival ratings for the specific elements of Team Qualifications.
- Table 5 identifies the adjectival ratings and their definitions that would be used in evaluating each of the three elements that are part of the Vendor Information and Past Performance evaluation criterion.  Table 6 identified the point values for each of the adjectival ratings for the specific elements of Vendor Information and Past Performance.

47467436v.1

Electronically Filed - Cole Circuit - August 29, 2021 - 12:59 PM

The RFP required each vendor's proposal to be reviewed and scored according to Attachment 139's rating definitions and associated scoring in the above-referenced tables. *See* **Exhibit 7**, at p. 12. A true copy of Attachment 139 is attached as **Exhibit 8**, and incorporated herein by reference.

12. The RFP also provided that "When evaluating a proposal, the State of Missouri reserves the right to consider relevant information and fact, whether gained from a proposal, from a vendor, from vendor's references, or from any other source." Exhibit 1, Terms and Conditions, ¶ 8.g.

13. Corizon submitted a proposal in response to the RFP. A true copy of Corizon's proposal is attached as **Exhibit 2**, and incorporated herein by reference.

14. Four other vendors submitted proposals in response to the RFP: Centurion of Missouri, LLC ("Centurion"), InGenesis, Inc. ("InGenesis"), Wellpath, LLC ("Wellpath"), and Wexford Health Sources, Inc. ("Wexford").

15. All vendors proposals were submitted by early December 2020, with Centurion's being submitted on December 2, 2020.

16. After the vendors submitted their proposals, Defendants entered into Best and Final Offer ("BAFO") negotiations with all vendors.

17. Defendants' BAFO letter stated, "In your response to this Best and Final Offer, you may make any modification, addition, or deletion deemed necessary to your proposal." A true copy of Defendants' protest denial letter, citing the language used by Defendants in the BAFO letters sent to all vendors, is attached as **Exhibit 7**, and incorporated herein by reference.

Electronically Filed - Cole Circuit - August 29, 2021 - 12:59 PM

18. The vendors, including Corizon and Centurion, submitted BAFO responses. Centurion submitted its BAFO response on March 17, 2021. A true and correct copy of Centurion's proposal is attached as **Exhibit 5**, and incorporated by reference.

19. After completing BAFO negotiations, Defendants evaluated the proposals and prepared an Evaluation Report that was signed by the evaluators on April 13 and 14, 2021. A true copy of the Evaluation Report is attached as **Exhibit 3**, and incorporated herein by reference.

20. Defendants awarded the vendors the following points:

| | Name of Vendor | Proposed Methodology, Approach, and Work Plan (Maximum 30 Points) | Team Qualifications (Maximum 20 Points) | Vendor Information and Past Performance (Maximum 60 Points) | Cost (Maximum 80 Points) | MBE/WBE Participation (Maximum 10 Points) | Organization for the Blind/Sheltered Workshop (Assigned by Division of Purchasing) (15 Points) | MO Service-Disabled Veteran Business Preference (3 Points) | Total Points (Maximum 218 Points) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Centurion of Missouri, LLC (Vienna, VA) | 30 | 18 | 50 | 66.68 | 6.5 | 0 | 0 | 171.18 |
| 2 | Corizon, LLC (Brentwood, TN) | 7 | 12 | 7 | 76.74 | 6.7 | 0 | 0 | 109.44 |
| 3 | InGenesis, Inc. (San Antonio, TX) | 7 | 4 | 0 | 70.36 | 10.0 | 5 | 3 | 99.36 |
| 4 | Wellpath, LLC (Nashville, TN) | 24 | 13 | 40 *39 | 63.46 | 10.0 | 5 | 0 | 155.46 *154.46 |
| 5 | Wexford Health Sources, Inc. (Pittsburgh, PA) | 14 | 13 | 28 | 80.00 | 10.0 | 0.1 | 0 | 145.10 |

*See* Exhibit 3, p. 6.

21. Defendants issued a Notice of Award awarding the contract to Centurion on May 28, 2021. A true copy of the Notice of Award is attached as **Exhibit 4**, and incorporated herein by reference. It was issued one day after it is dated.

22. Corizon submitted a timely bid protest letter to Defendants on June 14, 2021. A true copy of the Bid Protest Letter is attached as **Exhibit 6** and incorporated herein by reference.

23. On July 30, 2021, Defendants sent Corizon a letter denying its bid protest on the merits. *See* Exhibit 7.

24. Section 34.042, RSMo, prescribes the statutory competitive proposal process for contracting in the State of Missouri.

25. The contract "shall be let to the lowest and best offeror." § 34.042.3, RSMo. The

9

lowest and best offeror shall be determined "as provided in the request for proposals and under rules promulgated by the commissioner of administration." *Id.*

26.     Vendors must adhere to business ethics when participating in any procurement process or be subject to suspension or debarment by OA. 1 CSR 40-1.060(8). 1 CSR 40-1.060(8)(C), (E), (F), (G) and (H) provide:

> (8) The following shall be sufficient cause for suspension or debarment. The list is not meant to be all inclusive but shall serve as a guideline for vendor discipline and business ethics—
> (C) Providing false or misleading information on an application, in a bid/proposal, or in correspondence to the division or a state agency;
> (E) Colluding with others to restrain competition;
> (F) Obtaining information, by whatever means, related to a proposal submitted by a competitor in response to a Request for Proposal in order to obtain an unfair advantage during the negotiation process;
> (G) Contacting proposal/bid evaluators or any other person who may have influence over the award, without authorization from the division, for the purpose of influencing the award of a contract; or
> (H) Giving gifts, meals, trips, or any other thing of value or a monetary advantage for personal benefit, directly or indirectly, to an employee of the division or to any evaluator of bids/proposals.

27.     Defendants are required by 1 CSR 40-1.040(22) (A) to review proposals for responsiveness with mandatory requirements in the RFP and to reject "a proposal which contains nonresponsiveness issues which could never be expected to be brought in compliance."

28.     "[C]ompetitive bidding procedures for public contracts should ensure that all who wish to bid shall have a fair opportunity to compete in a field where no favoritism is shown or may be shown to other contestants." *State ex rel. Stricker v. Hanson*, 858 S.W.2d 771, 778 (Mo. Ct. App.  1993). *See also Byrne & Jones Enters., Inc. v. Monroe City R-1 Sch. Dist.*, 493 S.W.3d 847, 853 (Mo. banc 2016).

29. Competitive bidding procedures must also ensure the absence of fraud, corruption, and capriciousness. *Pub. Comm'ns Servs., Inc. v. Simmons*, 409 S.W.3d 538, 545 (Mo. Ct. App. 2013).

30. Section 536.150, RSMo, authorizes judicial review of OA's procurement decisions. *Id.*, 409 S.W.3d 538 at 547. Judicial review is *de novo*, with the circuit court determining whether the agency's decision was "unlawful, unreasonable, arbitrary, or capricious or involve[d] an abuse of discretion." *Id.*

31. The awarding of a contract in violation of the law renders the contract "void and of no effect." § 34.150, RSMo, states "Whenever any department or agency of the state government shall purchase or contract for any supplies, materials, equipment or contractual services contrary to the provisions of this chapter or the rules and regulations made thereunder, such order or contract shall be void and of no effect."

32. It impossible to know the impact of an unfair and unlawful process on the subjective evaluation of proposals and associated scoring, which is the reason that contracts awarded based on an unfair and unlawful process are void under § 34.150, RSMo.

33. As more fully articulated below, Defendants' contract award to Centurion is the product of an unfair and unlawful procurement process, which process directly and adversely affected Corizon and all vendors other than Centurion and denied Corizon the fair and equal opportunity to compete for the contract to which it was entitled under Missouri law.

34. Corizon will suffer imminent, permanent and irreparable harm absent the issuance of injunctive relief, including a temporary restraining order ("TRO") because it has the existing statewide contract for comprehensive health care services for Missouri state correctional facilities. This contract is due to expire on October 31, 2021 unless extended by Defendants. The

11

State has indicated it will immediately proceed to implement its contract award to Centurion and begin transitioning the existing contract from Corizon to Centurion. Corizon's contract obligates it to immediately cooperate with the State, including the DOC, in the transition process. A true and correct copy of the Affidavit of Michael Murphy is attached hereto as **Exhibit 9**, and incorporated by reference.

35.     The transition will completely divest Corizon from providing services to offenders in Missouri and result in its loss of it offices in Jefferson City and 700 site-level clinical and operational personnel. In addition, Corizon will incur significant expenses in this transition. If the contract is transitioned before this case is resolved in Corizon's favor, then Corizon also will incur substantial re-start-up costs plus re-employment of personnel issues. *Id.*

36.     Although the existing contract has been extended to expire on October 31, 2021, Defendants may terminate it at any time without advance notice. *Id.*

37.     Defendants are not harmed by entry of a TRO or other injunctive relief. They have a contract in place that they already have extended the contract two times since June 1, 2021 and can extend again. The TRO will not deny the State any services because Corizon is providing and will continue to provide services under the existing contract. And Corizon has been providing the same or similar services to the Defendants under contracts for nearly 30 years. Further, Defendants have no interest in a public contract awarded contrary to the legal requirements related to procurement and cannot be harmed by an order that prevents such an illegal contract from proceeding.

38.     The public will suffer harm absent a TRO or other injunctive relief affected because Defendants' unfair and unlawful procurement process will result in the unnecessary expenditure of millions of state tax dollars because Centurion's proposal costs the State $2.1

million per month more than Corizon's contract and over $300 million more than that of the lowest bidder's cost proposal for the life of the contract. *See* Exhibit 3.

39. Further, an unnecessary transition (and potential re-transition) will harm some offenders housed by Missouri correctional facilities because the transition process necessarily results in a change of some personnel providing health care services due to differences in contractors and agencies used by vendors, and in operating policies. A true copy of the affidavit of Jason Terris is attached as Exhibit 10, and incorporated herein by reference. Based on Corizon's experience, changes in the personnel providing health care services and policies often adversely affects a certain percentage of offenders, primarily those that are the most vulnerable offenders such as those with mental illnesses and chronic conditions who require regular and on-site medical care and/or off-site provider appointments. Some of these offenders suffer stress and anxiety due to receiving services from different providers. Implementation of new policies also can create a delay in on-site and off-site appointments, as well as the refilling of necessary medications. *Id.*

40. Because Defendants' contract award was unfair and unlawful, the proper remedy in this case is to declare the contract awarded to Centurion void, enjoin Defendants from continuing such contract with Centurion, and require Defendants to rebid the contract.

41. All the elements for entry of a temporary restraining order and preliminary injunction order exist and weigh in favor of Plaintiff, including (i) likelihood of success on the merits by Plaintiff, (ii) immediate and irreparable harm to Plaintiff if the relief is not granted, (iii) the balancing of the interests, including the public interest, and (iv) the absence of an adequate remedy at law.

**COUNT I**

**Defendants' procurement process was unfair, unreasonable, arbitrary, capricious, and unlawful because it did not require proposals to be free of false and misleading information and resulted in a contract award based on the application of evaluation and scoring criteria to false and misleading information, giving the winning vendor an unfair competitive advantage over Corizon.**

42.     Corizon incorporates the preceding paragraphs of this petition as if set forth fully herein.

43.     Defendants' contract award is the product of fraud and thus an unfair and unlawful procurement process because Defendants did not require all vendors' proposals to be free of false and misleading information throughout the procurement process.

**Salient Portions of the RFP**

44.     The subjectively evaluated categories of Proposed Methodology, Approach and Work Plan (worth a maximum of 30 points), Team Qualifications (worth a maximum of 20 points), and Vendor Information and Past Performance (worth a maximum of 60 points), comprised 55% of the total possible points. *See* Exhibit 3, p. 6.

45.     Paragraph 6.9.1.a of the RFP states:

6.9.1   The Technical Proposal should provide detailed information on the experience and qualifications of the vendor's proposed teams to ensure compliance with the requirements of the RFP using the format on Exhibit C and Exhibit D. The vendor's proposed teams should include both the Corporate Team and Statewide Administrative Team.

a.   Corporate Team: No more than five (5) Leadership Team (i.e. Chief Executive Officer, Chief Medical Officer, National Director of Mental Health, Corporate Director of Human Resources, and Corporate Information Technologist) members' biographies will be considered in the evaluation. One (1) member of the Corporate Team should be identified as the vendor's primary person responsible for the delivery of the services. By including their biographies, the vendor is committing the Corporate Team members to support the project, should it be awarded.

46.     Paragraph 6.9.1.a allows vendors to submit biographies for up to five corporate team members and provides that by including biographies, the vendor commits the corporate team members to support contract performance if Defendants award the contract to the vendor.

47.     Paragraph 6.4.1.c of the RFP requires vendors to provide information regarding past contract performance on Exhibit E, which provides in relevant part:

> *Directions to Vendor: The vendor should provide the overall relevant vendor experience related to this RFP and reflective of the contractor qualifications.*
> *…*
> *List, identify, and provide reasons for each contract gained and lost (cancelled, expired, terminated, vendor requested, etc.) in the past two years.*

48.     Paragraph 2.10.19 of the RFP provides that "The contractor agrees and understands that the State of Missouri's agreement to the contract is predicated in part on the utilization of the specific key individual(s) and/or personnel qualifications identified in the proposal."

49.     In evaluating all three subjectively scored categories, the evaluators relied on the completeness and accuracy of information in the vendors' respective proposals, which include their BAFO responses. *See* Exhibit 3, pp. 27-53 wherein the evaluators cite to information in each vendor's complete submission that was relied upon as the basis for the score given.

### Centurion's Representations Regarding Its Practice of Transparent and Open Communication

50.     During the procurement process, successful bidder Centurion represented to Defendants that they could rely on the accuracy and completeness of information in Centurion's proposal.

51.     For example, in its proposal submitted on December 2, 2021, Centurion stated

- "Centurion operates from a standpoint of *transparency*, *flexibility*, and *open communication* so that the MODOC will always know where and how its resources are being used." Exhibit 5, Part 2 at p. 30 (Executive Summary of Proposal).

- "Most importantly, we will be **a flexible, reliable, transparent, and responsive partner** to the Department and reasonable stewards of the trust that the MODOC will place in us. **These are our commitments to the MODOC.**" Exhibit 5, Part 2 at p. 37 (Executive Summary of Proposal).

15

- "Centurion's partnership with our clients is based on mutual **trust**, **respect**, **transparency**, and **accountability**." Exhibit 5, Part 2 at p. 48 (Executive Summary of Proposal).

- "**Our goal is to create a partnership with MODOC that is based on mutual respect, transparency, accountability, and trust.**" Exhibit 5, Part 2, at p. 49 (Executive Summary of Proposal).

- "Most importantly, we are a strong proponent of open communication, continuous collaboration, mutual respect, and transparency in our client relationships." Exhibit 5, Part 2 at p. 53 (Executive Summary of Proposal).

- "Our commitment to transparent and responsive communication will ensure that the MODOC understands at any given time the status of transition activities and associated milestones." Exhibit 5, Part 3, p. 293 (Exhibit B-Proposed Methodology).

- "[O]ur belief in and reputation of transparent partnership were integral in the County's decision to award the contract to Centurion." Exhibit 5, Part 3, p. 142 (Exhibit E – Technical Proposal Past Performance).

**Centurion's Representations Regarding its Corporate Leadership Team and Central Role of Corporate Team Member Jeffrey Wells as the Person in Charge of Performance of the Contract in Missouri.**

52. Throughout Centurion's proposal, Centurion emphasized the strength, experience and stability of its corporate leadership team as a significant reason why Defendants should award it the contract rather than the other vendors.

53. Centurion made these representations in Exhibits B, C, D and E of its proposal for all three subjectively scored categories: Proposed Methodology, Approach and Work Plan (Exhibit B to the RFP); Team Qualifications (Exhibits C and D to the RFP); and Vendor Information and Past Performance (Exhibit E to the RFP).

54. For example, in its proposal submitted on December 2, 2020, Centurion states:

- "By selecting Centurion [the state] will achieve: . . . Stronger, more stable corporate leadership, as described in detail in Exhibit C – Team Qualifications, Corporate Team Member Biographies." Exhibit 5, Part 2, at p. 30 (Proposal Cover Letter).

16

- "Centurion's success in providing correctional healthcare services, particularly for large, statewide systems, is the result of our extensive experience and the expertise of the individuals who form our corporate leadership team." Exhibit 5, Part 3, at p. 71 (Exhibit C, Team Qualifications).

- "While other companies struggle to operate under financial challenges and high senior management turnover, Centurion thrives under its stable leadership team and healthy financial condition. All companies will claim to have experience and be financially strong and stable. *We encourage the evaluation committee to conduct a thorough due diligence into the true financial and leadership condition of each company to identify the company best 'fit' to perform the services sought in the RFP today and for the years to come.*" Exhibit 5, Part 2, at p. 31 (Proposal Cover Letter). (Emphasis added).

- "We do so with confidence . . . in our ability to serve as a strong, stable, and productive partner for the MODOC." "In addition, we will bring the expertise and knowledge of our corporate leadership. . ." Exhibit 5, Part, at p. 35 (Executive Summary of Proposal).

- "We maintain one of the **most stable corporate leadership teams** in the industry who have been part of the Centurion family for years." Exhibit 5, Part 2, at p. 40 (Executive Summary of Proposal).

- "Centurion offers the MODOC . . . ● Experience and stable corporate and local leaderships."  Exhibit 5, Part 2, at p. 42 (Executive Summary of Proposal).

- "Our local leadership team and facility staff will have ongoing access to and support from our corporate leadership, composed of individuals with decades of experience and expertise in correctional healthcare. These professionals will be involved in the MODOC transition and will provide consultation, training, and support quality management activities for the program." Exhibit 5, Part 2, at p. 49 (Executive Summary of Proposal).

- "Our leadership team is experienced and remains stable." "Likewise, our corporate leadership team will remain involved throughout the contract and will provide extensive support to our local team and the MODOC." Exhibit 5, Part 2, at p. 53 (Executive Summary of Proposal).

- "We provide more information about our leadership teams in our response to RFP Exhibit C. Team Qualifications – Corporate Team Members, and Exhibit D. Team Qualifications – Statewide Administrative Team." Exhibit 5, Part 2, at p. 169 (Exhibit B – Proposed Methodology, Approach, and Work Plan).

17

- "Transition Leadership Team Our corporate transition team is composed of the following individuals, who have decades of experience in correctional health services delivery and management. They will be available both remotely and on site, as needed, to assist our local and facility leadership teams with the contract transition. Our key onsite leadership team members will include our statewide vice president of operations. Our Regional Vice President of Operations (RVP), Jeffrey Wells, MBA, will support our primary Centurion instate contract leadership team members." Exhibit 5, Part 3, at p. 66 (Exhibit B – Proposed Methodology, Approach, and Work Plan).

- "Centurion's success in providing correctional healthcare services, particularly for large, statewide systems, is the result of our extensive experience and the expertise of the individuals who form our corporate leadership team." "Our leadership team has the most stable and experienced team of correctional health experts available." Exhibit 5, Part 3, at p. 71 (Exhibit C – Team Qualifications Corporate Team Member Biographies).

55.     Centurion reiterated the strength, stability and experience of its corporate team in

its BAFO response submitted on March 17, 2021, stating:

- "In the narrative that follows, we outline our methodical and strategic growth and development in correctional healthcare in hopes the evaluation committee will see Centurion as the clear choice for a financially strong, stable, healthcare partner to meet the needs of the MODOC today and for the challenging years ahead." Exhibit 5, Part 1, at p. 14 (Exhibit E – Technical Proposal Past Performance).

- "Departments of correction across the nation continue to trust their healthcare system to Centurion because of the strength of our clinical programs, our stable leadership, and our financial strength." Exhibit 5, Part 1, at p. 16.

- "Our corporate leadership team invests heavily in recruiting and human resources management systems to ensure full staffing of our programs with high quality healthcare professionals." Exhibit 5, Part 1, at p. 107 (Exhibit E – Technical Proposal Past Performance).

- "Centurion's corporate leadership is composed of professionals with extensive experience managing, operating, and/or providing healthcare services. Each member of our leadership team has at least 10 years of experience." Exhibit 5, Part 1, p. 179 (Exhibit E – Technical Proposal Past Performance).

- A reason it gained the new Kansas Department of Corrections health care service contract was its "Stronger, more stable, and experienced corporate leadership and financial strength to support the KDOC in advancing its

18

Electronically Filed - Cole Circuit - August 29, 2021 - 12:59 PM

healthcare services program." Exhibit 5, Part 1, at p. 45 (Exhibit E – Technical Proposal Past Performance).

- "Centurion encourages the evaluation committee to carefully consider each bidder's current experience and ability to perform the requirements set forth in this RFP." Exhibit 5, Part 1, at p. 140 (Exhibit E – Technical Proposal Past Performance).

56. Centurion compared its corporate leadership to Corizon's and the other vendors', faulting them for leadership turnover, stating:

> While the MODOC's current contractor and other companies in the marketplace have experienced excessive senior management turnover, Centurion's leadership team is stable, with many years of experience working as a team in service to large state correctional systems.

57. Central to Centurion's corporate leadership team was its Regional Vice President of Operations, Jeffrey Wells. Throughout its proposal, Centurion emphasized Wells as pivotal to its performance of the contract and a key reason for Defendants to award the contract to it rather than the other vendors.

58. Centurion represented that Wells was one of "five of the key corporate team members who will support the MODOC program." Exhibit 5, Part 3, at p. 72 (Exhibit C – Team Qualifications Corporate Team Members).

59. Centurion stated:

> **Jeffrey Wells**, our Regional Vice President of Operations, will oversee the MODOC program. Mr. Well has over 20 years of correctional healthcare experience and will ensure that the MODOC program benefits from the expertise and knowledge of our corporate team. **Mr. Wells will be the primary person responsible for the delivery of the project.**

Exhibit 5, Part 3, at p. 72 (Exhibit C – Team Qualifications Corporate Team Members). Centurion vowed that "These professionals will be available to support the MODOC program during implementation and throughout the course of the contract." *Id.*

60. Centurion told Defendants that Wells' time commitment to contract performance would be as follows:

> Though his time commitment specific to the MODOC program is estimated at 30%, 100% of his time and efforts is dedicated to building and implementing the program initiatives to support all of the MODOC efforts.

Exhibit 5, Part 3, at p. 90 (Exhibit C – Team Qualifications Corporate Team Members).

61. Centurion's proposal pictured Wells and quoted him as saying he would guarantee that Centurion provided "best-class services for the Department." Wells' complete quote is as follows:



"We are a strong proponent of local leadership. Our MODOC regional team will be empowered to make the decisions that will ultimately impact the delivery of services. Our corporate leadership is at the ready to support this staff and I will be available to make sure that we provide best-in-class services for the Department. That is our commitment to the MODOC."

Jeffrey Wells, MBA
Regional Vice President of Operations
18 years with the company

Exhibit 5, Part 2, at p. 49 (Executive Summary of Proposal).

20

62.     Centurion represented that Wells would be instrumental in supporting its

statewide team, stating:

> Our local leadership team in Missouri will be supported directly by Mr. Wells and
> he will be active, accessible, and highly visible to the MODOC throughout the
> term of the contract. He will be actively involved with managing the program and
> ensuring success in all aspects of the day-to-day operations. Mr. Wells will
> routinely visit the state and our regional office and participate in site visits and
> meetings with the MODOC leadership. Mr. Wells will ensure that the regional
> office has access to and benefits from Centurion's corporate resources and will
> work collaboratively with both the local and corporate teams to ensure the
> delivery of services within the highest standards of quality and responsiveness. In
> addition, he will support the MODOC's goals and strategic plan, bringing lessons
> learned from other programs, change management experts and functions, and
> additional corporate resources to support the MODOC.
> . . .
> We will build the MODOC team under the leadership of **Jeffrey Wells, MBA**,
> Regional Vice President of Operations. Mr. Wells has been with the company for
> 18 years and is highly successful in operating contracts to the satisfaction of state
> correctional agencies in multiple states. Our local leadership team in Missouri will
> be supported directly by Mr. Wells and he will be active, accessible, and highly
> visible to the MODOC throughout the term of the contract. He will be actively
> involved with managing the program and ensuring success in all aspects of the
> day-to-day operations.
>
> Mr. Wells will routinely visit the state and our regional office and participate in
> site visits and meetings with the MODOC leadership. Mr. Wells will ensure that
> the regional office has access to and benefits from Centurion's corporate
> resources and will work collaboratively with both the local and corporate teams to
> ensure the delivery of services within the highest standards of quality and
> responsiveness. In addition, he will support the MODOC's goals and strategic
> plan, bringing lessons learned from other programs, change management
> experts and functions, and additional corporate resources to support the MODOC.

Exhibit 5, Part 3, at p. 96-97 (Exhibit D – Team Qualifications Statewide Administrative

Team Members).

63.     Centurion also indicated that Wells was essential in implementing its transition

plan. Exhibit 5, Part 3, at p. 56-57. 67-68, 72 (Exhibit B – Proposed Methodology, Approach,

and Work Plan).

47467436v.1

**Centurion's Representations Regarding the Tennessee Department of Corrections Contract Award and its Contract Termination History**

64.     In Exhibit E of Corizon's proposal that responded to the Vendor Information and Past Performance category of the RFP, Centurion asserted that its past performance of other similar health care services contracts and gain/loss record for these contracts compared to other vendors was a strong basis for Defendants to award it the contract.

65.     In Centurion's proposal submitted on December 2, 2021 and its BAFO response submitted on March 17, 2021, it stated:

> Centurion encourages the evaluation committee to carefully consider each current experience and ability to perform the requirements set forth in this RFP.

Exhibit 5, Part 1, at p. 37 Centurion's BAFO (Exhibit E – Technical Proposal Past Performance).

66.     Centurion's BAFO response included a substantially rewritten Exhibit E in which Centurion newly asserted as a basis for Defendants to award it the contract that it gained a new contract award in August 2020 from the Tennessee Department of Corrections for the provision of statewide behavioral health care services. Exhibit 5, Part 1, at p. 52 (Exhibit E – Technical Proposal Past Performance).

67.     Centurion's BAFO response at the same time disparaged vendors Corizon and Wexford for losing similar contracts in other states and represented that Centurion had never had a contract terminated for "negative reasons." Exhibit 5, Part 1, at pp. 41-42, 52 (Exhibit E – Technical Proposal Past Performance).

**Centurion's Representations Related to its Corporate Team, Wells, the TDOC Contract, and Never Having Lost a Contract for Negative Reasons Were or Became Misleading and False During the Procurement Process.**

68.     While Centurion's representations regarding the strength, experience, and stability of its corporate team and its commitment to use key corporate team member Wells to perform

the contract may have been technically accurate when they were made, they undisputedly became false and misleading during the procurement process.

69.    The initial RFP for the TDOC behavioral health services contract (RFP Release 1) was publicly released on August 8, 2019, and the RFP was revised when RFP Release 2 was publicly released on May 25, 2020. *See* Exhibit 6, at Ex. 13, RFP Release 2 and Exhibit 12, TDOC email notification of the public release of RFP Release 2.

70.    During the TDOC solicitation process for the behavioral health services contract, in which Corizon also was a bidder, Corizon raised issues regarding the fairness of the solicitation process.

71.    After the contract award to Centurion, the TDOC produced emails, as part of the post-award open file disclosure process, reflecting that Wes Landers, then CFO of TDOC, while being involved in the solicitation process, had numerous communications with Centurion senior executives about the RFP, including Jeffrey Wells. *See* Exhibit 6, at Ex. 5, Internal TDOC Landers Communications about the TDOC contract and Ex. 6, Landers/Centurion Communications.

72.    The TDOC also produced emails showing that during the solicitation process, Landers discussed employment at Centurion with Wells. *See* Exhibit 6, at Ex. 6, Landers/Centurion Communications.

73.    These emails, coupled with other information possessed by Centurion, gave Corizon reason to believe misconduct occurred in the solicitation process and that the TDOC contract award to Centurion was the product of an unfair or unlawful process.

74.    In 2020, Corizon filed a lawsuit against Centurion and TDOC employees in the United States District Court, Middle District of Tennessee, challenging the contract award and

asserting various claims ("TDOC lawsuit"). *See* Exhibit 6, at Ex. 7, *Corizon, LLC v. Wainright, et al.*, Case NO. 3:20-cv-0892, Second Amended Complaint (without exhibits and with the relevant complaint exhibits relabeled).

75.     Discovery in the TDOC lawsuit revealed that Wells, Landers, and other Centurion employees had secret, inappropriate electronic communications before and/or during the solicitation process for the TDOC contract using their personal email addresses and a chat service called "WhatsApp."

76.     For example, on March 21, 2019 Landers emailed Wells an internal TDOC discussion about how TDOC might calculate maximum liability for purposes of the TDOC contract. *See* Exhibit 6, at Ex. 8, March 21, 2019 email Landers/Wells regarding TDOC contract Maximum Liability Calculation.

77.     Also on March 21, 2019, five months before the TDOC contract draft RFP was released, Landers forwarded an internal state email regarding the draft RFP along with a copy of the draft RFP to Wells. *See* Exhibit 6, at Ex. 9, March 21, 2019 email Landers/Wells regarding the TDOC contract with nonpublic draft RFP for the TDOC contract.

78.     On July 23, 2019, approximately one month before the RFP for the TDOC contract was publicly released, Wells forwarded the ill-gotten RFP draft to Samantha Phillips, Centurion's Vice President of Operations (who Exhibit D of Centurion's proposal for the Missouri DOC contract indicates is a key member of Centurion's statewide team, the Statewide Vice President of Operations). *See* Exhibit 5, Part 3, at p.p. 98-99; Exhibit 6, at Ex. 10, July 23, 2019 email Wells/Phillips with the nonpublic draft RFP for the TDOC contract.

79.     On May 22, 2019, Landers forwarded Wells an internal state email thread discussing changes to the TDOC contract RFP and attaching a current draft of the RFP months

before it was publicly available, stating to Wells, "As promised." *See* Exhibit 6, at Ex. 11, May 22, 2019 email Landers/Wells As Promised.

80.     On June 19, 2019, almost two months before the RFP was publicly available, Landers sent to Wells what is, upon information and belief, the state's internal draft spreadsheet entry showing the timing of proposed events in the Contract solicitation process and made sure that Centurion was immediately aware when the actual RFP was issued. *See* Exhibit 6, at Ex. 14 and Ex. 15, Landers forwarding to Wells Wilson's August 7, 2019 email publishing the RFP.

81.     On January 3, 2020, about two months before RFP Release 2 was publicly released, Landers sent Wells a copy of a draft version of it. *See* Exhibit 6, at Ex. 16, Email Landers/Wells Nonpublic draft RFP Release. The draft shows dozens of internal state discussions about the RFP. *Id.*

82.     On January 15, 2020, Landers sent to Wells and Phillips, the same fellow Centurion Vice President to whom Wells previously emailed a nonpublic draft of the RFP—and who Centurion presently plans to use as its Statewide Vice President of Operations for the Missouri DOC contract—an email between and among TDOC leadership (including Landers) titled "December 2019 Monthly Report for Behavioral Health," pointing out increases in caseload. *See* Exhibit 6, at Ex. 17, Email Landers/Wells Phillips Monthly Report.

83.     Attached to this email was a report that Corizon sent to the State discussing various items related to the then-current behavioral health contract. *Id.*

84.     Upon information and belief, in exchange for providing this dishonest and almost certainly illegal provision of nonpublic state information that no doubt gave Centurion an unfair advantage over other bidders, Centurion rewarded Landers with a job.

85.     Wells began recruiting Landers to Centurion no later than October 16, 2019, when Wells sent to Landers a copy of Centurion's summary of benefits information. *See* Exhibit 6, at Ex. 18, Email Wells/Landers Centurion Benefits Summary.

86.     Wells recruited Landers to leave the TDOC and work at Centurion.

87.     At Wells' request, Landers' hiring was approved by Centurion CEO, Steven Wheeler (who—like Wells—Centurion's Missouri proposal indicates is a key member of its corporate leadership teams). *See* Exhibit 6, at Ex. 6, pp. 7-8.

88.     Landers announced his retirement on February 6, 2020, indicating his last day would be March 16, 2020, but began employment at Centurion on March 2, 2020, two weeks before his last day at the TDOC. *See* Exhibit 6, at Ex. 19, Landers Retirement Notice; Ex. 20, Landers TDOC Resignation; and Ex. 21, Email Wells/Landers 1st Day.

89.     When it became apparent as a result of Corizon's lawsuit that the TDOC and Centurion employee misconduct would be revealed, Centurion's CEO Wheeler attempted to mitigate damage to Centurion by firing Wells and Landers on February 11, 2021.

90.     Centurion Vice President Phillips notified the TDOC of the "organizational updates." *See* Exhibit 6, at Ex. 23, Text Phillips/TDOC Termination.

91.     On February 16, 2021, Wheeler reached out to TDOC Director Tony Parker by e-mail. Wheeler described his decisions to fire Landers and Wells, two egregious wrongdoers, as "a couple of the toughest decisions I have dome [sic] in my career." *See* Exhibit 6, at Ex. 24, Email Wheeler/TDOC Head Parker.

92.     Despite firing Landers and Wells, Wheeler put Phillips, who also received highly improper communications from Landers, in charge of the TDOC Contract as Wells' replacement.

93.     Thus, by mid-February 2021, at the absolute latest (and possibly at the time Centurion submitted its proposal on December 2, 2020), Centurion knew that significant information in its proposal—information that would impact the application of the evaluation and scoring criteria in the RFP to its proposal and those of other vendors—had become (or was) false:

- Centurion's corporate leadership team was not strong and stable as it represented to Defendants. At the very least, one member, Wells, was unethical and corrupt.

- Despite Wells' pivotal role in Centurion's performance of the Missouri DOC contract, Centurion could not use Wells as it committed to Defendants due to his misconduct in the TDOC procurement process for the TDOC's similar contract and Wells' firing.

94.     Centurion took no action to alert Defendants that this information in its proposal had become false, instead reinforcing it promises regarding the truthfulness of information in its proposal by submitting a BAFO response on March 17, 2021 that was misleading because it discloses some, but not all changes in information in Centurion's proposal and made no reference to its fraud induced firing of Wells. In its BAFO response, Centurion:

- Referenced the August 2020 TDOC contract award and its history of never losing a contract for a negative reason, but failed to mention Corizon's lawsuit and that Centurion's misconduct in the procurement process jeopardized the award (all the while disparaging other vendors for losing awards).; and

- Referenced its corporate leadership team and experience, but remained silent regarding its firing of Wells for misconduct even though it deemed it necessary to note a more minor change in corporate pharmacy personnel. Exhibit 5, Part 1, at p. 86.[4]

95.     In addition, after Defendants evaluated the proposals and before the contract was awarded, Centurion failed to disclose to Defendants that Tennessee decided to re-issue the

_____

[4] Centurion's BAFO response indicates that Gregg Puffenberger is no longer its corporate Vice President of Pharmacy Management and that Vince Grattan will serve as Acting Vice President Pharmacy Management.

27

TDOC contract for bid and award, meaning it withdrew the new contract award that Centurion's proposal boasted to Defendants that it won.

96. On May 10, 2021 the Tennessee procurement office's explanation for its decision was that, "[o]n March 18, 2021, TDOC and CPO [another Tennessee state office involving in procurement] received information/documentation regarding the recent RFP and contract award evidencing practices inconsistent with the rules and regulations in place to insure fairness and transparency in the procurement process."[5]

### The Evaluators Relied on Centurion's False and Misleading Representations in Applying the Evaluation and Scoring to Centurion's and the other Vendors' Proposals.

97. It is impossible to know how the false and misleading information in Centurion's proposal information impacted the evaluation of Centurion's, Corizon's and the other vendors' proposals.

98. However, it is evident from the Subjective Evaluation that the false and misleading information in Centurion's proposal did impact the application of evaluation and scoring criteria to proposals.

99. In the Team Qualifications category, the evaluators clearly relied on Centurion's commitment to include Wells on its corporate leadership team because their Subjective Evaluation noted that their scoring was based on the following criteria, all of which Wells meets based on information in his provided biography:

- Longevity within correctional healthcare
- Tenure within the company
- Clear advancement of correctional career from institutional front-line services to corporate level
- Current direct involvement with correctional accrediting body

---

[5] See Exhibit 25, TDOC Press Release.

- Centurion identifies the corporate team member who will be the primary person responsible for the delivery of the project.

Exhibit 3, p. 17 of Subjective Evaluation.

100.    Further, Centurion's heavy reliance on Wells throughout its proposal as the corporate team member responsible for Missouri contract performance and the superior experience of the Centurion corporate leadership team undoubtedly influenced the evaluators' scoring of all three subjectively-scored categories of the RFP. Notably, Centurion's proposal quotes Wells as saying that he personally would help Centurion provide "best-in-class services" and the evaluators find in several places of the Subjective Evaluation that Centurion's proposal presents "best-in-class" solutions. Exhibit 3, at pp. 3, 7, 10, and 14 of the Subjective Evaluation.

101.    The evaluators also clearly relied on Centurion's representations regarding its gain of the TDOC contract in evaluating the Performance Category of the Subjective Evaluation because they note in the Subjective Evaluation that:

- Centurion identified contracts gained and lost, with an explanation for the reason of the gain/loss.[6]

102.    In the same RFP category, further evidence of reliance by the evaluators is found in the following statement in the Subjective Evaluation given that the offender population of the TDOC, 22,000, is similar to Missouri's projected offender population of 21,800 for the first year of the original contract period[7]:

- They [referencing Centurion's bid] identify contracts of similar size, as well as larger size, population than the State of Missouri's offender population.[8]

---

[6] Exhibit 3, p. 21 of the Subjective Evaluation.
[7] RFP, ¶ 6.7.2.a.1).
[8] *Id. See also* Exhibit 4 Centurion BAFO Response, p. 37 of redlined Exhibit E.

29

103.    Further, missing from the Subjective Evaluation is any reference to the false and

misleading information in Centurion's proposal, which Centurion strategically chose not to

disclose so the evaluators did not know and could not have considered:

- Centurion's misconduct during the 2019-2020 TDOC procurement process that culminated in an award of the behavioral health care services contract.

- The litigation filed in 2020 asserting misconduct during the TDOC procurement process that involved Centurion and Wells.

- Wells' demonstrated misconduct in connection with the 2019-2020 TDOC procurement process.

- Centurion's firing of Wells in February 2021 for his misconduct, making all representations to Wells in the proposal impossible.

- The Tennessee procurement officials' decision to re-issue the TDOC contract for bid and award, meaning they withdrew the new contract award that Centurion's proposal boasted to Defendants that it won (which occurred before Defendants' contract award, but after the subjective evaluation was completed).[9]

- Acknowledged wrongdoing in connection with the Tennessee procurement process of additional Centurion personnel identified in Centurion's Missouri proposal.

104.    This information demonstrated a lack of integrity of Centurion and significant

weaknesses in Centurion's proposal—which presumably is why Centurion did not disclose it—

that clearly would have impacted the evaluator's Subjective Evaluation.

---

[9] Tennessee procurement officials have testified that if they had known of Centurion's misconduct during the procurement process they would have disqualified Centurion from participating in the RFP. It is Corizon's understanding that Tennessee procurement officials have not yet decided if Centurion will be disqualified from the re-bid of the contract. See Exhibit 11, Deposition Testimony of Tennessee Procurement Official Maggie Wilson.

**Defendants' Procurement Process Was Unfair, Unreasonable, Arbitrary, Capricious, Unlawful, Gave Centurion an Advantage, and Denied Corizon a Fair Opportunity to Compete.**

105.    Based on the foregoing, Defendants' conclusion that Centurion's proposal did not contain false and misleading information is wrong.

106.    Defendants' conclusion that the procurement process did not require Centurion to alert the state when information in its proposal became false and misleading information is contrary to the RFP and Missouri law.

107.    The RFP specifies the information that vendors must include in proposals for evaluation by Defendants using the evaluation and scoring criteria in the RFP.

108.    The RFP as a whole required vendors to provide information regarding their experience providing the services sought and pertinent contact awards.

109.    Paragraph 6.9 required vendors to provide information regarding their corporate teams and to commit team members for which biographies were submitted to performing the contract.

110.    Missouri law requires the procurement process to be conducted with truthfulness, integrity, and transparency. *See* § 34.042.3 (requiring contracts to be awarded to the "lowest and best offeror.")

111.    1 CSR 40-1.060(8)(C), which Defendants promulgated using authority granted them in Chapter 34, RSMo, expressly prohibits vendors from "[p]roviding false or misleading information on an application, in a bid/proposal, or in correspondence to the division or a state agency" and subjects vendors that violate this rule to suspension or debarment.

47467436v.1

112.    Application of § 34.042.3 and 1 CSR 40-1.060(8)(C) to the RFP imposes a legal and ethical duty of vendors to update information in their proposals that becomes false or misleading during the procurement process.

113.    As a matter of law, a vendor whose proposal contains false or misleading information violates 1 CSR 40-1.060(8)(C) and cannot be the "best" offeror as required by § 34.042 .3.

114.    As a matter of law, a proposal that contains false or misleading information must be disqualified for violating 1 CSR 40-1.060(8)(C).

115.    A procurement process lacking truthfulness, integrity, and transparency that results in a contract award to a vendor whose proposal contains undisclosed false and misleading information is unfair, gives unethical vendors an advantage, denies all truthful, ethical vendors a fair and equal opportunity to compete, and is unlawful, arbitrary, capricious and an abuse of discretion.

116.    Here, Defendants' procurement process denied Corizon (and Wellpath, Wexford, and InGenesis) a fair and equal opportunity to compete, gave Centurion an advantage, and was unfair, unjust and unlawful because Defendants awarded the contract to a vendor whose was not the "best" as required by § 34.042 because the vendor's proposal, despite promising truthful contents, contained the opposite.

117.    Corizon (and the other vendors) were entitled to a fair and lawful procurement process and a fair opportunity to compete as a matter of Missouri law and ethics, but did not receive one and Corizon thus was directly and adversely affected by the unfair, unjust and unlawful process.

32

118.    Corizon suffered a pecuniary loss due to the unfair and unlawful process because it spent money in reliance on a fair and just process that did not occur and was deprived of its right to a fair opportunity to compete for a re-award of the contract.

WHEREFORE, Corizon respectfully requests this Court to enter an order declaring that Defendants awarded the contract unlawfully; declaring that as a result of Defendants' unlawful award, the contract is void; temporarily, preliminarily and permanently enjoining Defendants from entering into any contract resulting from the RFP; requiring Defendants to rebid the contract; extending Corizon's contract until the rebid is completed; declaring Centurion to have violated Missouri law during the procurement process and ineligible to compete for the contract on rebid; and providing any other relief the Court deems just.

## COUNT II

**Defendants unfairly, unreasonably, arbitrarily, and capriciously applied the evaluation and scoring criteria in the RFP to Corizon's proposal due to bias against Corizon arising from strained relationships between Corizon and the DOC, refusing to award points due to Corizon under the RFP criteria.**

119.    Corizon incorporates the preceding paragraphs of this petition as if set forth fully herein.

120.    In conducting the procurement process, Defendants must follow a fair process that is fair and free from bias and discrimination and gives all vendors a fair and equal opportunity to compete.

121.    The RFP required Defendants' evaluators to score all proposals element-by-element in accordance with the rating definitions and associated scoring in the tables in RFP Attachment 139.

122.    Corizon has provided health care services in partnership with the Missouri DOC since 1992.

33

123.     Corizon is the current provider of statewide medical and mental health services to the Missouri DOC.

124.     During the current contract period, two dramatic, material and unexpected changes occurred that fell well outside the bidding assumptions the DOC asked Corizon to consider when preparing its proposal for the current contract and resulted in Corizon incurring significant and ongoing increased performance costs.

125.     Missouri's offender population experienced an unprecedented, never experienced before, historic drop which has resulted in a significantly older offender population with increased health care needs.

126.     In 2017, the average daily offender population ("ADP") in the Missouri DOC was 32,429, and as of August 1, 2019, it was 27,522, a 15% decrease in two years.  During this time, 81% of the decrease in offender population was among the under 25 years age group, which is the healthiest population demographic. In contrast, the over 55 years age group, which has much higher incidences of chronic illness and disease, increased by 39% as a total percentage of ADP.

127.     These changes necessitated Corizon requesting an upward rate adjustment to maintain the viability of the contract.

128.     Defendants agreed with and approved the amendment to the contract over the objection of the DOC's leadership which engaged in lobbying efforts with members of the Missouri General Assembly to prevent this contract amendment. As of June 14, 2021, the current inmate population in Missouri was 22,777 and the DOC has since recognized that the drop in offender population was a permanent situation by asking for pricing in the RFP based on populations above and below 23,000.

129.     The other unexpected change was the COVID-19 global pandemic that ravaged Missouri and the rest of the world.

130.     The pandemic necessitated a complete departure from pre-current contract 2014 prevailing practice for the provision of correctional healthcare services and required the immediate and timely imposition of substantial new pandemic response measures.

131.     Corizon's compliance with the changed prevailing practice has resulted in it incurring significant and ongoing costs for COVID-19 related labor, hazard pay, off-site health care, COVID-19 testing and Personal Protective Equipment.

132.     From March 1, 2020 through April 30, 2021 alone, Corizon incurred $8,148,015 in increased service costs. Since then, Corizon has continued to incur additional costs.

133.     This change necessitated Corizon requesting an upward rate adjustment to maintain the viability of the contract.

134.     Defendants have not yet made a determination on Corizon's requested amendment.

135.     The DOC's leadership, however, has already objected, engaging in lobbying efforts with members of the Missouri General Assembly to block funding for this contract amendment.

136.     Because of Corizon's reasonable requests for amendment of the current contract to include the unforeseeable increased service costs that the DOC did not and does not want to pay, its relationship with the current DOC leadership became strained.

137.     The DOC did not want Defendants to award the contract to Corizon.

138.     Corizon's proposal demonstrated significant and robust correctional healthcare services experience, corporate and Missouri leadership team qualifications, and a demonstrated

35

plan of performance and implementation. *See* examples in Exhibit 6, at pp. 18-27, and Exhibit 2, which are incorporated herein by reference.

139.    Defendants have full knowledge of Corizon's experience and qualifications to perform the contract from its proposal and the fact that two of their evaluators are management-level employees of the DOC. *See* examples in Exhibit 6, at pp. 18-27, and Exhibit 2, which are incorporated herein by reference.

140.    Yet, inexplicably, Defendants' evaluators awarded Corizon's Technical Proposal just 26 out of 110 possible points, a mere 10 points more than vendor InGenesis that lacks Corizon's correctional healthcare experience, qualifications, and performance history.

141.    Defendants' scoring of Corizon's proposal was unfair and unlawful because Defendants did not follow the scoring criteria in the RFP. *See* Exhibit 6.

142.    Had Defendants' followed the scoring criteria in the RFP, Corizon would have been the winning bidder or at least had an even and fair opportunity to be the winning bidder.

143.    Defendants' failure to follow the scoring criteria in the RFP when scoring Corizon's proposal was biased and discriminatory resulting from the strained relationship with the DOC.

144.    Defendants' scoring of Corizon's proposal is an unfair and unlawful product of the DOC's bias and discrimination against Corizon rather than a fair application of the scoring criteria to Corizon's proposal.

145.    Corizon was directly and adversely affected by Defendants' use of unfair and unlawful procurement process.

Electronically Filed - Cole Circuit - August 29, 2021 - 12:59 PM

146.     Corizon suffered a pecuniary loss due to the unfair and unlawful process because it spent money in reliance on a fair and just process that did not occur and was deprived of its right to a fair opportunity to compete for a re-award of the contract.

WHEREFORE, Corizon respectfully requests this Court to enter an order declaring that Defendants failed to follow state law in awarding the contract; declaring that as a result of Defendants' unlawful award, the contract is void; temporarily, preliminarily and permanently enjoining Defendants from entering into any contract resulting from the RFP; requiring Defendants to rebid the contract; extending Corizon's contract until the rebid is completed; declaring Centurion to have violated Missouri law during the procurement process and ineligible to compete for the contract on rebid; and providing any other relief the Court deems just.

## COUNT III

**Defendant unfairly and unlawfully awarded the contract to Centurion because its proposal was nonresponsive and had to be rejected, and Centurion engaged in misconduct during the bidding process that required it to be disqualified.**

147.     Corizon incorporates the preceding paragraphs of this petition as if set forth fully herein.

148.     In conducting the procurement process, Defendants must follow § 34.042.3 and 1 CSR 40-1.050, and ensure that it does not create an unfair competitive advantage for any bidder.

149.     1 CSR 40-1.050 (21) provides:

(21)     Awards are to be made to the bidder/offeror whose bid/proposal complies with—
(A)     All mandatory specifications and requirements of the bid/proposal;
(B)     Is the lowest and best bid/proposal in accordance with the evaluation methodology outlined in the bid/proposal; and
(C)     Complies with Chapter 34, RSMo, other applicable Missouri statutes, and all applicable Executive Orders.

150.    Paragraph 6.6.1 of the RFP provides that "The contract shall be awarded to the lowest and best proposal."

151.    Similarly, paragraph 8.d. of the RFP Terms and Conditions states:

d. Awards shall be made to the vendor whose proposal (1) complies with all mandatory specifications and requirements of the RFP…

152.    Paragraph 6.2.3 of the RFP provides:

Vendors are cautioned that the State of Missouri shall not award a non-compliant proposal. Consequently, any vendor indicating non-compliance or providing a response in conflict with mandatory requirements, terms, conditions or provisions of the RFP shall be eliminated from further consideration for award ...

153.    1 CSR 40-1.050 (19) states:

(18) Minor technicalities or irregularities in bid/proposals can be waived by the division if the waiver does not create a competitive advantage for any bidder/offeror. Such waiver is appropriate for a condition that does not conform with a mandatory requirement of the solicitation document, and therefore could otherwise be considered non-responsive, but is so minor in nature, or cannot otherwise be met by all bidders/offerors, that to determine non-responsiveness could be considered unreasonable and would not be to the state's advantage.

154.    1 CSR 40-1.050 (21) (A) and paragraphs 6.6.1, 8.d., and 6.2.3 of the RFP prohibited Defendants from awarding a contract to any vendor whose proposal did not meet the mandatory requirements of the RFP.

155.    1 CSR 40-1.050 (19) supplies the simple reason for this rule: doing so would create an unfair competitive advantage to the detriment of other bidders.

156.    Paragraph 6.9 of the RFP required proposals to include "detailed information on the experience and qualifications of the vendor's proposed teams" and to include a "Corporate Team."

157.    Paragraph 6.9.a allowed bidders to submit up to five corporate leadership team biographies for "consideration in the evaluation" of their technical proposals, and stated that "By

38

including their biographies, the vendor **is committing** the Corporate Team members to support the project, should it be awarded." (Emphasis added.).

158.    The term "commit" was not defined in the RFP so its dictionary definition governs under the rule in Missouri that undefined terms are given the plain and ordinary meaning ascribed them in the dictionary.

159.    Merriam Webster's online dictionary defines "commit" as:

> **:** OBLIGATE, BIND
> *//* a contract *committing* the company to complete the project on time

*See* https://www.merriam-webster.com/dictionary/commit.

160.    The dictionary further defines "obligate" as:

> **:** to bind legally or morally **:** CONSTRAIN
> *//* You are *obligated* to repay the loan.

*See* https://www.merriam-webster.com/dictionary/obligate.

161.    Similarly, "bind" is defined as:

> **:** to constrain with legal authority
> *//* The court's decision *binds* them to pay the fine.

*See* https://www.merriam-webster.com/dictionary/bind.

162.    The scoring criteria in the RFP require the evaluators to rely on the vendor's commitment to perform the contract with corporate team members for whom biographies are provided, with Team Qualifications being one of three categories in the Technical Proposal that are subjectively evaluated and scored.

163.    The composition of a vendor's corporate team also impacts the subjective evaluation and scoring of the other two categories of the Technical Proposal because there is a direct correlation between the qualifications, reputation, stability and experience of a vendors'

corporate team and its ability to implement its Proposed Methodology, Approach, and Work Plan, and it Past Performance.

164.     Paragraph 2.10.19 of the RFP acknowledges that contract awards are based in part on specific members of a vendor's corporate team, providing that:

> The contractor agrees and understands that the State of Missouri's agreement to the contract is predicated in part on the utilization of the specific key individual(s) and/or personnel qualifications identified in the proposal.

165.     Based on these paragraphs in the RFP, a vendor's commitment to provide a corporate leadership team member for whom a biography is submitted is a mandatory term of the RFP.

166.     Therefore, a vendor whose proposal includes a biography for and falsely identifies a corporate leadership team member no longer employed by it who cannot support the project fails to meet a mandatory term of the RFP and must be rejected as nonresponsive.

167.     As discussed in Count I above, Centurion's proposal provided a biography for and identified corporate team member Wells as its Vice President that would be in charge of performance of the Missouri DOC contract.

168.     Despite firing Wells for procurement violations, Centurion did not update its proposal to remove Wells, even though ethics and Missouri law required it to do so and even thought more than a month after firing Wells Centurion submitted a BAFO response in which Centurion deemed it necessary to update Defendants that it had experienced a change in corporate pharmacy personnel.

169.     Centurion's failure to disclose this information while correcting other similar false and material information in its proposal was clearly intentional and calculated to avoid adverse

40

consequences flowing from the application of the evaluation and scoring criteria in the RFP to accurate information that was negative.

170.   Awarding a contract to a deceitful vendor who consciously choose not to disclose negative facts that render its proposal false and misleading puts the entire procurement process at risk.

171.   The terms of the RFP required Defendants to reject Centurion's proposal as nonresponsive because Centurion could no longer provide Wells to perform the contract and did not remove this false information from its proposal. Alternatively, Defendants were required to disqualify Centurion's proposal because it contained false and misleading information.

172.   Defendants' procurement process was thus unlawful and unfairly, arbitrarily and capriciously gave Centurion an advantage over Corizon and other vendors who provided responsive proposals and were capable of honoring commitments in their proposals, denying honest vendors like Corizon a fair chance to compete.

173.   Further, even if paragraph 6.9.1.a. of the RFP could be deemed not to be mandatory, Centurion's fraud in the procurement process warranted termination of the contract for cause or the convenience of the State of Missouri under paragraph 16.a. of the terms and conditions section of the RFP or paragraph 5.4.1 of the RFP.

174.   Corizon was directly and adversely affected by Defendants' use of unfair and unlawful procurement process.

175.   Corizon suffered a pecuniary loss due to the unfair and unlawful process because it spent money in reliance on a fair and just process that did not occur and was deprived of its right to a fair opportunity to compete for a re-award of the contract.

WHEREFORE, Corizon respectfully requests this Court to enter an order declaring that Defendants failed to follow state law in awarding the contract; declaring that as a result of Defendants' unlawful award, the contract is void or terminated for the convenience of the State of Missouri temporarily, preliminarily and permanently enjoining Defendants from entering into any contract resulting from the RFP; requiring Defendants to rebid the contract; extending Corizon's contract until the rebid is completed; declaring Centurion to have violated Missouri law during the procurement process and ineligible to compete for the contract on rebid; and providing any other relief the Court deems just.

## COUNT IV

**Defendants unfairly used cost criteria that are unlawful as applied and will result in the unnecessary expenditure of millions of state tax dollars because the vendor's proposal that Defendants deemed the lowest and best exceeds the cost of the lowest vendors' proposal by over $300 million.**

176. Corizon incorporates the preceding paragraphs of this petition as if set forth fully herein.

177. Section 34.042.3 and the RFP required the contract to be awarded to the lowest and best offeror.

178. Defendants used a formula set forth in Paragraph 6.7 of the RFP to award points for contract "Cost." This cost formula compares the vendor offering the low cost bid to other vendors.

179. Application of this formula here resulted in the vendor with the lowest cost bid receiving all 80 possible cost points and Centurion, the vendor with the second highest cost bid—with a total price over the life of the contract that is $329.4 million higher than that of the lowest cost bid—receiving 66.68 points, a mere 13.32 points less than the vendor with the lowest cost bid.

42

180.    Application of this formula here also resulted in the award of the contract to a bidder with the second highest cost bid.

181.    Centurion's proposal exceeded the legislature's appropriation for FY 2022 by more than $21.6 million for the first year of the contract and more than $329.4 million for the entire contract.

182.    Based on these facts, it is impossible to conclude that application of the formula in the RFP resulted in a contract award to the lowest and best bidder as required by § 34.042.3 and the RFP.

183.    Application of this formula rendered the procurement process unfair because it gave Centurion an advantage over Corizon and certain other vendors who submitted lower cost bids but were not awarded meaningful cost points for doing so and thereby were denied an unfair opportunity to compete.

184.    Application of this formula also is unfair to the general public because it results in an unnecessary expenditure of over $300 million tax dollars.

185.    Corizon was directly and adversely affected by Defendants' use of unfair and unlawful procurement process.

186.    Corizon suffered a pecuniary loss due to the unfair and unlawful process because it spent money in reliance on a fair and just process that did not occur and was deprived of its right to a fair opportunity to compete for a re-award of the contract.

WHEREFORE, Corizon respectfully requests this Court to enter an order declaring that Defendants failed to follow state law in awarding the contract; declaring that as a result of Defendants' unlawful award, the contract is void; temporarily, preliminarily and permanently enjoining Defendants from entering into any contract resulting from the RFP; requiring

Defendants to rebid the contract; extending Corizon's contract until the rebid is completed;

declaring Centurion to have violated Missouri law during the procurement process and ineligible

to compete for the contract on rebid; and providing any other relief the Court deems just.

Dated: August 29, 2021

LATHROP GPM LLP

By:    /s/ *Jennifer S. Griffin*
      Jennifer S. Griffin (44406)
      jennifer.griffin@lathropgpm.com
      314 E. High Street
      Jefferson City, Missouri 65101
      Phone:  (573) 893-4336
      Fax:  (573) 893-5398

      ATTORNEYS FOR PLAINTIFF
      CORIZON, LLC

Electronically Filed - Cole Circuit - August 29, 2021 - 12:59 PM

**CERTIFICATE OF SERVICE**

I hereby certify that on August 29, 2021, a true and correct copy of the foregoing was sent via electronic mail to the following:

Craig Jacobs
Assistant Attorney General
207 West High Street
Jefferson City, MO 65101
Craig.jacobs@ago.mo.gov

Mark Long
Office of Administration
Capitol Building, Room 125
Jefferson City, MO 65101
Mark.Long@oa.mo.gov

Sarah H. Steelman, Commissioner
Office of Administration
Capitol Building, Room 125
Jefferson City, MO 65101
Sarah.Steelman@oa.mo.gov

Karen S. Boeger, Director
Division of Purchasing and Materials Management
Office of Administration
301 West High Street, Room 630
Jefferson City, MO 65101
Karen.boeger@oa.mo.gov

/s/ *Jennifer S. Griffin*
Attorney for Plaintiff

47467436v.1

Electronically Filed - Cole Circuit - August 29, 2021 - 12:59 PM

## VERIFICATION

STATE OF ___TENNESSEE___    )
                            )  ss.
COUNTY OF ___DAVIDSON___    )


The undersigned hereby acknowledges and affirms that he is authorized to execute this

Verification on Corizon, LLC's behalf, that he has read the foregoing Petition; and that the facts

asserted in the same are true and correct to the best of his knowledge.



Name: Scott King
Title:   Chief Legal Officer of Corizon, LLC

Subscribed and sworn to before me this 27th day of _August_, 2021.



Notary Public

My commission expires:

01/03/2023

46